# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: INSULIN PRICING LITIGATION | Case No. 2:23-md-03080 (BRM)(RLS)<br>MDL No. 3080 |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | |
| | JUDGE BRIAN R. MARTINOTTI<br>JUDGE RUKHSANAH L. SINGH |
| Plaintiff, | |
| v. | DIRECT-FILED COMPLAINT PURSUANT TO CASE MANAGEMENT ORDER NO. 9 |
| ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; CVS HEALTH CORPORATION; CVS PHARMACY, INC.; CAREMARKPCS HEALTH, LLC; CAREMARK, LLC; CAREMARK RX, LLC; ZINC HEALTH SERVICES, LLC; EVERNORTH HEALTH, INC. (F/K/A EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL PHARMACY SERVICES, INC.; EXPRESS SCRIPTS PHARMACY, INC.; ASCENT HEALTH SERVICES LLC; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMRX INC.; OPTUMRX HOLDINGS, LLC; OPTUMINSIGHT, INC.; EMISAR PHARMA SERVICES LLC, | Civil Action No. 2:25-cv-13210 |
| Defendants. | |

## Complaint and Demand for Jury Trial

## TABLE OF CONTENTS

DESIGNATED FORUM………………………………………………………………… 1

INTRODUCTION………………………………………………………………………... 1

    A.   Plaintiff…………………………………………………………………...11

    B.   Manufacturer Defendants………………………………………………...13

    C.   PBM Defendants………………………………………………………… 17

JURISDICTION AND VENUE………………………………………………… 40

ADDITIONAL FACTUAL ALLEGATIONS………………………………………42

A.   Diabetes and Insulin Therapy……………………………………………………… 42

    1.   The Diabetes Epidemic…………………………………………………42

    2.   Insulin: A Century-Old Drug…………………………………………… 43

    3.   The Current Insulin Landscape………………………………………… 46

    4.   The Insulin Market is Enormous………………………………………51

    5.   Insulin Adjuncts: Type 2 Medications………………………………... 51

    B.   The Dramatic Rise in the Price of Diabetes Medication in the U.S……………… 56

    C.   Pharmaceutical Payment and Supply Chain…………………………………… 73

    D.   The PBM's Role in the Pharmaceutical Payment Chain……………………………75

    1.   The Rise of the PBMs in the Pharmaceutical Supply Chain………………… 78

    2.   The Insular Nature of the Pharmaceutical Industry……………………………... 79

    E.   The Insulin Pricing Scheme…………………………………………… 83

    F.   The Manufacturers React to Threats of Formulary Exclusion by Increasing Rebates

Offered to the PBMs…………………………………………………… 88

    G.   Defendants Play Down the Insulin Pricing Scheme and Its Harms…………………… 94

i

H.  All Defendants Profit from the Insulin Pricing Scheme.................................... 101

   1.  The PBMs Pocket a Substantial Share of Manufacturer Payments...................... 102

   2.  The Insulin Pricing Scheme Allows the PBMs to Profit Off Pharmacies.............. 113

   3.  The Insulin Pricing Scheme Increases PBM Mail-Order Profit......................... 118

I.  Plaintiff Purchased the At-Issue Drugs Directly from Defendants.......................... 119

J.  Defendants Deceived Plaintiff................................................................ 120

   1.  The Manufacturer Defendants Deceived Plaintiff....................................... 121

   2.  The PBM Defendants Deceived Plaintiff................................................ 124

K.  The Insulin Pricing Scheme Has Damaged Plaintiff........................................ 135

L.  Defendants' Recent Efforts in Response to Rising Insulin Prices.......................... 137

TOLLING OF STATUTES OF LIMITATIONS......................................................... 139

A.  Discovery Rule Tolling.................................................................... 139

B.  Fraudulent Concealment................................................................... 140

C.  Equitable Estoppel........................................................................ 144

D.  Continuing Violations..................................................................... 145

CLAIMS FOR RELIEF............................................................................. 145

First Cause of Action (Count I)................................................................ 145

A.  Defendants Are Culpable "Persons" Under RICO........................................... 145

B.  The Manufacturer-PBM RICO Enterprise.................................................... 146

C.  The Enterprises Misrepresent and Fail to Disclose Material Facts in Furtherance of the
Insulin Pricing Scheme........................................................................ 149

D.  Defendants' Use of the U.S. Mails and Interstate Wire Facilities........................ 151

E.  Conduct of the Manufacturer-PBM Enterprises' Affairs.................................... 154

F.    Defendants' Pattern of Racketeering Activity……………………………………..155

G.    The RICO Defendants' Motive…………………………………………………156

H.    The Manufacturer-PBM Enterprises' Insulin Pricing Scheme Injured Plaintiff………..156

Second Cause of Action (Count II)………………………………………………………158

Third Cause of Action (Count III)………………………………………………………160

Fourth Cause of Action (Count IV)………………………………………………………164

Fifth Cause of Action (Count V)…………………………………………………………168

Sixth Cause of Action (Count VI)………………………………………………………..170

PRAYER FOR RELIEF…………………………………………………………………...173

JURY DEMAND…………………………………………………………………………174

Plaintiff The Trustees of The University of Pennsylvania, on behalf of the University of Pennsylvania and its operating division, the University of Pennsylvania Health System ("UPHS"), by and through undersigned counsel, brings this lawsuit against the above-named Defendants and alleges as follows:

## DESIGNATED FORUM

1.      Pursuant to Amended Case Management Order No. 9 in the above-captioned action, Plaintiff  hereby states that the Designated Forum for this action is the Eastern District of Pennsylvania under 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in that District.

## INTRODUCTION

2.      The cost of diabetes medications has risen more than tenfold over the past twenty years.

3.      Over the same period of time, the average cost of consumer goods and services has risen just 1.75-fold. The skyrocketing prices of diabetes medications are not tethered to the rising cost of goods, production costs, investment in research and development, or competitive market forces. Instead, Defendants engineered these price increases via an opaque, conspiratorial kickback scheme (referred to herein as the "Insulin Pricing Scheme"), which has exponentially increased their profits at the expense of payors, like Plaintiff and its plan members. The Insulin Pricing Scheme is a multibillion-dollar industry.

4.      Diabetes is widespread. The total estimated cost of diabetes in the U.S. in 2022,

1

according to the American Diabetes Association, was $412.9 billion.[1] One in four healthcare dollars are spent caring for people with diabetes.[2]

5.     Approximately 1.18 million Pennsylvania residents, comprising 10% of the population, have diabetes. A 2018 survey found that 14% of Philadelphia adults are living with diabetes.[3]

6.     In Pennsylvania, diabetes costs over $9.3 billion per year in direct medical expenses. Defendants Eli Lilly, Novo Nordisk, and Sanofi (collectively, the "Manufacturer Defendants" or the "Manufacturers") manufacture nearly all insulins and other diabetes medications available in the United States. In 2020, as in years past, the three Manufacturer Defendants controlled over 92% (by volume) and 96% (by revenue) of the global market for diabetes drugs.

7.     Defendants CVS Caremark, Express Scripts, and OptumRx (collectively, the "PBM Defendants") are pharmacy benefit managers ("PBMs") that work with the Manufacturer Defendants to dictate the availability and price of the at-issue drugs for most of the U.S. market.[4] Remarkably, the PBM Defendants are: (1) the three largest PBMs in the United States (controlling more than 80% of the PBM market); (2) the largest pharmacies in the United States (comprising

---

[1] American Diabetes Association, *News Release – New American Diabetes Association Report Finds Annual Costs of Diabetes to be $412.9 Billion* (Nov. 6, 2023), https://diabetes.org/sites/default/files/2023-11/6AM_2023%20Economic%20Report%20News%20Release%20%285%29.pdf  (last visited May 19, 2025).

[2] *Id.*

[3] Philadelphia Department of Public Health, *Diabetes Prevalence and Impact on Philadelphia* (July 2, 2019), https://www.phila.gov/media/20190702120959/chart-v4e5-edit2.pdf (last visited June 8, 2025).

[4] In the context of this Complaint, the "at-issue drugs" or "at-issue medications" are: Apidra, Basaglar, Humalog, Humulin N, Humulin R, Humulin R 500, Lantus, Levemir, Novolin N, Novolin R, Novolin 70/30, Novolog, Ozempic, Soliqua, Toujeo, Tresiba, Trulicity, and Victoza.

three of the top five dispensing pharmacies in the U.S.); and, (3) housed within the same corporate families as three of the largest insurance companies in the United States— Aetna (CVS Health), Cigna (Express Scripts), and UnitedHealthcare (OptumRx).

8.      In the 2025 Fortune 500 List, Defendants' respective corporate conglomerates sit at 3rd (UnitedHealth Group), 5th (CVS Health), and 13th (Cigna) on the Fortune 500 List.

**Figure 1: PBMs, PBM-Affiliated Insurers, PBM-Affiliated Pharmacy**

| PBMs | PBM-Affiliated Insurer | PBM-Affiliated Pharmacy |
|---|---|---|
| CVS Caremark | Aetna | CVS Pharmacy |
| Express Scripts | Cigna | Express Scripts Pharmacy Inc. |
| Optum | UnitedHealthcare | OptumRX |

9.      In transactions where the PBM Defendants control the insurer, the PBM, and the pharmacy, these middlemen can capture up to half of the money spent on each insulin prescription (compared to 25% in 2014), despite contributing nothing to the development, manufacture, production, or innovation of the drugs.

10.     As part of their work, the PBM Defendants establish national formulary offerings (i.e., approved drug lists), which, among other things, set the baseline for which diabetes medications are covered and which are not covered by nearly every payor in the United States, thereby controlling which medications Plaintiff can cover for its employees.

11.     The Manufacturers and PBMs understand that the PBMs' national formularies drive drug utilization. The more accessible a drug is on the PBMs' national formularies, the more that drug will be purchased throughout the United States. Conversely, exclusion of a drug from one or more of the PBMs' formularies can render the drug virtually inaccessible for millions of covered persons.

12.     Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that the PBM Defendants wield enormous control over drug prices and purchasing behavior.

13.     The unfair and deceptive conspiracy at the root of this Complaint—the Insulin Pricing Scheme—was born from this mutual understanding.

14.     The Manufacturers set the initial list price (i.e., wholesale price) for their respective insulin medications. Over the last twenty years, these prices have sharply increased in lockstep, even though the cost to produce these drugs has decreased during that same period.

15.     Insulins, which today cost Manufacturers as little as $2 to produce, and which were originally priced at $20 in the 1990s, now range from $300 to $700.

16.     The Manufacturer Defendants have, in tandem, raised the prices of their insulin products by as much as 1,000%, often implementing identical increases down to the decimal point within a few days of one another. According to a U.S. Senate Finance Committee investigation, Manufacturer Defendants were "sometimes mirroring" one another in "days or even hours."[5]

17.     From 2013 to 2018, prices for insulin products have increased at rates far exceeding inflation, as illustrated in the chart below from the Kaiser Family Foundation.

---

[5] Charles E. Grassley & Ron Wyden, *Staff Report on Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug, Sen. Fin. Comm.*, at 4 (Jan. 2021), https://www.finance.senate.gov/imo/media/doc/Insulin%20Committee%20Print.pdf (hereinafter "Senate Insulin Report").

**Figure 2: Average annual price increase of insulins vs inflation, 2013–2018**



18.     Today's exorbitant prices do not accord with insulin's origins. The discoverers sold the original patent for $1 to ensure that the medication would remain affordable. But today, insulin is the poster child for skyrocketing pharmaceutical prices.

19.     Nothing about these medications has changed over the past 100 years; today's $350 insulin is the same product Defendants once sold for $20.

<strong>How the Insulin Pricing Scheme Works</strong>

20.     In the simplest terms, there are four important classes of participants in the insulin medication chain:

    a.     **Health Insurance Plans**. Health insurance plans, often funded by employers (here, UPHS and the University of Pennsylvania), provide cost coverage and reimbursements for medical treatment and care of individuals. These plans often include pharmacy benefits, meaning that the health plan pays a substantial share of the purchase price of its beneficiaries' prescription drugs, which includes the at-issue diabetes medications. Operators of these plans may be referred to as payors, plan sponsors, or clients. The three main types of payors are government/public payors,

commercial payors, and private payors.

b. **PBMs.** Payors routinely engage PBMs to manage their prescription benefits, which includes negotiating prices with drug manufacturers and (ostensibly) helping payors manage drug spending. Each PBM maintains a formulary—a list of covered medications. A PBM's power to include or exclude a drug from its formulary theoretically should incentivize manufacturers to lower their list price. PBMs also contract with pharmacies to reimburse them for medications purchased by the plan's beneficiaries. PBMs are compensated by retaining a portion of what should—again in theory—be shared savings on the cost of medications.

c. **Rebate Aggregators.** Rebate aggregators are group purchasing organizations ("GPOs") that negotiate and collect rebates and other fees for PBM clients. Each of the three PBM Defendants here established its own rebate aggregator GPO (Defendants Zinc, Ascent, and Emisar) between 2018 and 2022 to outsource the negotiation and collection of rebates and other fees to a subsidiary, and to impose new fees on the Manufacturers, purportedly for the aggregator's services. The PBM Defendants' rebate aggregators allow the PBMs to further obfuscate the rebate payment trail and extract additional profits from their contracts with payors.

d. **Manufacturers.** Manufacturers produce the at-issue insulin medications.[6] Each of them set a list price for each of their products. The term "list price" is often used interchangeably with the Wholesale Acquisition Cost ("WAC") (defined by federal law as the undiscounted list

---

[6] There are three types of insulin medications. First are *biologics*, which are manufactured insulins derived from living organisms. Second are *biosimilars*, which are "highly similar" copies of biologics. They are similar in concept to "generic" drugs; but in seeking approval they use biologics (rather than drugs) as comparators. Third, the confusingly-named *authorized generics* are not true generics—they are an approved brand-name drug marketed without the brand name on the label. FDA approved the original insulins as drug products rather than biologics, so although there was a regulatory pathway to introduce biosimilars generally (copies of biologics), companies could not introduce insulin biosimilars because their comparators were "drugs" rather than "biologics."

price for a drug or biological to wholesalers or direct purchasers). The manufacturers self-report list prices to publishing compendiums such as First DataBank, Medi-Span, or Redbook, who then publish those prices.[7]

21.    Normally, drug manufacturers compete for inclusion on the standard national formularies by lowering prices. Given the PBMs' purchasing power and their control over formularies that govern the availability of drugs, their involvement should theoretically drive down list prices. Instead, to gain access to the PBMs' formularies, the Manufacturers artificially inflate their list prices and then pay a significant, but undisclosed, portion of the inflated price back to the PBMs (the "Manufacturer Payments").[8] The Manufacturer Payments bear a variety of dubious labels—rebates, discounts, credits, inflation/price protection fees, administrative fees, etc. By whatever name, the inflated list prices and resulting Manufacturer Payments are a quid pro quo for inclusion and favorable placement on the PBMs' formularies.[9]

22.    Further, Defendants mislabeled rebates as "fees," "discounts," and "credits" to avoid paying them to payors.

23.    Contracts between PBM Defendants and payors, like Plaintiff, tie the definition of

---

[7] The related term Average Wholesale Price ("AWP") is the published price for a drug sold by wholesalers to retailers.

[8] In this Complaint, "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on a PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, and any other form of consideration exchanged.

[9] Favorable or preferred placement may, for example, involve placing a branded product in a lower cost-sharing tier or relaxing utilization controls (such as prior authorization requirements or quantity limits). Favorable placement of a relatively more expensive drug encourages use of that drug and leads to higher out-of-pocket costs for payors and copayors.

"rebates" to patient drug utilization. But the contracts between PBMs and Manufacturers define "rebates" and other Manufacturer Payments differently—e.g., calling rebates for formulary placement "administrative fees." Defendants thus profit from the "rebates" and other Manufacturer Payments, and the payments are beyond a payor's contractual audit right to verify the accuracy of "rebate" payments they receive.

24.     In recent years, the PBM Defendants have further obfuscated the rebate payment trail by forming a specific class of GPOs known as "rebate aggregators." These PBM subsidiaries—as relevant here, Defendants Zinc (CVS), Ascent (Express Scripts), and Emisar (OptumRx)—negotiate rebates and other fees on the PBMs' behalf and retain a portion of the rebates and fees collected. As a result, these fees are neither passed through to payors nor subject to audit under the terms of payors' sponsor agreements with the PBMs. Because the rebate aggregators are PBM subsidiaries, however, the PBMs secure additional profits from each drug purchase. While there may be some efficiencies associated with GPOs in some contexts, these GPOs were nothing more than an additional fee layer on insulin purchases by which the PBM Defendants could further enrich themselves.

25.     The PBMs' staggering revenues vastly exceed the fair market value of the services they provide, and specifically, the amount of Manufacturer Payments the PBMs receive in connection with the at-issue drugs vastly exceeds the fair market value of the services they provide with respect to those drugs.

26.     The Manufacturers' list prices are not the result of free-market competition for payors' business. Those list prices do not reflect the Manufacturers' actual costs to produce the at-

issue drugs or the fair market value of the drugs.[10]

27.    The PBMs grant formulary status based upon the highest inflated price—a price that the PBMs know is false or artificially inflated—and based upon which diabetes medications will generate the largest profits for themselves.

28.    The Insulin Pricing Scheme creates a "best of both worlds" scenario for Defendants. The Manufacturer Defendants buy formulary access and increase their revenues while the PBM Defendants receive significant secret Manufacturer Payments.

29.    The PBM Defendants profit off the Insulin Pricing Scheme in numerous ways, including by: (1) retaining a significant but undisclosed share of the Manufacturer Payments, either directly or through rebate aggregators like Defendants Zinc, Ascent and Emisar; (2) using the price produced by the Insulin Pricing Scheme to generate unwarranted profits from pharmacies; and, (3) relying on those same artificial list prices to drive up the PBMs' margins and pharmacy related fees, including those relating to their mail-order pharmacies. In addition, because the PBM Defendants claim that they can extract higher rebates due to their market power, ever-rising list prices increase demand for the PBM's purported negotiation services.

30.    As detailed below, although the PBM Defendants represent both publicly and directly to their clients, like Plaintiff, that they use their market power to drive down prices for diabetes medications, these representations are false and deceptive. Instead, the PBMs intentionally incentivize the Manufacturers to inflate list prices, and the PBMs' "negotiations" intentionally drive up the price of the at-issue drugs. The "negotiations" are directly responsible

---

[10] "Net price" refers to the price the manufacturer ultimately realizes, i.e., the list price less rebates, discounts, etc. (net sales divided by volume). At times, Defendants' representatives use "net price" to refer to the amount payors or plan members pay for medications. In this Complaint, "net price" refers to the former—the amount that the Defendant Manufacturers realize for the at-issue drugs, which is roughly the List Price less Manufacturer Payments.

for the skyrocketing price of diabetes medications, which confers unearned benefits upon the PBMs and Manufacturers alike.

31.    Because the purchase price of every at-issue diabetes medication flows from the artificially inflated list price generated by Defendants' unfair and deceptive scheme, every payor in the United States that purchases these life-sustaining drugs, including Plaintiff, has been directly harmed by the Insulin Pricing Scheme.

32.    Even if temporary reductions in Plaintiff's costs for the at-issue drugs occurred from time to time, those costs remained higher than the prices that would have resulted from a transparent exchange in an open and competitive market.

33.    As a payor for, and purchaser of, the at-issue drugs, Plaintiff has been overcharged millions of dollars during the relevant time period. As a direct result of the Insulin Pricing Scheme, Defendants were able to extract exorbitant amounts of money from Plaintiff for the at-issue diabetes medications.

34.    A substantial portion of this exorbitant amount is attributable to Defendants' artificially inflated prices that do not arise from transparent or competitive market forces; rather, these inflated costs can be attributed to undisclosed dealings between the Manufacturer Defendants and the PBM Defendants, as further described herein.

35.    This action alleges that Defendants violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), and Pennsylvania common law by engaging in the Insulin Pricing Scheme. The Insulin Pricing Scheme directly and foreseeably caused and continues to cause harm to Plaintiff.

36.    This action seeks damages, including actual damages, restitution, disgorgement, treble damages, and punitive damages, as well as attorneys' fees and costs, and injunctive relief to

address and abate the harm caused by the Insulin Pricing Scheme.

37.    The relevant time period for damages alleged in this Complaint is from 2011 through the present.

## PARTIES

### A. Plaintiff

38.    The Trustees of the University of Pennsylvania is a private, 501(c)(3) not-for-profit, independent, non-sectarian research institution of higher education chartered under the laws of Pennsylvania and is the third oldest Ivy League university, established in 1740, with its principal place of business in Philadelphia, Pennsylvania. The University of Pennsylvania is comprised of an academic component and a health system component. The academic component includes the Ruth and Raymond Perelman School of Medicine, which is the nation's oldest medical school. The health system component is the University of Pennsylvania Health System, also identified generally as Penn Medicine.

39.    The University of Pennsylvania Health System consists of certain operating divisions of The Trustees of the University of Pennsylvania and controlled affiliated entities, including but not limited to the Hospital of the University of Pennsylvania; Pennsylvania Hospital of the University of Pennsylvania Health System; Presbyterian Medical Center of the University of Pennsylvania Health System d/b/a Penn Presbyterian Medical Center;  Clinical Care Associates of the University of Pennsylvania Health System and its affiliates; the faculty practice plan of the University, Clinical Practices of the University of Pennsylvania;  Lancaster General Health, including Lancaster General Hospital and their controlled affiliates; Chester County Hospital and Health System, including Chester County Hospital and their controlled affiliates;  Princeton HealthCare System Holding Inc, including Princeton HealthCare System, a New Jersey

11

Corporation, d/b/a Penn Medicine Princeton Medical Center, and their controlled affiliates; Doylestown Hospital d/b/a Penn Medicine Doylestown Health and its controlled affiliates; and Wissahickon Hospice d/b/a Penn Medicine at Home and d/b/a Penn Medicine Hospice.

40.    The Trustees of the University of Pennsylvania maintain a governance structure with respect to its healthcare and medical education components under the governance umbrella of Penn Medicine. Penn Medicine is committed to remain a world-leading institution in three equally valued and interrelated missions of patient care, education, and research. UPHS hospitals include the Hospital of the University of Pennsylvania, Penn Presbyterian Medical Center, Pennsylvania Hospital, Chester County Hospital, Lancaster General Hospital, Penn Medicine Princeton Medical Center, and Doylestown Hospital. Penn Medicine's regional market spans 27 counties and its hospitals, affiliates, home care and hospice services, and multispecialty centers primarily serve Pennsylvania and New Jersey.

41.    The University of Pennsylvania employs approximately 21,028 regular faculty and staff members across its academic schools, research centers, and administrative units. UPHS employs approximately 47,631 individuals, including clinical and non-clinical staff across its hospitals and facilities.

42.    Any increase in spending has a significant detrimental effect on Plaintiff's overall budget and, in turn, critically limits its ability to provide indispensable and high priority services to the community.

43.    The Insulin Pricing Scheme has had such an effect.

44.    Plaintiff employs thousands of employees, including those working in areas including, but not limited to, healthcare, research, administration and more. Plaintiff provides health benefits to its employees, retirees, and their dependents ("Beneficiaries"), which includes

paying for Beneficiaries' pharmaceutical drugs, such as the at-issue diabetes medications.

45.    Plaintiff self-insures the vast majority of its healthcare costs.

46.    Plaintiff contracted with CVS Caremark for services related to the drugs at issue during the relevant time period. During the relevant period CVS Caremark provided pharmacy benefit management services for Plaintiff's Beneficiaries.

47.    Plaintiff spends thousands of dollars per year on the costs of providing diabetes medications for its health-plan members. Accordingly, during the relevant time period, and to the detriment of its Beneficiaries and taxpayers, Plaintiff has paid millions of dollars more for insulin than it otherwise would have paid absent Defendants' misconduct.

48.    Plaintiff seeks to recover for the losses it has suffered due to Defendants' illegal Insulin Pricing Scheme.

**B. Manufacturer Defendants**

**Defendant Eli Lilly and Company ("Eli Lilly")**

49.    Eli Lilly is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

50.    Eli Lilly is registered to do business in the Commonwealth of Pennsylvania.

51.    In Pennsylvania and nationally, Eli Lilly manufactures, promotes, and distributes several at-issue diabetes medications: Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

52.    Eli Lilly brings in billions in global revenues from the drugs Trulicity, Humalog, Humulin, and Basaglar.

53.    Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin and $801 million from Basaglar. [11]

---

[11] Eli Lilly & Co., *Annual Report* (Form 10-K) (FYE Dec. 31, 2018).

13

54.     Eli Lilly transacts business in Pennsylvania, targeting these markets for its products, including the at-issue diabetes medications.

55.     Eli Lilly employs sales representatives throughout Pennsylvania to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

56.     Eli Lilly also directs advertising and informational materials to Pennsylvania, as well as physicians and potential users of Eli Lilly's products.

57.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli Lilly published its prices for the at-issue diabetes medications throughout Pennsylvania with the express knowledge that payment and reimbursement by Plaintiff would be based on those artificially inflated list prices.

58.     Upon information and belief, Plaintiff purchased Eli Lilly's at-issue drugs at a price based on artificially inflated list prices generated by the Insulin Pricing Scheme through its employee health plans during the relevant time period.

59.     All Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Pennsylvania based on the specific false and inflated prices Eli Lilly caused to be published in Pennsylvania in furtherance of the Insulin Pricing Scheme.

**Defendant Sanofi-Aventis U.S. LLC ("Sanofi")**

60.     Sanofi is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

61.     Sanofi is registered to do business in the Commonwealth of Pennsylvania.

62.     Sanofi manufactures, promotes, and distributes pharmaceutical drugs both in Pennsylvania and nationally, including several at-issue diabetes medications: Lantus, Toujeo, Soliqua, and Apidra.

14

63.    Sanofi touts Lantus as one of its "flagship products" and "one of Sanofi's leading products in 2021 with net sales in the billions of dollars..[12]

64.    Sanofi's U.S. net sales in 2019 were $1.29 billion from Lantus, $323.7 million from Toujeo, and $51.5 million from Apidra.[13] Sanofi does business in Pennsylvania targeting these markets for its products, including the at-issue diabetes medications.

65.    Sanofi employs sales representatives throughout Pennsylvania to promote and sell Lantus, Toujeo, Soliqua, and Apidra.

66.    Sanofi also directs advertising and informational materials to Pennsylvania physicians and potential users of Sanofi's products for the specific purpose of selling the at-issue drugs in Pennsylvania and profiting from the Insulin Pricing Scheme.

67.    At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Sanofi published its prices of its at-issue diabetes medications throughout Pennsylvania for the purpose of payment and reimbursement by payors, including Plaintiff.

68.    Upon information and belief, Plaintiff purchased Sanofi's at-issue drugs at prices based on inflated list prices generated by the Insulin Pricing Scheme through its employee health plans during the relevant time period.

69.    All of the Sanofi diabetes medications related to the at-issue transactions were paid for, and/or reimbursed in, Pennsylvania based on the specific artificially inflated prices Sanofi caused to be published in Pennsylvania in furtherance of the Insulin Pricing Scheme.

**Defendant Novo Nordisk Inc. ("Novo Nordisk")**

---

[12] Sanofi, *Annual Report* (Form 20-F) (FYE Dec. 31, 2021); Sanofi, *Annual Report* (Form 20-F) (FYE Dec. 31, 2020).

[13] Sanofi, *Annual Report* (Form 20-F) (FYE Dec. 31, 2019).

70.     Novo Nordisk is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

71.     Novo Nordisk manufactures, promotes, and distributes pharmaceutical drugs both in Pennsylvania and nationally, including at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

72.     Novo Nordisk's combined net sales of these drugs in the United States from 2018 to 2020 totaled approximately $18.1 billion ($6.11 billion for Victoza alone).[14]

73.     Novo Nordisk's global revenues for "total diabetes care" over that three-year period exceeded billions of dollars.

74.     Novo Nordisk transacts business in Pennsylvania targeting these markets for its products, including the at-issue diabetes medications.

75.     Novo Nordisk employs sales representatives throughout Pennsylvania to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

76.     Novo Nordisk also directs advertising and informational materials for physicians and potential users of Novo Nordisk's products in Pennsylvania.

77.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Novo Nordisk published the prices of its at-issue diabetes medications throughout Pennsylvania for the purpose of payment and reimbursement by Plaintiff.

78.     Upon information and belief, Plaintiff purchased Novo Nordisk's at-issue diabetes medications at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans, during the relevant time period.

79.     All Novo Nordisk diabetes medications related to the at-issue transactions were

---

[14] Novo Nordisk, *Annual Report* (Form 20-F) (Dec. 31, 2019).

paid for, and/or reimbursed in, Pennsylvania based on the specific false and inflated prices Novo Nordisk caused to be published in Pennsylvania in furtherance of the Insulin Pricing Scheme.

80.      Collectively, Defendants Eli Lilly, Novo Nordisk, and Sanofi are referred to as the "Manufacturer Defendants" or the "Manufacturers."

**C. PBM Defendants**

<u>**CVS Caremark**</u>

**Defendant CVS Health Corporation ("CVS Health")**

81.      CVS Health is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health transacts business and has locations throughout the United States and Pennsylvania.

82.      CVS Health transacts business and has locations throughout Pennsylvania and the United States.

83.      CVS Health—through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents, and Chief Communication Officers—is directly involved in creating and implementing the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs involved in the Insulin Pricing Scheme.

84.      CVS Health's conduct had a direct effect in Pennsylvania and damaged Plaintiff, as a payor and purchaser.

85.      On a regular basis, CVS Health executives and employees communicate with, and direct its subsidiaries, related to the at-issue PBM services and formulary activities.

86.      In annual reports throughout the last decade, CVS Health (or its predecessor) has repeatedly and explicitly stated that CVS Health:

- designs pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members;

- negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists, and these negotiated discounts enable CVS Health to offer reduced costs to clients; and

- utilizes an independent panel of doctors, pharmacists, and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.

87.    CVS Health publicly represents that it constructs programs that lower the cost of the at-issue diabetes medications. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, stating:

> *CVS Health* . . . introduced a new program available to help the company's pharmacy benefit management (PBM) clients improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (emphasis supplied). [15]

88.    In 2017, CVS Health stated that "CVS Health pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year, the lowest in five years. Despite manufacturer price increases of near 10 percent, CVS Health kept drug price growth at a minimal 0.2 percent."[16]

89.    In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, and mail-order and retail pharmacy chain. As a result,

---

[15] Pharmacy Times, *CVS Health Introduces New "Transform Diabetes Care" Program to Improve Health Outcomes and Lower Overall Health Care Costs* (Dec. 13, 2016), https://www.pharmacytimes.com/view/cvs-health-introduces-new-transform-diabetes-care-program-to-improve-health-outcomes-and-lower-overall-health-care-costs (last visited May 26, 2025).

[16] CVS Health, *Drug Trend Report 2017* (2018), https://s2.q4cdn.com/447711729/files/doc_downloads/company_documents/2017-drug-trend-report.pdf (last visited May 19, 2025).

CVS Health controls the health plan/insurer, the PBM, and the pharmacies utilized by approximately 40 million Aetna members in the United States, including in Pennsylvania. CVS Health controls the entire drug pricing chain for these 40 million Americans.

90.     CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Pennsylvania that dispensed and received payment for the at-issue diabetes medications throughout the relevant time period. According to CVS Health's 2022 Form 10-K filed with the U.S. Securities and Exchange Commission, the company "maintains a national network of approximately 66,000 retail pharmacies, consisting of approximately 40,000 chain pharmacies (which include CVS Pharmacy locations) and approximately 26,000 independent pharmacies, in the United States."[17]

**Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")**

91.     CVS Pharmacy is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

92.     CVS Pharmacy is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Pennsylvania and is directly involved in these pharmacies' dispensing and payment policies related to the at-issue diabetes medications.

93.     CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, LLC.

94.      CVS Pharmacy holds numerous licenses in Pennsylvania.

95.     During the relevant time period, CVS Pharmacy provided retail pharmacy services in Pennsylvania that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

**Defendant Caremark Rx, LLC**

---

[17] CVS Health Corp., *Annual Report* (Form 10-K) (FYE Dec. 31, 2022).

96.     Caremark Rx, LLC is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy benefit management and mail-order subsidiaries that engaged in the activities in Pennsylvania that gave rise to this Complaint.

97.     Caremark Rx, LLC is a wholly owned subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of CVS Health, and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

98.     During the relevant time period, Caremark Rx, LLC provided PBM and mail order pharmacy services in Pennsylvania that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

**Defendant Caremark, LLC**

99.     Defendant Caremark, LLC is a California limited liability company whose principal place of business is at the same location as CVS Health.

100.    Caremark, LLC is a subsidiary of Caremark Rx, LLC, which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health. Caremark, LLC holds numerous pharmacy licenses in Pennsylvania.

101.    During the relevant time period, Caremark, LLC provided PBM and mail order pharmacy services in Pennsylvania that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

**Defendant CaremarkPCS Health, LLC**

102.    CaremarkPCS Health, LLC is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.

103.    CaremarkPCS Health is a subsidiary of CaremarkPCS, LLC, which is a subsidiary of Caremark Rx, LLC, which is a subsidiary of Defendant CVS Pharmacy, which is a wholly

owned subsidiary of Defendant CVS Health.

104.    CaremarkPCS Health, LLC, doing business as CVS Caremark, provides pharmacy benefit management services.

105.    During the relevant time period, CaremarkPCS Health, LLC provided PBM services in Pennsylvania, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

**Defendant Zinc Health Services, LLC ("Zinc Health")**

106.    Zinc Health Services, LLC is a Delaware limited liability company with its principal place of business at the same location as CVS Health.

107.    Zinc Health is a direct subsidiary of CVS Pharmacy, which is a direct subsidiary of CVS Health.

108.    CVS Health established Zinc Health as a GPO for CVS Caremark's PBM business in March 2020. Zinc Health was created, at least in part, to negotiate rebates with drug manufacturers on behalf of CVS Caremark.

109.    Upon information and belief, during the relevant period, Zinc Health negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in Pennsylvania.

110.    Defendants CaremarkPCS Health, LLC, Caremark, LLC, and Zinc Health are agents and/or alter egos of Caremark Rx, LLC, CVS Pharmacy, and CVS Health.

111.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, LLC, CVS Pharmacy, and CVS Health are directly involved in the conduct of and control of CaremarkPCS Health, LLC; Caremark, LLC; and Zinc Health's operations, management, and business decisions related to the at-issue formulary construction; Manufacturer Payments; and mail-order and retail pharmacy services—to the ultimate detriment of Plaintiff. For example:

   a.    During the relevant time period, these parent companies and subsidiaries have had

common officers and directors.

b.    Upon information and belief, CVS Health owns CVS Pharmacy, which in turn, owns Caremark Rx, LLC, which in turn, owns Caremark, LLC. CVS Health also directly or indirectly owns all the stock of CaremarkPCS Health, LLC.

c.    Upon information and belief, the corporate elements of CVS Health do not operate as separate entities. Rather, the public filings, documents, and statements of CVS Health present its subsidiaries—including CVS Pharmacy, CaremarkPCS Health, LLC, Caremark, LLC and Caremark Rx, LLC—as divisions or departments of one unified, diversified health services company. The day-to-day operations of this corporate family reflect these public statements. [18]

d.    CVS Health's recent public filings also disclose that the company "operates a group purchasing organization that negotiates pricing for the purchase of pharmaceuticals and rebates with pharmaceutical manufacturers on behalf of its participants", without identifying Zinc Health by name. [19]

e.    Upon information and belief, executives of CaremarkPCS Health, LLC, Caremark, LLC, Caremark Rx, LLC, CVS Pharmacy, and Zinc Health ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

f.    As stated above, CVS Health's executives are directly involved in the policies and business decisions of CaremarkPCS Health, LLC and Caremark, LLC that gave rise to Plaintiff's claims in this Complaint.

---

[18] *See, e.g.*, CVS Caremark/CVS Health, *Annual Report* (Form 10-K) (Dec. 31, 2009-2019); CVS Health, *Annual Report Archive*, https://investors.cvshealth.com/investors/financial-information/annual-reports-archive/; https://www.cvshealth.com/about/public-policy.html.

[19] CVS Health Corp., *Annual Report* (Form 10-K) (FYE Dec. 31, 2020, 2021, 2022, 2023).

112.    Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC CaremarkPCS Health, LLC, and Zinc Health, including all predecessor and successor entities, are referred to as "CVS Caremark."

113.    CVS Caremark is named as a Defendant in its capacities as a PBM, a rebate aggregator and a mail-order pharmacy.

114.    In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these Manufacturers' diabetes medications on CVS Caremark's formularies.

115.    CVS Caremark has among the largest PBM market share based on total prescription claims managed. In 2021, CVS Caremark's pharmacy services segment "surpassed expectations" and had a "record selling season of nearly $9 billion in net new business wins for 2022." In all, it generated just over $153 billion in total revenues (on top of total 2019–2020 segment revenues exceeding $283 billion).[20]

116.    At all times relevant hereto, CVS Caremark offered pharmacy benefit services, nationwide and to Pennsylvania payors, and derived substantial revenue therefrom, and, in doing so, (a) made misrepresentations while concealing the Insulin Pricing Scheme and (b) utilized the false prices generated by the Insulin Pricing Scheme to unlawfully profit from payors like Plaintiff.

117.    At all times relevant hereto, CVS Caremark offered PBM services nationwide and maintained standard formularies that are used nationwide, including in Pennsylvania. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Complaint.

118.    CVS Caremark purchases drugs directly from manufacturers and for dispensing

---

[20] CVS Health, *Annual Report* (Form 10-K) (FYE Dec. 31, 2021).

through its pharmacy network.

119.    During the relevant time period, CVS Caremark provided PBM services to Plaintiff and, in doing so, set the price that Plaintiff paid for the at-issue drugs based on the artificially inflated list prices generated by the Insulin Pricing Scheme. Plaintiff paid CVS Caremark for the at-issue drugs.

120.    In its capacity as a retail pharmacy, CVS Caremark further and knowingly profited from the artificially inflated list prices produced by the Insulin Pricing Scheme by pocketing the spread between acquisition cost for the drugs at issue (an amount well below the list price generated by the Insulin Pricing Scheme) and the amounts it received from payors (which amounts were based on the artificially inflated list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

121.    During the relevant time period, CVS Caremark provided mail-order and retail pharmacy services to Plaintiff and, in doing so, Plaintiff paid CVS Caremark for the at-issue drugs at prices based on the artificially inflated list prices generated by the Insulin Pricing Scheme.

122.    At all times relevant hereto, CVS Caremark dispensed the at-issue medications, nationwide and directly to Plaintiff, through its mail-order and retail pharmacies and derived substantial revenue from these activities in Pennsylvania.

123.    At all times relevant hereto, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail-order pharmacies.

### Express Scripts

### Defendant Evernorth Health, Inc. ("Evernorth")

123.    Evernorth Health Inc. formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.[21]

124.    Evernorth, through its executives and employees—including its CEO and Vice Presidents—is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme.

125.    Evernorth's conduct had a direct effect in Pennsylvania.

126.    On a regular basis, Evernorth executives and employees communicate with and direct Evernorth's subsidiaries related to the at-issue PBM services and formulary activities.

127.    Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Pennsylvania, which engaged in the activities that gave rise to this Complaint.

128.    In December 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM, and mail-order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by approximately 15 million Cigna members in the United States, including in Pennsylvania. Evernorth controls the entire drug pricing chain for these 15 million Americans.

129.    In annual reports filed with the SEC throughout the last decade, Evernorth has repeatedly and explicitly:

---

[21] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to Evernorth Health, Inc and Express Scripts Holding Company.

- Acknowledged that it is directly involved in the company's PBM services, stating "[Evernorth is] the largest stand-alone PBM company in the United States."

- Stated that Evernorth: "provid[es] products and solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members."

130.    Even after the merger with Cigna, Evernorth "operates various group purchasing organizations that negotiate pricing for the purchase of pharmaceuticals and formulary rebates with pharmaceutical manufacturers on behalf of their participants" and operates the company's Pharmacy Rebate Program, while its subsidiary Express Scripts provides "formulary management services" that ostensibly "assist customers and physicians in choosing clinically-appropriate, cost-effective drugs and prioritize access, safety and affordability." In 2021, Evernorth reported adjusted revenues of $131.9 billion, up from $116.1 billion in 2020.[22]

**Defendant Express Scripts, Inc.**

131.    Express Scripts, Inc is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is the same location as Evernorth.

132.    Express Scripts, Inc. is registered to do business in Pennsylvania.

133.    Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Pennsylvania that engaged in the conduct that gave rise to this Complaint.

134.    During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail-order pharmacy services that gave rise to the Insulin Pricing Scheme and damaged

---

[22] Cigna Corp., *Annual Report* (Form 10-K) (FYE Dec. 31, 2021).

Plaintiff.

**Defendant Express Scripts Administrators, LLC**

135.    Express Scripts Administrator, LLC, doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

136.    During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Pennsylvania discussed in this Complaint that gave rise to the Insulin Pricing Scheme that damaged Plaintiff.

**Defendant Medco Health Solutions, Inc. ("Medco")**

137.    Medco Health Solutions, Inc. is a Delaware Corporation with its principal place of business located at the same address as Evernorth.

138.    Express Scripts acquired Medco in 2012.

139.    Before the merger, Express Scripts and Medco were two of the largest PBMs in the United States.

140.    Prior to the merger, Medco provided the at-issue PBM and mail-order services, which gave rise to the Insulin Pricing Scheme and damaged payors within Pennsylvania.

141.    Following the merger, all of Medco's PBM and mail-order pharmacy functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers, becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

142.    At the time of the merger, on December 6, 2011, in his testimony before the Senate

Judiciary Committee, David B. Snow, then-CEO of Medco, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater [Manufacturer Payments] from drug manufacturers and other suppliers."[23]

143.    The then-CEO of Express Scripts, George Paz, during a hearing of the Congressional subcommittee on Intellectual Property, Competition and the Internet in September 2011, echoed these sentiments: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."[24]

**Defendant ESI Mail Pharmacy Service, Inc.**

144.    ESI Mail Pharmacy Service, Inc. is a Delaware corporation that is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is the same location as Evernorth.

145.    During the relevant time period, ESI Mail Pharmacy Services provided the mail-order pharmacy services in Pennsylvania discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

**Defendant Express Scripts Pharmacy, Inc.**

146.    Express Scripts Pharmacy, Inc. is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is the same location as Evernorth.

147.    Express Scripts Pharmacy, Inc. is registered to do business in Pennsylvania.

---

[23] Transcript available at
https://www.sec.gov/Archives/edgar/data/1170650/000119312511331890/d265904ddefa14a.htm
(last visited May 14, 2025).

[24] Transcript available at https://www.govinfo.gov/content/pkg/CHRG-112hhrg68401/html/CHRG-112hhrg68401.htm (last visited May 14, 2025).

148.    During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail-order pharmacy services discussed in this Complaint in Pennsylvania, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

**Defendant Ascent Health Services LLC ("Ascent")**

149.    Ascent Health Services LLC is a Delaware limited liability company with its principal place of business at Mühlentalstrasse 36, 8200 Schaffhausen, Switzerland.

150.    Ascent is part of Evernorth and a subsidiary of Cigna Corporation.

151.    Express Scripts established Ascent in 2019 as a GPO for Express Scripts' PBM business. Ascent was created, at least in part, to negotiate rebates with drug manufacturers for Express Scripts and now performs this service for Express Scripts and third-party clients.

152.    During the relevant period, Ascent negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in Pennsylvania.

153.    As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. control Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Medco Health Solutions, Inc.; and Express Scripts Pharmacy, Inc's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services to the ultimate detriment of Plaintiff. For example:

    a. During the relevant time period, these parent companies and subsidiaries have had common officers and directors.

    b. Upon information and belief, Evernorth directly or indirectly owns or otherwise controls Express Scripts Administrators, LLC; Medco Health Solutions, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; and Express Scripts, Inc., and

Ascent.[25]

   c. Upon information and belief, the entities within the Evernorth corporate family do not operate as separate entities. The public filings, documents, and statements of Evernorth present its subsidiaries, including Cigna Health Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts, Inc.; and Ascent, as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience [. . .] to take health services further with integrated data and analytics that help us deliver better care to more people" and which "includes a broad range of coordinated and point solution health services and capabilities, as well as those from partners across the health care system, in pharmacy solutions, benefits management solutions, care delivery and care management solutions and intelligence solutions to deliver custom and flexible solutions that meet the needs of our clients and customers."[26] The day-to-day operations of this corporate family reflect these public statements.

   d. All of these entities comprise a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. All of the executives of Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts, Inc.; and Ascent—including the CEOs—ultimately report to the executives of Evernorth.

   e. As stated above, Evernorth's CEO, other executives, and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC; ESI

---

[25] Express Scripts Holding Co., *Annual Report* (Form 10-K, Ex. 21) (FYE Dec. 31, 2018).

[26] Cigna Corporation, *Quarterly Report* (Form 10-Q) (March 31, 2022).

Mail Pharmacy Service, Inc.; Medco Health Solutions, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts, Inc.; and Ascent that gave rise to Plaintiff's claims in this Complaint.

154.    Collectively, Defendants Evernorth Health, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Medco Health Solutions, Inc.; Express Scripts Pharmacy, Inc.; and Ascent—including all predecessor and successor entities—are referred to as "Express Scripts."

155.    Express Scripts is named as a Defendant in its capacities as a PBM, a rebate aggregator and a mail order pharmacy.

156.    In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these Manufacturers' diabetes medications on Express Script's formularies.

157.    Prior to merging with Cigna, Express Scripts was the largest independent PBM in the United States.[27] During the relevant period of this Complaint, Express Scripts controlled 30% of the PBM market in the United States.

158.    The Express Scripts network offers more than 68,000 retail pharmacies in the nation.

159.    Express Scripts transacts business throughout the United States and Pennsylvania.

160.    At all times relevant hereto, Express Scripts derived substantial revenue providing retail and mail-order pharmacy benefits in Pennsylvania.

161.    At all times relevant hereto, and contrary to their express representations, Express Scripts knowingly insisted that its payor clients use the artificially inflated list prices produced by

---

[27] *Id.*

the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

162.    At all times relevant hereto, Express Scripts concealed its critical role in generating those artificially inflated list prices.

163.    At all times relevant hereto, Express Scripts maintained standard formularies that are used nationwide, including in Pennsylvania. During the relevant time period, those formularies included drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications.

164.    In its capacity as a mail-order pharmacy, Express Scripts received payments from Pennsylvania payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the artificially inflated prices generated by the Insulin Pricing Scheme and, as a result, damaged Plaintiff.

165.    At all times relevant hereto, Express Scripts offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Pennsylvania. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Complaint.

166.    Express Scripts purchases drugs directly from manufacturers for dispensing through its mail-order pharmacy.

167.    During the years when some of the largest at-issue price increases occurred, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement.

168.    For example, in a February 2014 email released by the U.S. Senate in conjunction with its January 2021 report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" ("January 2021 Senate Insulin Report"), Eli Lilly describes a "Russian nested

32

doll situation" in which Express Scripts was negotiating rebates on behalf of OptumRx related to the at-issue drugs for Cigna (who later would become part of Express Scripts).[28]

169.    At all times relevant hereto, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' mail-order pharmacies.

## OptumRX

### Defendant UnitedHealth Group, Inc.

170.    UnitedHealth Group, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

171.    UnitedHealth Group, Inc. is a diversified managed healthcare company. In 2022, UnitedHealth Group reported revenue in excess of $324 billion, and the company is currently ranked fifth on the Fortune 500 list.[29] UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans through its wholly owned subsidiaries and prescription drugs through its PBM, OptumRx.

172.    A substantial portion of the overall revenues of UnitedHealth Group come from OptumRx.

173.    UnitedHealth Group, Inc., through its executives and employees, is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme. For example,

---

[28] *Letter from Joseph B. Kelley, Eli Lilly Vice President, Global Gov. Affairs, to Charles E. Grassley & Ron Wyden*, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf.

[29] UnitedHealth Group, Inc., *Annual Report* (Form 10-K) (FYE Dec. 31, 2022).

UnitedHealth Group executives' structure, analyze, and direct the company's overarching policies, including with respect to PBM and mail-order services, as a means of maximizing profitability across the corporate family.

174.    UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies—or drug lists—to ensure people get the right medications. [UnitedHealth Group] then negotiate[s] with pharmacies to lower costs at the point of sale [UnitedHealth Group] also operate[s] [mail-order pharmacies] . . . [UnitedHealth Group] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."

175.    In addition to being a PBM and a mail-order pharmacy, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by approximately 26 million UnitedHealthcare members in the United States, including those in Pennsylvania. UnitedHealth Group controls the entire drug pricing chain for these 26 million Americans.

176.    UnitedHealth Group's conduct had a direct effect in Pennsylvania.

177.    UnitedHealth Group states in its Annual Reports that UnitedHealth Group "utilizes Optum's capabilities to help coordinate patient care, improve affordability of medical care, analyze cost trends, manage pharmacy benefits, work with care providers more effectively and create a simpler consumer experience."

178.    Its 2022 annual report states plainly that it is "involved in establishing the prices charged by retail pharmacies, determining which drugs will be included in formulary listings and

34

selecting which retail pharmacies will be included in the network offered to plan sponsors' members …." As of year-end 2023 and 2022, UnitedHealth Group's "total pharmaceutical manufacturer rebates receivable included in other receivables in the Consolidated Balance Sheets amounted to $11.0 billion and $8.2 billion, respectively."[30]

**Defendant Optum, Inc.**

179.    Optum, Inc. is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.

180.    Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in Pennsylvania.

181.    For example, according to Defendant's own press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers." [31] In this role Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx." [32] Furthermore, the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform

---

[30] UnitedHealth Group Inc., *Annual Report* (Form 10-K) (FYE Dec. 31, 2023); UnitedHealth Group Inc., *Annual Report* (Form 10-K, Ex. 21) (FYE Dec. 31, 2021); UnitedHealth Group Inc., *Annual Report* (Form 10-K, Exhibit 21) (FYE Dec. 31, 2022).

[31] UnitedHealth Group, https://www.unitedhealthgroup.com/ (last visited on May 19, 2025); *UnitedHealth Group Announces "Optum" Master Brand for Its Health Services Businesses, Fierce Healthcare* (Apr. 11, 2011), https://www.fiercehealthcare.com/healthcare/unitedhealth-group-announces-optum-master-brand-for-its-health-services-businesses.

[32] *Id.*

the at-issue formulary construction and mail order activities.

**Defendant OptumRx, Inc.**

182.    Defendant OptumRx, Inc. is a California corporation with its principal place of business at 2300 Main Street, Irvine, California, 92614.

183.    OptumRx, Inc. operates as a subsidiary of OptumRx Holdings, LLC which in turn operates as a subsidiary of Defendant Optum, Inc.

184.    OptumRx, Inc. is registered to do business in Pennsylvania.

185.    During the relevant time period, OptumRx, Inc. provided the PBM and mail order pharmacy services in Pennsylvania that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

**Defendant OptumInsight, Inc.**

186.    OptumInsight, Inc. is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

187.    OptumInsight, Inc. is registered to do business in Pennsylvania. OptumInsight, Inc. is an integral part of the Insulin Pricing Scheme and, during the relevant time period, coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise the other Defendants regarding the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

**Defendant Emisar Pharma Services, LLC ("Emisar Pharma")**

188.    Emisar Pharma Services, LLC ("Emisar Pharma") is a Delaware limited liability company with its principal place of business at 1 Optum Circle, Eden Prairie, Minnesota 55344 and operations in the United States and Ireland.

189.    Emisar is a wholly owned indirect subsidiary of UnitedHealth Group, Inc.

190.    Optum established Emisar in June 2021 as a GPO for Optum's PBM business. Emisar negotiates rebates with drug manufacturers on behalf of Optum's commercial clients.

191.    During the relevant period, Emisar negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in Pennsylvania.

192.    As a result of numerous interlocking directorships and shared executives, UnitedHealth Group; OptumRx Holdings, LLC; and Optum, Inc are directly involved in the conduct and control of OptumInsight and Optum Rx's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail order pharmacy services to the ultimate detriment of Plaintiff. For example:

   a.    During the relevant time period, these parent companies and subsidiaries have common officers and directors.

   b.    Upon information and belief, UnitedHealth Group directly or indirectly owns all the stock of Optum, Inc.; OptumRx, Inc.; OptumInsight, Inc and Emisar.

   c.    Upon information and belief, the entities comprising UnitedHealth Group corporate family do not operate as separate entities. The public filings, documents, and statements of UnitedHealth Group present its subsidiaries, including Optum, Inc.; OptumRx, Inc.; OptumInsight and Emisar as divisions or departments of a single company that is "a diversified family of businesses" and that "leverages core competencies" to "help people live healthier lives and help make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and

should be treated as such as to all legal obligations detailed in this Complaint. [33]

    d.    Upon information and belief, all the executives of Optum, Inc.; OptumRx, Inc.; OptumInsight and Emisar-including the CEOs—ultimately report to the executives of UnitedHealth Group.

    e.    As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of Optum, Inc.; OptumRx, Inc.; OptumInsight and Emisar that gave rise to Plaintiff's claims in this Complaint.

193.    Collectively, Defendants UnitedHealth Group, Inc.; OptumRx, Inc.; OptumInsight, Inc.; Optum, Inc., and Emisar, including all predecessor and successor entities-are referred to as "OptumRx."

194.    OptumRx is named as a Defendant in its capacities as a PBM, a rebate aggregator, and a mail-order pharmacy.

195.    OptumRx is a PBM and, as such, coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these Manufacturers' diabetes medications on OptumRx's drug formularies.

196.    OptumRx provides pharmacy care services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities. [34]

197.    In 2023, Optum Rx managed $159 billion in pharmaceutical spending. [35]

198.    In 2022, OptumRx managed more than $124 billion in pharmaceutical spending. [36]

---

[33] UnitedHealth Group Inc., *Quarterly Report* (Form 10-Q) (Mar. 31, 2017).

[34] UnitedHealth Group Inc., *Annual Report* (Form 10-K) (Dec. 31, 2018).

[35] UnitedHealth Group Inc., *Annual Report* (Form 10-K) (Dec. 31, 2023).

[36] UnitedHealth Group Inc., *Annual Report* (Form 10-K) (FYE Dec. 31, 2022), https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2022/UNH-Q4-2022-Form-10-K.pdf (last visited May 19, 2025).

199.    At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in Pennsylvania.

200.    At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Pennsylvania. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Complaint.

201.    At all times relevant hereto, and contrary to their express representations, OptumRx knowingly insisted that its payor clients use the artificially inflated list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

202.    At all times relevant hereto, OptumRx concealed its critical role in the generation of those artificially inflated list prices.

203.    In its capacity as a mail-order pharmacy with a contracted network of retail pharmacies, OptumRx received payments from payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the artificially inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Plaintiff.

204.    At all times relevant hereto, OptumRx dispensed the at-issue medications nationwide and in Pennsylvania through its mail-order pharmacies and derived substantial revenue from these activities.

205.    OptumRx purchases the Manufacturer Defendants' drugs, including the at-issue diabetes medications, for dispensing through its mail-order pharmacies and network of retail pharmacies.

206.    At all times relevant hereto, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the

Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail-order pharmacies.

207.    Collectively, CVS Caremark, Express Scripts, and Optum Rx are referred to as the "PBM Defendants" or the "PBMs."

## JURISDICTION AND VENUE

208.    This action is directly filed in *In Re: Insulin Pricing Litigation*, MDL No. 3080, which was established on August 3, 2023, pursuant to the United States Judicial Panel on Multidistrict Litigation transfer order, and in accordance with Case Management Order #9. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and pursuant to 18 U.S.C. § 1964(c) because this action alleges violations of the RICO Act, 18 U.S.C. § 1962, which raises a federal question. This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

209.    There is also federal subject matter jurisdiction over this action because complete diversity exists among the parties, 28 U.S.C. § 1332. The parties are citizens of different states, and the amount in controversy, exclusive of interests or costs, exceeds the sum or value of $75,000.

210.    This Court has personal jurisdiction over each Defendant. Each Defendant: (a) transacts business and/or is registered to conduct business in Pennsylvania, (b) maintains substantial contacts in Pennsylvania, and (c) committed the violations of Pennsylvania statutes, federal statutes, and common law at issue in this lawsuit in whole or part within the Commonwealth of Pennsylvania.

211.    The Insulin Pricing Scheme has been directed at the Commonwealth of Pennsylvania and has had the foreseeable and intended effect of causing injury to persons residing in, located in, or doing business in Pennsylvania, including Plaintiff. All transactions at issue

occurred in the Commonwealth of Pennsylvania or involved Pennsylvania residents.

212.    Each Defendant has purposefully availed itself of the privilege of doing business within the Commonwealth of Pennsylvania, including within this District; and each has derived substantial financial gain from doing so. These continuous, systematic, and case-related business contacts—including the tortious acts described herein—are such that each Defendant should reasonably have anticipated being brought into this Court.

213.    Each Defendant submitted itself to jurisdiction through, among other things, pervasive marketing; encouraging the use of its services; and its purposeful cultivation of profitable relationships in the Commonwealth of Pennsylvania.

214.    In short, each Defendant has systematically served a market in Pennsylvania relating to the Insulin Pricing Scheme and has caused injury in Pennsylvania such that there is a strong relationship among Defendants, this forum, and the litigation.

215.    This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Pennsylvania.

216.    This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprises described herein before the Court in a single action for a single trial.

217.    Venue is proper pursuant to 18 U.S.C. § 1965 because each of the Defendants reside, are found, have an agent, or transact their affairs, in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court. In particular at all

times relevant, Defendants provided pharmacy benefit services, provided mail-order pharmacy services, employed sales representatives, promoted and sold diabetes medications, and published prices of the at-issue drugs in this District.

218.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because all Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to the Complaint took place within this District.

## ADDITIONAL FACTUAL ALLEGATIONS

A.    **Diabetes and Insulin Therapy**

*1. The Diabetes Epidemic*

219.    Diabetes occurs when a person's blood glucose is too high. In people without diabetes, the pancreas secretes the hormone insulin which controls the rate at which food is converted to blood glucose. When insulin is lacking or when cells stop responding to insulin, however, blood sugar stays in the bloodstream. Over time, this can cause serious health problems, including heart disease, blindness, and kidney disease. Diabetes-related complications are the eighth leading cause of death in the United States.[37]

220.    It is estimated 38.4 million people in the United States, or 11.6 percent of the population, had diabetes and that number continues to grow.[38] There are two basic types of diabetes: Type 1 and Type 2.

- Type 1: Approximately 5 – 10% of diabetes are Type 1, which occurs when a person's pancreas does not make – or makes very little – insulin. They are

---

[37] Am. Diabetes Assoc., *Statistics About Diabetes*, https://diabetes.org/about-us/statistics/about-diabetes (last visited May 19, 2025).

[38] CDC, *National Diabetes Statistics Report: Estimates of Diabetes and Its Burden in the United States*, Centers for Disease Control and Prevention (May 15, 2024), https://www.cdc.gov/diabetes/php/data-research/index.html.

treated with insulin injection and other diabetes drugs.

- Type 2: Approximately 90 – 95% are Type 2, which develops when a person does not produce enough insulin or has become resistant to the insulin they produce. While Type 2 patients can initially be treated with tablets, in the long term most patients switch to insulin injections.[39]

221.    Diabetes has been on the rise for decades. In 1958, only 1.6 million Americans had diabetes. By the turn of the century, that number had grown to over ten million. Fourteen years later, the number had tripled. Today, more than 38 million Americans—approximately 12% of the country—live with the disease.

222.    The prevalence of diabetes in Pennsylvania has increased as well.

### 2. Insulin: A Century-Old Drug

223.    Despite its potentially deadly impact, diabetes is highly treatable. Patients able to consistently follow a prescribed treatment plan may avoid the health complications associated with the disease. Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

224.    In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal's pancreas that could then be used to treat diabetes.[40] After the discovery, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent to $18 today) explaining "[w]hen the details of the

---

[39] National Institute of Diabetes and Digestive and Kidney Diseases, *What is Diabetes?* (Apr. 2023), https://www.niddk.nih.gov/health-information/diabetes/overview/what-is-diabetes (last visited May 19, 2025).

[40] *History of Insulin*, Diabetes.co.uk (Jan. 25, 2023), https://www.diabetes.co.uk/insulin/history-of-insulin.html.

method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[41]

225.    After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale their production. Under this arrangement, drug manufacturers were allowed to apply for patents on variations to the manufacturing process.[42]

226.    Although early insulin iterations were immediately perceived as lifesaving, there have been numerous incremental improvements since its discovery.

227.    The earliest insulin was derived from animals and, until the 1980s, it was the only available diabetes treatment.[43]

228.    While effective, animal-derived insulin created the risk of allergic reaction. This risk was lessened in 1982 when synthetic insulin, known as human insulin, was developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin. [44] The development of human insulin benefited heavily from government and non-profit funding through the National Institute of Health and the American Cancer Society.

229.    Over a decade later, Eli Lilly released the first analog insulin.

---

[41] Jessica DiGiacinto & Valencia Higuera, *Everything You Need to Know About Insulin*, Healthline (Oct. 5, 2021), http://www.healthline.com/health/type-2-diabetes/insulin (last visited May 19, 2025); *see also, e.g.*, Univ. of Toronto Librs., *The Manufacture of Insulin*, Insulin at 100 (2021), https://fisherdigitus.library.utoronto.ca/exhibits/show/insulin100/manufacture-of-insulin (last visited July 8, 2025).

[42] Serena Gordon, *Insulin Prices Skyrocket, Putting Many Diabetics in a Bind*, Chi Trib. (Nov. 29, 2016), https://web.archive.org/web/20161130000000/http://www.chicagotribune.com/lifestyles/health/sc-anger-over-high-insulin-prices-health-1207-20161130-story.html.

[43] *Animal Insulin*, Diabetes.co.uk (Apr. 25, 2023), http://www.diabetes.co.uk/insulin/animal-insulin.html.

[44] Celeste C. Quianzon & Issam Cheikh, MD, *History of insulin*, J. Community Hosp. Intern. Med. Perspectives (July 16, 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3714061/.

230.    Analog insulin is laboratory-grown and genetically altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body.

231.    Defendant Eli Lilly developed the first analog insulin, Humalog, in 1996.

232.    Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and Defendant Sanofi's Apidra, which have similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

233.    The Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

234.    When first introduced, and for many years after, analog insulins remained affordable. Today however, Defendants' Insulin Pricing Scheme has resulted in extreme price increases that have put the 100-year-old medicine out of reach for many people in the United States with diabetes.[45]

235.    In 2015, Sanofi introduced Toujeo, another long-acting insulin similar to Lantus; however, Toujeo is highly concentrated, making injection volume smaller than Lantus.

236.    In December 2015, Eli Lilly introduced Basaglar, which is a long-acting insulin biologically similar to Sanofi's Lantus.

237.    Even though insulin was first extracted 100 years ago, and despite its profitability, only Defendants Eli Lilly, Novo Nordisk, and Sanofi manufacture insulin for the United States

---

[45] William Newton, *Insulin pricing: could an e-commerce approach cut costs?*, Pharmaceutical Technology (Mar. 31, 2022), https://www.pharmaceutical-technology.com/features/insulin-pricing-could-an-e-commerce-approach-cut-costs/?cf-view&cf-closed; see also Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2015), https://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep.

market. This did not occur by chance.

238.    Many of the at-issue medications are now off-patent. The Manufacturers maintain market domination through patent "evergreening." Drugs usually face generic competition when their 20-year patents expire. While original insulin formulas may technically be available for generic use, the Manufacturers "stack" patents around the original formulas, making new competition more costly and risky. For example, Sanofi has filed more than 70 patents on Lantus—more than 95% were filed after the drug was approved by the FDA—potentially providing more than three additional decades of patent "protection" for the drug. The market therefore remains highly concentrated.

239.    In 2021, the U.S. House of Representatives Committee on Oversight and Reform issued a report following its investigation into drug pricing ("Drug Pricing Investigation").[46] It expressly included inquiry into the Manufacturer Defendants' insulin pricing strategies, and concluded: "Every company in the Committee's investigation engaged in one or more strategies to suppress competition from generics or biosimilars, and keep prices high."[47] It continued:

> Insulin manufacturers have also used secondary patents to extend their market monopolies. A 2020 study by the State of Colorado found, "Many insulin products have received additional patents, exclusivities, and extensions, adding decades of protection and monopoly prices." According to this study, secondary patents enabled Eli Lilly to add 17 years of protection for Humalog, Novo Nordisk to add 27 years of protection for NovoLog, and Sanofi to add 28 years of protection for Lantus.[48]

### 3.    The Current Insulin Landscape

---

[46] U.S. House of Representatives, Committee on Oversight and Reform, *Drug Pricing Investigation: Majority Staff Report* (Dec. 2021), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX%20v3.pdf (last visited May 19, 2025).

[47] *Id.* at xii.

[48] *Id.* at 81.

240.    While insulin today is generally safer and more convenient to use than when originally developed in 1922, some questions remain about whether the overall efficacy of insulin has significantly improved over the last twenty years.

241.    For example, while long-acting analogs may have certain advantages over human insulins—such as affording more flexibility around mealtime planning—it has yet to be shown that analogs lead to better long-term outcomes. Research suggests that older human insulins may work just as well for patients with Type 2 diabetes.[49]

242.    A recent study published in the Journal of the American Medical Association suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.

243.    When discussing the latest insulin iterations, Harvard Medical School professor David Nathan recently stated:

> I don't think it takes a cynic such as myself to see most of these [insulins] are being developed to preserve patent protection. The truth is they are marginally different, and the clinical benefits of them over the older drugs have been zero.[50]

244.    Moreover, all insulins at issue have either been available in the same form since the late 1990s and early 2000s or they are biologically equivalent to insulins available then.

245.    As Dr. Kasia Lipska, a Yale researcher, explained in the Journal of the American Medical Association:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing

---

[49] Jing Luo et al., *Implementation of Health Plan Program for Switching from Analogue to Human Insulin and Glycemic Control Among Medicare Beneficiaries with Type 2 Diabetes*, Jama Network (Jan. 29, 2019) https://jamanetwork.com/journals/jama/article-abstract/2722772.

[50] Carolyn Y. Johnson, *Why Treating Diabetes Keeps Getting More Expensive*, The Washington Post (Oct. 31, 2016) https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years/.

that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.[51]

246.    Production costs have also decreased in recent years. A September 2018 study calculated that, based on production costs, a reasonable price for a year's supply of human insulin is $48 to $71 per person and $78 to $133 for analog insulins.[52] Another recent study found that the Manufacturers could profit at as little as $2 per vial. Additionally, a study based on data collected through 2023 concluded that sustainable cost-based prices "for treatment with insulin in a reusable pen device could cost as little as $96 (human insulin) or $111 (insulin analogues) per year for a basal-bolus regimen, $61 per year using twice-daily injections of mixed human insulin, and $50 (human insulin) or $72 (insulin analogues) per year for a once-daily basal insulin injection (for type 2 diabetes), including the cost of injection devices and needles."[53]

247.    Diabetics in the United States spent an average of $5,705 each for insulin in 2016. According to a 2020 RAND Report, the list price per vial across all forms of insulin in 2018 was just $12 in Canada and less than $7 in Australia. In the United States, it was $98.70.[54]

248.    While R&D costs often contribute significantly to a drug's price, the initial basic insulin research occurred 100 years ago, and its costs have long-since been recouped. Other costs, such as developing the recombinant DNA-fermentation process and the creation of insulin analogs,

---

[51] Natalie Shure, *The Insulin Racket*, American Prospect (June 24, 2019), https://prospect.org/health/insulin-racket/ (last visited November 25, 2024).

[52] Dzintars Gotham, Melissa J. Barber and Andrew Hill, *Production costs and potential prices for biosimilars of human insulin and insulin analogues,* https://gh.bmj.com/content/3/5/e000850 (last visited May 19, 2025).

[53] Melissa J. Barber, et al., *Estimated Sustainable Cost-Based Prices for Diabetes Medicines*, Jama Network Open, (Mar. 27, 2024), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2816824.

[54] Doug Irving, *The Astronomical Price of Insulin Hurts American Families*, RAND https://www.rand.org/pubs/articles/2021/the-astronomical-price-of-insulin-hurts-american-families.html (last visited May 19, 2025).

were incurred decades ago. In recent years, the lion's share of R&D costs are incurred in connection with the development of new insulin-related devices and equipment, not in connection with the drug formulations themselves.

249.    The House Committee on Oversight and Reform also found that R&D costs "d[id] not justify price increases." According to the committee, "when drug companies did invest in R&D, those expenditures often went to research designed to protect existing market monopolies." The committee also found that "drug companies often invested in development only after other research—much of it federally funded—demonstrated a high likelihood of financial success."

250.    In response to rising scrutiny, the Manufacturer Defendants recently announced limited pricing changes and out-of-pocket limits. On March 1, 2023, Eli Lilly announced that it would cap the prices of certain insulin medications at $35 per month, with additional reductions to follow later in the year. Specifically, Eli Lilly promised that it would list its Lispro injection at $25 per vial effective on May 1, 2023, and slash the price of Humalog and Humulin injections by 70% starting in the fourth quarter of 2023. The price reductions to date are limited to these medications and do not apply to other Eli Lilly diabetes medications like Trulicity and Basaglar. These decisions suggest that, prior to March 1, 2023, the prices of these medications had not been raised to cover costs of research and development, manufacture, distribution, or any other necessary expense.

251.    Two weeks after Eli Lilly announced that it would be implementing pricing changes, on March 14, 2023, Novo Nordisk announced that it would also lower the U.S. list prices of several insulin products by up to 75%—specifically, Levemir, Novolin, NovoLog, and NovoLog Mix 70/30. Novo Nordisk will also reduce the list price of unbranded biologics to match the lowered price of each respective branded insulin. The price reductions to date are limited to these medications and do not apply to other Novo Nordisk diabetes medications like Victoza and

Ozempic. These changes went into effect on January 1, 2024, and, as with Eli Lilly's price reduction, suggest that the prices of these medications before that date were not increased to cover costs of research and development, manufacture, distribution, or any other necessary expense.

252.    These three announcements (the "Price Cuts") were prospective and do not mitigate damages already incurred by payors like Plaintiff.

253.    The Price Cuts are limited to certain insulin medications, and do not encompass all at-issue medications. As part of the Insulin Pricing Scheme, PBMs provide preferred formulary placement to the most expensive insulins based on list prices. Accordingly, the Insulin Pricing Scheme will proceed, with the PBMs continuing to target the most expensive at-issue medications, which will likely be the at-issue medications not included in the Price Cuts.

254.    The Price Cuts are woefully insufficient. An Eli Lilly spokeswoman has represented that the current list price for a ten-milliliter vial of the fast-acting, mealtime insulin Humalog will drop to $66.40 from $274.70, and a ten-milliliter vial of Humulin will fall from $148.70 to $44.61.[55] These prices far exceed the Manufacturer Defendant's costs and remain significantly higher than prices for the same and similar drugs in other countries.

255.    To make matters worse, on November 8, 2023, before the 65% price cut for its long-acting insulin Levemir had taken effect, Novo Nordisk announced that it would be discontinuing Levemir in the United States, citing manufacturing constraints, formulary-placement issues, and "alternative treatments" for patients.

256.    Levemir is the only branded, long-acting insulin product for which Novo Nordisk announced a list price reduction and the only long-acting insulin FDA- approved for pregnancy.

---

[55] Tom Murphy, *Lilly plans to slash some insulin prices, expand cost cap*, AP NEWS (Mar. 2, 2023), https://apnews.com/article/insulin-diabetes-humalog-humulin-prescription-drugs-eli-lilly-lantus- 419db92bfe554894bdc9c7463f2f3183 (last visited May 19, 2025).

257.    Yet, Novo Nordisk is discontinuing Levemir—before allowing the price reduction to take effect—with supply disruptions beginning in early 2024, followed by formal discontinuation of the Levemir FlexPen vial by the end of 2024.

### 4.    The Insulin Market is Enormous

258.    More than 38 million Americans live with diabetes, and another 97.6 million Americans have prediabetes, a health condition that significantly increases a person's risk of type 2 diabetes. The condition is a significant source of health care costs.[56] Spending on insulin alone has nearly tripled between 2012 and 2022.[57]

259.    Thus, millions of purchasers of insulin whose lives—or the lives of their loved ones—depend on this drug are captive to the market manipulation and other harmful aspects of Defendants' Insulin Pricing Scheme that has unlawfully hiked the price of this needed drug.

260.    This conduct occurred throughout the United States and its territories, and concerned analog insulins (including Lantus, Apidra, NovoLog, Levimir, and Humalog).

261.    Revenue from these top selling analog insulins tops billions of dollars, and the steep price tag has severely limited access and hurt patients physically, financially, and psychologically.

### 5.    Insulin Adjuncts: Type 2 Medications

262.    Over the past several years, the Manufacturer Defendants released several non-insulin diabetes medications. Novo Nordisk released Victoza in 2010, followed by Trulicity (Eli

---

[56] *The Staggering Costs of Diabetes*, Am. Diabetes Assoc., https://diabetes.org/sites/default/files/2024-09/ADA_2024_StaggeringCostsOfDiabetes.pdf (last visited May 19, 2025).

[57] American Diabetes Association, *supra* note 1.

Lilly), Soliqua (Sanofi), and Ozempic (Novo Nordisk).[58] In 2022, Eli Lilly received approval for another GLP-1, Mounjaro. Each of these medications can be used in conjunction with insulins to control diabetes.

263.    The Manufacturers negotiate rebates and other fees with the PBMs for "bundles" of insulin and GLP-1 receptor agonist (GLP-1) medications, packaging them as a single class of diabetes medications. This practice is known as "bundling."

264.    The Manufacturer Defendants bundle medications to gain formulary access for multiple drugs in exchange for increased manufacturer payments to the PBMs.

265.    In 2013, Novo Nordisk tied its "exclusive" rebates for insulin to formulary access for GLP-1 medication, Victoza. The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included two insulin products on their formulary. In order to qualify for the exclusive rebate, the plans would also need to list Victoza on their formulary, exclude all competing insulin products, and ensure existing patients switch from competitor diabetes medications.[59]

266.    Upon information and belief, all Manufacturer Defendants negotiate the prices of insulin and GLP-1 medications through bundling.

267.    The first GLP-1 was approved by the FDA in 2005 and was indicated for the treatment of Type 2 diabetes. Currently, the GLP-1 market is consolidated among a limited number of patent-holding entities, with Manufacturer Defendants Eli Lilly, Novo Nordisk, and Sanofi controlling much of this market.

---

[58] Victoza, Trulicity, and Ozempic are glucagon-like peptide-1 receptor agonists ("GLP-1") and mimic the GLP-1 hormone produced in the body. Soliqua is a combination long-acting insulin and GLP-1 drug. Each of these drugs can be used in conjunction with insulins to control diabetes.

[59] Senate Insulin Report at 78, 79.

268.    Through extensive patents and regulatory exclusivities, the Manufacturer Defendants have effectively barricaded competition from the GLP-1 market, giving them the ability to exercise comprehensive control over the price of GLP-1 medications.

269.    To date, no generic alternative exists for any GLP-1 medication. The Manufacturer Defendants will continue to enjoy patent protection of their respective GLP-1 agonist molecules through at least 2030, if not later.[60]

270.    Novo Nordisk developed, and now sells, three GLP-1 drugs indicated for Type 2 diabetes: Victoza (liraglutide), Xultophy (insulin degludec/liraglutide), and Ozempic (semaglutide). Novo Nordisk holds several patents related to semaglutide and liraglutide, some of which are device patents unrelated to the therapeutic molecule of the GLP-1.[61] Eli Lilly and Sanofi, too, have several patents related to their GLP-1 drugs indicated for type 2 diabetes.[62]

271.    This patent stacking and evergreening ensures that generic and other branded GLP-1 cannot enter the market and gives Novo Nordisk, Eli Lilly, and Sanofi disproportionate pricing power over GLP-1 medications.

272.    In addition to the limited competition in the GLP-1 landscape, the Manufacturer and PBM Defendants use this disproportionate pricing power to inflate the prices of GLP-1s, consistent with the broader Insulin Pricing Scheme.

---

[60] Rasha Alhiary, *et al.*, *Patents and Regulatory Exclusivities on GLP-1 Receptor Agonists*, 330 *JAMA* 650 (2023).

[61] Rasha Alhiary, *et al.*, *Delivery Device Patents on GLP-1 Receptor Agonists*, 331 *JAMA* 794 (2024).

[62] *Id.*

**Figure 3: List and net prices of GLP-1 agonists**



273.    As shown above, counterintuitively, list and net prices increased as more GLP-1 medications were approved and introduced. Between 2007 and 2017, the average list price of GLP-1s rose 15% per year despite the introduction of competing brands. The net price increased an average of 10% per year during the same time period.[63]

274.    The PBM Defendants are also central to these untethered price increases. As shown in the chart above, the growing disconnect between the list and net prices of these drugs further reflects the PBM Defendants' ill-gotten gains through identical methods to those employed in the Insulin Pricing Scheme.

275.    The absence of generics in the GLP-1 market allows manufacturers to keep prices artificially high. PBMs then realize the benefit of these artificially high prices through manufacturer payments in exchange for formulary placement. PBMs and manufacturers are thus incentivized to increase prices or maintain high, untethered prices for GLP-1s.

---

[63] Ameet Sarpatwari et al., *Diabetes Drugs: List Price Increases Were Not Always Reflected in Net Price; Impact of Brand Competition Unclear*, 40 Health Aff. 774–775 (2021).

276.    GLP-1s are significantly more expensive in the United States than in other countries, indicating that the increasing price of GLP-1s are untethered to any legal, competitive, or fair market price. For example, in 2023, the list price for a one-month supply of Ozempic was about $936 in the United States, $147 in Canada, $103 in Germany, $93 in the United Kingdom, $87 in Australia, and $83 in France.

277.    In 2018, Victoza's list price in the United States was more than double its average list price in eleven comparable countries and Trulicity's list price in the United States was more than six times its average list price in eleven comparable countries. One study found that drug companies could profitably sell certain GLP-1s, including Ozempic, for $0.89-$4.73 per month.

278.    In March 2024, PBM Defendant Evernorth entered into a financial guarantee agreement for GLP-1 spend with Manufacturer Defendants Novo Nordisk and Eli Lilly to limit the annual cost increase of GLP-1s to 15%.[64]

279.    Like the caps put in place for insulins, Evernorth, Eli Lilly, and Novo Nordisk's agreement suggests that the prices of GLP-1s before March 2024 were not raised to cover costs of research and development, manufacture, distribution, or any other necessary expense. Such cost caps and savings guarantee indicate that the increasing price of GLP-1s were untethered to any legal, competitive, or fair market price. Further, this agreement is prospective and does not mitigate damages already incurred by payors like Plaintiff.

280.    The following is a table of some of the diabetes medications at issue in this MDL:

---

[64] *Evernorth announces industry's first financial guarantee on GLP-1*, Evernorth Health Services (Mar. 7, 2024), https://www.evernorth.com/articles/evernorth-announces-industry-first-financial-guarantee-glp-1-spend.

| Insulin Type | Action | Name | Company | FDA Approval | Current/Recent List Price |
|---|---|---|---|---|---|
| Human | Rapid-Acting | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1982 | $1784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | Intermediate | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| Analog | Rapid-Acting | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | Pre-mixed | Humalog 50/50 | Eli Lilly | 1999 | $93 (vial) $180 (pens) |
| | | Humalog 75/25 | Eli Lilly | 1999 | $99 (vial) $140 (pens) |
| | | Novolog 70/30 | Novo Nordisk | 2001 | $203 (vial) $246 (pens) |
| | Long-Acting | Lantus | Sanofi | 2000 | $340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $370 (vial) $555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2015 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |

**B. The Dramatic Rise in the Price of Diabetes Medication in the U.S.**

281.    Over the past 25 years, the list price of certain insulins, including for insulin manufactured by Eli Lilly, Novo Nordisk, and Sanofi have risen dramatically.

282.    The Manufacturer Defendants have similarly ballooned the prices for noninsulin diabetes medications.

283.    Driven by these price hikes, payors' and diabetics' spending on these drugs has steadily increased with totals in the tens of billions of dollars. The Manufacturer Defendants have increased prices in Lockstep.

284.    The timing of the price increases reveals that the Manufacturer Defendants have not only dramatically increased prices for the at-issue diabetes treatments but have done so in lockstep.

285.    Between 2009 and 2015, for example, Sanofi and Novo Nordisk raised the list prices of their insulins in tandem thirteen times, taking the same price increase down to the decimal point within a few days of each other (sometimes within a few hours).[65]

286.    This conduct is known as "shadow pricing" which communicates between competitors their intention not to price compete against one another and permitted lockstep increases for the at-issue drugs.

287.    Figures 4 and 5 below shows how, collectively, the Manufacturer Defendants have exponentially raised the prices of insulin products in near-perfect unison.[66]

---

[65] Senate Insulin Report, *supra* note 5.

[66] William Newton, *Insulin pricing: could an e-commerce approach cut costs?*, Pharmaceutical Technology (March 31, 2022), https://www.pharmaceutical-technology.com/features/insulin-pricing-could-an-e-commerce-approach-cut-costs/.

**Figure 4 and 5: Lockstep insulin price increases**





288.    There is clear evidence that these lockstep price increases were carefully coordinated to preserve formulary placement for the at-issue medications and to allow greater rebates to the PBMs. These lockstep price increases further illustrate the perverse economics of competing by increasing prices in lockstep.

289.    Eli Lilly was not inclined to lower prices of its insulin products to compete with the other drug makers. Documents produced to the House Committee on Oversight and Reform[67] show

---

[67] Senate Insulin Report, *supra* n. 5.

that Eli Lilly regularly monitored competitors' pricing activity and viewed competitors' price increases as justification to raise the prices of their own products. On May 30, 2014, a senior vice president at Eli Lilly sent a proposal to Enrique Conterno—then-President of Lilly Diabetes— for June 2014 price increases for Humalog and Humulin. The executive reported that Novo Nordisk had just executed a 9.9% price increase across its insulin portfolio." Eli Lilly took a 9.9% price increase shortly thereafter, on June 5, 2014.[68]

290.    Six months later, on November 19, 2014, Mr. Conterno reported to then-CEO John Lechleiter that Novo Nordisk had taken another 9.9% price increase on NovoLog, the direct competitor to Eli Lilly's Humalog. Mr. Conterno wrote, "[a]s you are aware, we have assumed as part of our business plan a price increase of 9.9% for Humalog before the end of the year." The following Monday—six days after Mr. Conterno's initial email to the CEO—Eli Lilly took price increases of 9.9% on all Humalog and Humulin products.[69]

291.    Sanofi also closely monitored competitors' pricing activity and planned its own pricing decisions around Eli Lilly's and Novo Nordisk's price increases. Executives were aware that Sanofi's long-acting insulin competitors—particularly Novo Nordisk—would likely match its pricing actions on long-acting insulin. In internal documents, Sanofi leaders welcomed competitors' price increases because they allowed Sanofi to claim it was maintaining pricing "parity" with competitors.

292.    Sanofi had no incentive or intention to compete to lower its insulin pricing. For example, on November 7, 2014, Sanofi executed a price increase of approximately 12% across its family of Lantus products. The following week, a Sanofi senior vice president sent an email asking,

---

[68] Drug Pricing Investigation, *supra* note 46, at 140.

[69] *Id.*

"[d]id Novo increase the price of Levemir following our price increase on Lantus last week? I just want to confirm we can still say that Lantus and Levemir are still priced at parity on a WAC [wholesale acquisition cost] basis." The head of Sanofi pricing responded that Novo Nordisk had not yet taken the price increase, but noted, "[o]ver the past four price increases on Lantus they have typically followed within 1 month." Novo Nordisk raised the price of Levemir by 12% the following week.

293.    An internal Sanofi chart shows that, between April 2013 and November 2014, each time Sanofi raised the price of Lantus, Novo Nordisk followed suit for Levemir:

**Figure 6: Sanofi price tracking**



294.    The Manufacturers often used their competitors' price increases as justification for their own increases. For example, before taking price increases on Lantus, Sanofi compared the new list price to the prices of competitor products. In an April 2018 email exchange about accelerating and increasing previously planned price increases for Lantus and Toujeo (from July to April, and from 3% on Lantus to 5.3%), one senior director requested, "[p]lease confirm how the new WAC of Lantus/Toujeo would compare with the WAC of Levemir/Tresiba." In reply, another senior Sanofi leader provided a chart comparing Sanofi prices to those of its competition.

295.    Sanofi also engaged in shadow pricing with its rapid-acting insulin products, including Apidra. Sanofi was not the market leader in the fast-acting insulin space and typically did not act first to raise prices. But when its competitors raised prices on their fast-acting insulins, Sanofi quickly followed suit. As a Sanofi slide deck explained: "Over the past three years, we have executed a 'fast follower' strategy for Apidra and have executed price increases only after a price increase was announced."

296.    In December 2018, Sanofi's director of strategic pricing and planning emailed diabetes and cardiovascular pricing committee members seeking approval for across-the-board price increases for its rapid and long-acting insulin products, including Lantus, Toujeo, and Apidra. The then-Senior Vice President and Head of Sanofi's North America General Medicines group forwarded the proposal to the then-Senior Vice President and Head of Sanofi's External Affairs and inquired, "[p]rior to my approval, just confirming that we are still on for these." The Head of Sanofi's External Affairs wrote back, "Yes. As of now I don't see any alternative. Not taking an increase won't solve the broader policy/political issues, and based on intel, we believe many other manufacturers plan to take increases next year as well." He added, "[s]o while doing it comes with high political risk, I don't see any political upside to not doing it."

297.    Although Sanofi generally led price increases in the long-acting insulin market with its pricing for Lantus, Novo Nordisk often led in the rapid-acting market with NovoLog. On May 8, 2017, Novo Nordisk CEO Lars Jorgenson learned that Eli Lilly had raised U.S. list prices by approximately 8% across its injectable diabetes drug portfolio. Mr. Jorgenson emailed this information to a Novo Nordisk executive and asked, "[w]hat is our price increase strategy?" The executive responded, "[Eli Lilly] followed our increase on NovoLog, so we're at parity here, so no action from us. They led with Trulicity and based on our strategy, we will follow which will

61

likely be on June or July 1st."

298.    Further illustrating the anticompetitive scheme between the Manufacturers, rather than compete by lowering prices Sanofi raised Lantus' list price to respond to rebate and discount competition from Novo Nordisk. Novo Nordisk manufactures two long-acting insulins called Levemir and Tresiba, as well as two rapid-acting insulins, NovoLog and Fiasp. In the long-acting insulin category, Sanofi's Lantus and Novo Nordisk's Levemir often compete to win the same accounts. According to internal memoranda, in 2013, Sanofi believed that Novo Nordisk was attempting to minimize the clinical difference between Lantus and Levemir and was offering "increased rebates and/or portfolio offers for the sole purpose of removing Lantus from favorable formulary access." According to an internal Sanofi memo, "the strategy to close the price differential between the Lantus vial and pen before the LOE [loss of exclusivity] period was believed to be critical to the overall long-term success of the franchise."

299.    At the time, Sanofi faced increased pressure from its payor and PBM clients to offer more generous rebates and price protection terms or face exclusion from formularies, developments that were described as "high risk for our business" that had "quickly become a reality." This market environment created an enormous challenge for Lantus and, in order to protect its flagship diabetes franchise, Sanofi increased Lantus's list price so that it could improve its rebate and discount offering to payors while maintaining net sales.

300.    Sanofi understood the risk of its decision and "went into 2013 with eyes wide open that the significant price increases planned would inflame [its] customers," and that its aggressive pricing would cause a quick reaction from Novo Nordisk. But Sanofi sought to make up for "shortfalls with Lantus demand generation and global profit shortfalls," which it said, "put pressure on the US to continue with the price increases to cover gaps." The company conceded that it was

"difficult to determine whether we would face these risks anyway if we hadn't taken the price increases."

301.    Novo Nordisk also engaged in shadow pricing with its long-acting insulin, Levemir, increasing Levemir's list price in lockstep with Lantus in a continued effort to offer increased rebates and discounts to payors and displace Lantus from preferred formulary placement. Novo Nordisk typically did not act first to raise prices. However, when its competitors raised prices, Novo Nordisk followed suit. A March 2015 Novo Nordisk pricing committee presentation slide articulated this strategy: "Levemir price strategy is to follow market leader."

302.    On May 19, 2014, Novo Nordisk's pricing committee discussed how to price Levemir in response to Sanofi's 2013 pricing actions. Based on an internal presentation created for this meeting, Novo Nordisk's pricing committee discussed whether it should be a follower in the market in relation to Sanofi, and considered external factors like press coverage, payor reactions, profits, and performance. In each case, the company's strategic recommendation was to follow Sanofi's moves, rather than lead. Of note, the presentation shows that the pricing committee considered Levemir's performance, which was ahead of 2014's annual budgeting by $89 million, but that "overall company performance [was] behind." The presentation recommends following Sanofi's pricing actions if the brand's performance is the priority, and to lead if the company's performance is the priority. An excerpt of Novo Nordisk's presentation is shown below:

**Figure 7: Novo Nordisk pricing committee presentation**



303.    In alignment with this strategy, Novo Nordisk's pricing committee debated potential pricing scenarios based on Sanofi's actions, which they projected with a great deal of specificity. The presentation provided options regarding whether the company should follow Sanofi—and increase list price in July—or lead with a 9.9% increase in August which it considered "optically less aggressive." Based on internal memoranda, Novo Nordisk's pricing committee decided to revisit the issue with specific recommendations once Sanofi took action.

304.    Less than two weeks later, on May 30, 2014, Farruq Jafery, Vice President of Pricing, Contract Operations and Reimbursement, emailed Novo Nordisk's pricing committee to inform them that "Sanofi took a price increase on Lantus effective today: 16.1% vial and 9.9% pen." He further wrote that the pricing committee had "agreed that the best strategy for Levemir is to observe the market and maintain list price parity to competitors." Mr. Jafery then requested that Novo Nordisk's committee vote "ASAP" to raise the list price of Levemir effective May 31, 2014 (the next day) from $191.28 to $222.08 for vials and from $303.12 to $333.12 for pens. Only a few hours after Sanofi took its list price increase, members of the pricing committee approved

Mr. Jafery's request and Novo Nordisk moved forward with a 16.1% increase on Levemir vial, and a 9.9% increase on Levemir FlexPen and FlexTouch.

305.    Another series of emails shows that Novo Nordisk again shadowed Sanofi's price increase in November 2014, increasing Levemir's list price immediately after Sanofi increased Lantus vials and pens by 11.9%. On the morning of November 7, 2014, Novo Nordisk's pricing committee learned that Sanofi increased Lantus's list price overnight. And, by the afternoon they were asked to approve the same exact price increase for Levemir, which was approved hours later.

306.    The speed with which Novo Nordisk reacted to Sanofi's price changes is striking. Within twenty-five minutes of learning of Sanofi's price increase, Rich DeNunzio, Senior Director of Novo Nordisk's Strategic Pricing, emailed Novo Nordisk's pricing committee to alert them of the change and promised a recommendation the same afternoon after reviewing the financial impact of any move. By late afternoon, Mr. DeNunzio had requested Novo Nordisk's pricing committee to again "follow [Sanofi's] 11.9 [list price increase] on November 18th" and vote to increase Levemir's list price, which was promptly approved by Novo Nordisk's Chief Financial Officer for U.S. operations, Lars Green.

307.    Novo Nordisk's pricing strategy for other diabetes products even became the subject of humorous exchanges among senior analysts within the company. After a Novo Nordisk analyst shared news of an Eli Lilly price increase for a diabetes product on December 24, 2015, a senior director of national accounts wrote, "[m]aybe Sanofi will wait until tomorrow morning to announce their price increase. . . that's all I want for Christmas." The first analyst responded, "I actually started a drinking game. I have to take a shot for every response that says, 'what about Sanofi'" and then said, '[m]y poor liver. . .'" The senior director responded, "Ho Ho Ho!!!"

308.    The back-and-forth between Novo Nordisk officials underscores how closely it was

monitoring Sanofi's actions and appears to mirror the approach laid out in a January 27, 2014 presentation regarding the company's bidding strategy that hinged on CVS Caremark's business. Novo Nordisk described its bids for the CVS Caremark business as "pivotal" and laid out a game of cat-and-mouse across different accounts in which company officials sought to have Levemir be the only therapeutic option on different PBM formularies. Novo Nordisk recognized that offering "attractive exclusive rebates to large receptive customers" would "encourage a stronger response from Sanofi." However, Novo Nordisk was willing to take this risk because it would result in "immediate volume and value" for the company and could lead to an exclusive deal for CVS's commercial formulary.

309.     The agreements the Manufacturers had with the PBM Defendants deterred competition on lowering prices. For example, following its April 2018 list price increase, Novo Nordisk began to face pressure from payors, the media, and Congress to reduce the prices of its insulin drugs. On May 29, 2018, Novo Nordisk's U.S. Pricing Committee debated whether it should reduce the list price of its insulin drugs by 50% after a string of news reports detailed how patients were struggling to afford their medications. Novo Nordisk understood that a 50% cut would be a meaningful reduction to patients, significantly narrow the list-to-net gap, head off negative press attention, and reduce "pressure" from Congressional hearings. However, Novo Nordisk was concerned that a list price reduction would pose significant financial risk to the company.

310.     The company's primary concerns were retributive action from other entities in the pharmaceutical supply chain, many of which derive payments that are based on a percentage of a drug's WAC price. A PowerPoint slide created for this meeting suggests that the reasons not to lower prices were that "many in the supply will be negatively affected ($) and may retaliate" and

that its "[c]ompetitors may not follow putting [Novo Nordisk] at a disadvantage":

**Figure 8: Novo Nordisk presentation on reduced list prices**



311. Despite these concerns, internal memoranda suggest that Novo Nordisk was still prepared to lower its list price by 2019 or 2020 if its "must haves" were met, which included an agreement from the PBMs that they would not retaliate against them by changing their formulary placement and would accept lower rebate percentages.

312. According to internal memoranda, Novo Nordisk's board of directors voted against this strategy in June 2018 and recommended that the company continue its reactive posture. The rationale for this decision was the "$33 million downside identified (NovoLog only)" "risk of payor [PBM] backlash or demand for current rebate on new NDC," and "high likelihood of immediate pressure to take similar action on other products." Following the decision by its board of directors, on August 30, 2018, Novo Nordisk decided to continue its strategy to "monitor the market . . . to determine if other major pharma companies are taking list price [increases]."

313. Following years of rebate and list-price increases, the Manufacturers faced increased pressure from patients, payors, and the federal government to decrease insulin's list

price. However, internal memoranda and correspondence suggest that the downstream impact of lowering the list prices presented hurdles for pharmaceutical companies.

314.    There is also evidence of direct communications between the Manufacturers and the PBM Defendants regarding lowering the prices of insulins. For example, a June 23, 2018 email memorializes a conversation Eli Lilly's President of the Diabetes Unit, Enrique Conterno, had with the CEO of OptumRx, who allegedly "re-stated that [OptumRx] would be fully supportive of Lilly pursuing a lower list price option," but indicated that OptumRx would encounter challenges, namely, "the difficulty of persuading many of their customers to update contracts without offering a lower net cost to them."

315.    In response, an Eli Lilly executive noted, "we wouldn't be able to lower our list price without impacting our net price," and counseled waiting until early 2020 to reduce prices. Two weeks before this email, Eli Lilly executives had raised the possibility that PBMs would object to a list price reset because it would (a) result in a reduction in administrative fees for PBMs, (b) reduce rebates, which would impact PBMs' ability to satisfy rebate guarantees with some clients, and (c) impair their clients' ability to lower premiums for patients, thereby impacting their market competitiveness. An excerpt of this email is shown below:

**Figure 9: Eli Lilly internal email re potential price reductions**



316.     Insulin price increases were driven, in part, by tactics the PBMs employed in the early 2010s. At that time, the PBMs began to aggressively pressure the Manufacturers to raise list prices by implementing formulary exclusions in the insulin therapeutic class. When a drug is excluded, it means that it will not be covered by the insurer. Formulary exclusions effectively stop manufacturers from reaching large blocks of patients and require patients to either switch to a new product or pay significantly more to stay on their preferred medication. This tactic boosted the size of rebates and catalyzed the upward march of list prices. The Manufacturers responded to these formulary exclusion threats by raising list prices aggressively—increases that often were closely timed with price changes by competitors.

317.     Internal memoranda and correspondence confirm that PBM formulary exclusion lists have contributed to higher rebates in the insulin therapeutic class. The Manufacturers have increased rebates in response to formulary exclusion threats to preserve their revenue and market share through patient access. In addition, increases in rebates are associated with increased list

prices, such that the PBM Defendants' demands for increased rebates directly contributed to rising insulin prices. As Eli Lilly's CEO, David Ricks, has explained, Eli Lilly agreed to raise list prices to fund higher rebates and fees for the PBMs:

> Getting on [a] formulary is the best way to ensure most people can access our medicines affordably—once again, that's how insurance is supposed to work. But that requires manufacturers to pay ever- increasing rebates and fees, which can place upward pressure on medicines' list prices. If we cannot offer competitive rebates, our medicines may be excluded from formularies, and people cannot access them. Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees. Last year, about eighty cents of every dollar spent on our insulins went to pay rebates and fees.

318. Insulin was among the first classes of drugs to face PBM formulary exclusions, and the number of insulins excluded has increased over time.[70] In 2014, Express Scripts and CVS Caremark excluded six and seven insulins, respectively. OptumRx excluded four insulins in 2016, its first year with an exclusion list. As of 2022, insulins have faced 193 total plan-years of exclusion across the PBMs since 2014:

---

[70] Xcenda, *Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access* (May 2022), https://www.xcenda.com/-/media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda_pbm_exclusion_may_2022.pdf.

**Figure 10: Insulin exclusions by plan year**



319.    The Manufacturers have also made price-increase decisions due to countervailing pressures in their relationships with the PBMs. A higher list-price increases the dollar value of rebates, discounts, and other fees that a Manufacturer can offer to a PBM—all of which are based on a percentage of the list price. Internal documents show that the Manufacturers were sensitive not only to their own bottom lines, but also to the bottom lines of PBMs that set formularies, without which a Manufacturer's product would likely lose significant market share.

320.    Exclusions, driven in part by perverse PBM incentives, have had a significant impact on patients' access to insulin. Lower list-priced insulins have been available since 2016— including follow-on insulins[71] (Admelog, Basaglar, Lyumjev, Fiasp), "authorized generic" insulins

---

[71] The term "follow-on biologic" is a broad, overarching term. The designation of "biosimilarity" is a regulatory designation. "Follow-on biologics" are copies of originator innovator biologics. Those approved via the Biologics License Application (BLA) regulatory pathway (Public Health Service Act) are referred to as "biosimilars." Those approved via the New Drug Application (NDA) regulatory pathway (Food, Drug, and Cosmetic Act) retain the designation "follow-on" biologics.   *See* Richard Dolinar, *et al.*, *A Guide to Follow-on Biologics and Biosimilars with a Focus on Insulin*, 24 Endocrine Practice 195-204 (Feb. 2018),

https://www.sciencedirect.com/science/article/abs/pii/S1530891X20353982 (last visited May 19, 2025).

(Lispro, Insulin Aspart),[72] and, more recently, biosimilar insulins. PBMs, however, often exclude these insulins from their formularies in favor of products with higher list prices and larger rebates. For example, two of the three PBM Defendants have excluded the two insulin authorized generics since 2020, instead favoring the higher list-priced equivalents. Remarkably, those PBM Defendants did so even though the list prices for these authorized generic insulins can be half the list price of the brand.[73]

321.    In addition to the exclusions of authorized generic insulins, lower list-priced biosimilar insulins have also faced PBM formulary exclusions. The first biosimilar insulin was launched in 2021. Due to prevailing market dynamics, two identical versions of the product were simultaneously introduced—one with a higher list price and large rebates, and one with a lower list price and limited rebates—giving payors the option of which to cover. All three PBMs excluded the lower list-priced version in 2022, instead choosing to include the identical product with the higher list price.[74]

322.    Excluding lower list-priced medicines from formularies can substantially increase out-of-pocket costs for patients in plans using deductibles or coinsurance, where cost-sharing is

---

[72] An authorized generic medicine is a "brand name drug that is marketed without the brand name on its label." Additionally, "even though it is the same as the brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug." *See,* Food and Drug Administration, *FDA Listing of Authorized Generics as of April 1, 2025,* https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs (last visited May 19, 2025).

[73] Tori Marsh, *Can't Access Generic Humalog? There's an Even Cheaper Insulin Option Available*, (Aug. 26, 2019), https://web.archive.org/web/20190831134152/https://www.goodrx.com/blog/admelog-now-cheaper-than-generic-humalog/ (last visited May 28, 2025).

[74] Adam Fein, *Five takeaways from the big three PBMs' 2022 formulary exclusions,* Drug Channels (Jan. 19, 2022), https://www.drugchannels.net/2022/01/five-takeaways-from-big-three-pbms-2022.html.

typically determined based on the medicine's full list price.[75] This trend of favoring higher list-priced products has dramatically affected patient affordability and access to insulins.

323.    The PBM Defendants and the Manufacturers are complicit in this. There has been little, if any, attempt by the PBM Defendants to discourage the Manufacturers from increasing the list price of their products. Instead, the PBMs used their size and aggressive negotiating tactics, such as the threat of excluding drugs from formularies, to extract even more generous rebates, discounts, and fees from the Manufacturers, who have increased their insulin list prices in lockstep.

324.    The PBMs thus had every incentive to encourage the Manufacturers to raise list prices, since the rebates, discounts, and fees the PBMs negotiate are based on a percentage of a drug's list price—and the PBMs retain a large portion of what they negotiate. In fact, the Manufacturers have been dissuaded from decreasing list prices for their products, which would have lowered out-of-pocket costs for patients, due to concerns that the PBMs and health plans would react negatively.

325.    Because of the collusive price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

## C. Pharmaceutical Payment and Supply Chain

326.    The prescription drug industry is comprised of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third-party payors, PBMs, and patients.

327.    Given the complexities of the different parties involved in the pharmaceutical industry, there are many ways in which pharmaceutical drugs are distributed. Generally speaking,

---

[75] Adam Fein, *Express Scripts vs. CVS Health: five lessons from the 2020 formulary exclusions and some thoughts on patient impact* (Jan. 2020), https://www.drugchannels.net/2020/01/express-scripts-vs-cvs-health-five.html.

branded prescription drugs, such as the at-issue diabetes medications, are often distributed in one of three ways: (1) from manufacturer to wholesaler (distributor), wholesaler to pharmacy, and pharmacy to patient; (2) from manufacturer to mail-order pharmacy to patient; and (3) from manufacturer to mail-order pharmacy, mail-order pharmacy to self-insured payor, and then self-insured payor to patient.

328.    The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity, i.e., different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is inexorably tied to the price set by the manufacturer.

329.    Here is how the payment chain often works:[76]

---

[76] *See* Karen Van Nuys, *et al.*, *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018*, Jama Health Forum (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932 (last visited May 19, 2025).

**Figure 11: The pharmaceutical payment chain**



330.     The payment chain includes self-insured payors like Plaintiff paying PBMs directly.

331.     There is no transparency in this pricing system. Typically, only a brand drug's list price—also known as its AWP or the mathematically related WAC—is available. AWP is usually calculated by applying a significant mark-up to the manufacturer's WAC and does not account for discounts available to various payers, nor is it based on actual sales transactions.

332.     Publishing compendia such as First DataBank report both the WAC and the AWP.

333.     As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used list price in reimbursement and payment calculations and negotiations for both payors and patients.

**D. The PBM's Role in the Pharmaceutical Payment Chain**

334.     PBMs are at the center of this convoluted pharmaceutical payment chain, as illustrated in Figure 12 below.

**Figure 12: Insulin distribution and payment chain**



335.    PBMs—including the PBM Defendants—develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that the payor will pay for prescription drugs, and are paid by the payor to reimburse pharmacies for the drugs utilized by the payor's beneficiaries.

336.    The PBMs also work with a network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. The PBMs reimburse pharmacies for the drugs dispensed.

337.    The PBM Defendants also own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to payors like Plaintiff, their Beneficiaries, and other patients, by mail.

338.    Often, the PBM Defendants purchase drugs—including the at-issue drugs— directly from the Manufacturers and distribute them directly to the patients. The prices that PBM Defendants pay are significantly less than the purchase prices paid by payors.

339.    Even where PBM Defendant mail-order pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the manufacturers.

340.    In addition, and of particular significance here, the PBM Defendants contract with pharmaceutical manufacturers, including the Manufacturer Defendants. The PBMs extract from the Manufacturers rebates, fees, and other consideration that are paid back to the PBMs, including the Manufacturer Payments related to the at-issue drugs.

341.    The Manufacturers also interact with the PBMs related to other services outside the scope of the Insulin Pricing Scheme, such as health and educational programs, and patient and prescriber outreach with respect to drugs not at issue here.

342.    These relationships allow PBMs to exert tremendous influence over what drugs are available throughout the United States, including Pennsylvania, on what terms, and at what prices.

343.    Thus, PBMs are at the center of the flow of pharmaceutical money. Historically and today PBMs:

- negotiate the price that payors pay for prescription drugs (based on prices generated by the Insulin Pricing Scheme);

- separately negotiate a different (and often lower) price that pharmacies in their networks receive for the same drug;

- see the amount in fees that the pharmacy pays back to the PBM for each drug sold (based prices generated by the Insulin Pricing Scheme);

- set the price paid for each drug sold through their mail-order pharmacies (based on prices generated by the Insulin Pricing Scheme); and

- negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme)

344.    Yet, for most of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the same drugs. The full extent of the relationship between the PBMs and Manufacturers is undisclosed to Plaintiff.

345.    This lack of transparency affords Defendants the opportunity to extract billions of dollars from this payment and supply chain without detection.

346.    In every interaction that the PBMs have within the pharmaceutical pricing chain, they stand to profit from the prices generated by the Insulin Pricing Scheme.

*1.    The Rise of the PBMs in the Pharmaceutical Supply Chain*

347.    At first, in the 1960s, PBMs functioned largely as claims processors.

348.    Over time, however, they have taken on increasingly larger roles. One of the roles the PBMs have taken on, as discussed above, was negotiating with drug manufacturers— ostensibly on behalf of payors. In so doing, the PBMs affirmatively represented that they were using their leverage to drive down drug prices.

349.    In the early 2000s, the PBMs started buying pharmacies, thus creating an additional incentive to collude with manufacturers to keep certain prices high.

350.    These perverse incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBMs' corporate families. Further, recent consolidation in the industry has given the PBMs disproportionate market power.

351.    Nearly forty PBM entities have combined into what are now the three PBM Defendants. Moreover, each PBM Defendant now is owned by other significant players in the pharmaceutical chain, e.g., Express Scripts merged with Cigna; CVS bought Caremark, which now also owns Aetna; and UnitedHealth Group acquired OptumRx.

352.    Figure 13 depicts this consolidation within the PBM market.

**Figure 13: PBM Consolidation**



353.   After merging with or acquiring all competitors, and now backed by multibillion-dollar corporations, the PBM Defendants have taken over the market in the past decade, controlling more than 80% of drug benefits for more than 270 million Americans.

354.   Together, the PBM Defendants report more than $300 billion in annual revenue.

355.   The PBMs use this market consolidation and the resulting purchasing power as leverage when negotiating with other entities in the pharmaceutical payment chain.

*2. The Insular Nature of the Pharmaceutical Industry*

356.   The insular nature of the pharmaceutical industry has provided Defendants with ample opportunity to contact and communicate with the other PBM and Manufacturer Defendants and to devise, coordinate, and carry out the Insulin Pricing Scheme.

357.   The Manufacturer Defendants are members of the industry-funded Pharmaceutical Research and Manufacturers of America ("PhRMA") and routinely communicate through PhRMA meetings and platforms in furtherance of the Insulin Pricing Scheme. According to PhRMA's 2019 IRS Form 990, it received $515 million in "membership dues." All members are pharmaceutical

companies.[77]

358.    Executives of the Manufacturer Defendants serve on the PhRMA board of directors and/or part of the PhRMA executive leadership team.

359.    The PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturers at trade associations and industry conferences.

360.    Each year during the relevant period, the main PBM trade association, the industry-funded Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.[78]

361.    The PCMA is governed by PBM executives. During the relevant time period the board of the PCMA included David Joyner (Executive Vice President and President of Pharmacy Services of PBM Defendant CVS Caremark); Adam Kautzner (President of PBM Defendant Express Scripts); and Heather Cianfrocco (CEO of PBM Defendant OptumRx).

362.    At one point, PCMA issued a press release naming Mr. Kautzner to the Board and appointing him Chairman of the Board of Directors.

363.    All PBM Defendants are members of the PCMA and, due to their leadership positions, have substantial control over that association.

364.    Additionally, the Manufacturer Defendants are affiliate members of the PCMA.

365.    Every year, high-level representatives and corporate officers from both the PBM

---

[77] *Pharmaceutical Research & Manufacturers of Am.*, IRS Form 990, at 9 (2019), https://projects.propublica.org/nonprofits/organizations/530241211/202043189349300519/full (last visited May 19, 2025).

[78] The PCMA's industry funding in the form of "membership dues" is set out in its 2019 Form 990, *See*, PhRMA, 2019 Form 990, https://projects.propublica.org/nonprofits/organizations/383676760/202042969349301134/full (last visited June 16, 2025).

and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing Scheme.

366.    In fact, for many of the past several years, all Manufacturer Defendants have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PBM conferences.

367.    Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, the website boasts that it has "private meeting rooms."[79]

368.    Representatives from each Manufacturer Defendant have routinely met privately with representatives from each PBM Defendant during the Annual Meetings and Business Forum conferences that the PCMA holds (and the manufacturers sponsor) each year.

369.    In addition, all PCMA members, affiliates, and registered attendees of these conferences are invited to join PCMA-Connect, "invitation only LinkedIn group and online networking community."[80]

370.    As PCMA members, the PBM and Manufacturer Defendants clearly utilized both PCMA-Connect, as well as the private meetings at the PCMA conferences, to exchange information and to reach agreements in furtherance of the Insulin Pricing Scheme.

371.    Key at-issue lockstep price increases occurred shortly after the Defendants had convened at PCMA meetings. For example, on September 26 and 27, 2017, the PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms and executives

---

[79] PCMA, *PCMA Annual Meeting 2021*, (2021) https://www.pcmanet.org/wp-content/uploads/2021/08/PCMA_AM2021_Second-Edition-FINAL-1.pdf) (last visited May 28, 2025).

[80] PCMA, *PCMA-Connect*, https://www.pcmanet.org/contact/pcma-connect/ (last visited May 19, 2025).

from each Defendant and engaged in several meetings throughout the conference. Mere days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. Novo Nordisk also recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.

372.    Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir a matter of hours after Sanofi made its list price increase on Lantus. These price hikes occurred just weeks after the 2014 PCMA spring conference in Washington, D.C., attended by representatives from all the PBM Defendants.

373.    The PBMs control the PCMA and have exploited it to further their interests and to conceal the Insulin Pricing Scheme. The PCMA has brought numerous lawsuits and lobbying campaigns aimed at blocking drug-pricing transparency efforts, including recently suing the Department of Health and Human Services (HHS) to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them as direct-to-consumer discounts.

374.    Notably, the PCMA's tax return reports more than a million dollars in revenue for "litigation support." Prior tax returns available at ProPublica reveal millions of dollars in revenue for "litigation support" (and tens of millions in revenue for "industry relations") year after year. [81]

375.    Communications among the PBM Defendants are facilitated by the fluidity and frequency with which executives relocate from one PBM Defendant to another. For example:

- Mark Thierer worked as an executive at Caremark Rx (now CVS Caremark) prior to becoming the CEO of OptumRx in 2016 (he also served as Chairman of the Board for PCMA starting in 2012);

---

[81] *See, e.g.*, PCMA 2019-2021 Form 990 and prior years' returns on ProPublica.

- Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015 (he also served as a PCMA board member from 2015-2017 while with Aetna Rx);

- Derica Rice, former EVP for CVS Health and President of CVS Caremark, previously served as EVP and CFO for Eli Lilly;

- Duane Barnes was the Vice President of Medco (now Express Scripts) before becoming division President of Aetna Rx;

- Everett Neville was the division President of Aetna Rx before becoming Senior Vice President of Express Scripts;

- Albert Thigpen was a Senior Vice President at CVS Caremark before becoming a Senior Vice President at OptumRx;

- Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a Vice President at Aetna Rx; he also served as SVP Member Services Operations for CVS Caremark ; and

- Bill Kiefer was a Vice President of Express Scripts before becoming Senior Vice President of Strategy at OptumRx in 2013.

### E. The Insulin Pricing Scheme

376.    The market for the at-issue diabetes medications is unique in that it is highly concentrated with no true generics and few biosimilar options. The drugs and biosimilars have similar efficacy and risk profiles.

377.    This affords the PBMs great leverage that, in theory, could be used to negotiate with the Manufacturer Defendants to drive down list prices for the at-issue drugs through open competition.

378.    But the PBMs do not want the prices for diabetes medications to go down. A 2022 report by the Community Oncology Alliance put it this way:

> Among the different sources of revenue, the most prolific by far is in the form of rebates from pharmaceutical manufacturers that PBMs extract in exchange for placing the manufacturer's product drug on a plan sponsor's formulary or encouraging utilization of the manufacturer's drugs . . . . [T]he growing number and scale of rebates is the

primary fuel of today's high drug prices. The truth is that PBMs have a vested interest to have drug prices remain high, and to extract rebates off of these higher prices. PBM formularies tend to favor drugs that offer higher rebates over similar drugs with lower net costs and lower rebates.[82]

379.    The Manufacturer Defendants understand that PBM Defendants make more money as prices increase. This is confirmed by the January 2021 Senate Insulin Report after review of internal documents produced by the Manufacturers: [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price.[83]

380.    The documents eventually released by the Senate also show how the Manufacturers' pricing strategy focuses on the PBMs' profitability. In an internal August 6, 2015, email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug in order to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price?
>
> . . . We know CVS has stated their disappointment with our price increase strategy (ie: taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.[84]

381.    The Manufacturer Defendants also understand that because of the PBMs' market dominance, most payors, including Plaintiff and its Beneficiaries, accept the baseline national

---

[82] Community Oncology Alliance & Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers, and Taxpayers* (Feb. 2022), https://communityoncology.org/wp-content/uploads/2022/02/COA_FL_PBM_Expose_2-2022.pdf (last visited May 19, 2025).

[83] Senate Insulin Report, *supra* note 5, at 89.

[84] Letter from Raphael A. Prober, Counsel for Novo Nordisk Inc., to Charles E. Grassley & Ron Wyden, *S. Fin. Comm.* (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Novo_Redacted.pdf (last visited Jan. 15, 2023).

formularies offered by the PBMs with respect to the at-issue drugs.

382.   The Insulin Pricing Scheme was borne out of these understandings. Both sets of Defendants realized that if the Manufacturers artificially inflate their list prices while paying large, undisclosed Manufacturer Payments back to the PBMs, both the PBMs and Manufacturers would generate billions of unearned dollars. The plan worked.

383.   Over the past several years the Manufacturers have raised prices in unison and have paid correspondingly larger Manufacturer Payments to the PBMs.

384.   In exchange for the Manufacturers artificially inflating their prices and paying the PBMs substantial amounts in Manufacturer Payments, the PBM Defendants grant the Manufacturer Defendants' diabetes medications elevated prices and preferred status on their national formularies. During the relevant period, the rebate amounts (as a proportion of the list price) grew year-over-year while list prices themselves increased.

385.   For example, in July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary. Five years later, in 2018, Sanofi rebates were as high as 56% for preferred placement. In 2015, Sanofi offered OptumRx rebates up to 42% for Lantus for preferred formulary placement. That figure grew to 79.75% by 2019. Similarly, in 2014, Novo Nordisk offered Express Scripts 25% rebates for Levemir. That figure climbed to 47% in 2017.

386.   Beyond increased rebate demands, the PBMs also have sought and received larger and larger administrative fee payments and other Manufacturer Payments from the Manufacturers during the relevant period.

387.   A recent study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the

Manufacturers tripled, reaching more than $16 billion. The study observed that, although rebates were sent to payors during this period, PBMs retained the same volume of rebates in pure dollars, given the overall growth in rebate volume while administrative fees and spread pricing (charging a client payor more for a drug than the PBM pays the pharmacy) further offset reductions in retained rebate volumes.

388.    Thus—and contrary to their public representations—the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) have caused and continue to cause precipitous price increases for the at-issue drugs.

389.    As a result of the Insulin Pricing Scheme, every payor that pays for and/or reimburses for the at-issue drugs has been overcharged.

390.    Moreover, the PBMs use this artificially inflated price to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system. For example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary." [85] Likewise, in April 2019, CVS Caremark President Derica Rice stated: "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."[86]

---

[85] Surabhi Dangi-Garimella, *PBMs Can Help Bend the Cost Curve: Express Scripts' Tim Wentworth*, Am. J. Manag. Care (Jan. 12, 2016), https://www.ajmc.com/view/pbms-can-help-bend-the-cost-curve-express-scripts-tim-wentworth (last visited May 19, 2025).

[86] CVS Health, *CVS Health PBM Solutions Blunted the Impact of Drug Price Inflation, Helped Reduce Member Cost, and Improved Medication Adherence in 2018* (Apr. 11, 2019),

391.    In making these representations, the PBMs fail to disclose that the amount of "savings" generated is calculated based on the artificially inflated list price, which is not paid by any entity in the pharmaceutical pricing chain and which all Defendants are directly responsible for artificially inflating.

392.    The Insulin Pricing Scheme is a coordinated effort among the Manufacturer and PBM Defendants in which each agreed to, and did, participate, and which created enormous profits for all. For example:

a.  The Manufacturers and the PBMs are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that form and fuel the scheme. As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also in determining the same for competing products;

b.  The Manufacturers and the PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug utilization tracking efforts and mail-order pharmacy claims, internal medical efficacy studies, and financial data. Defendants then use this information in coordination to set the artificially inflated prices for the at-issue medications and to construct their formularies in the manner that is most profitable for both sets of Defendants. The data used to further this coordinated scheme is compiled, analyzed, and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx, which utilizes OptumInsight and Optum Analytics; and

c.  The Manufacturers and the PBMs engage in coordinated outreach programs directly to patients, pharmacies, and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients. For example, the Grassley-Wyden Senate committee recently released an email where Eli Lilly discussed paying Defendant UnitedHealth Group and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog. The email continued: "United's leadership committee made one ask of Lilly – that we are highly

---

https://www.cvshealth.com/news/pbm/cvs-health-pbm-solutions-blunted-the-impact-of-drug-price.html (last visited May 19, 2025).

engaged in the communication/pull through plan. [87] I of course indicated we fully expect to support this massive patient transition [to Eli Lilly's at-issue drugs favored by United] and provider education with the full breadth of Lilly resources. UHC also proactively thanked Lilly for our responsiveness, solution generation and DBU execution."

393. Rather than using their prodigious bargaining power to lower drug prices as they claim, Defendants instead used their dominant positions to conspire to generate billions of dollars in illicit profits at the expense of payors like Plaintiff.

### F. The Manufacturers React to Threats of Formulary Exclusion by Increasing Rebates Offered to the PBMs

394. Although the PBM Defendants have insisted they had no control over how the Manufacturers price their insulin products, their threats of formulary exclusion illustrate how they used new insulin competitors with lower prices to leverage even higher rebates on the existing insulin drugs.

395. In the face of formulary exclusion threats based on new entrants in the insulin market, the Manufacturers have willingly met the PBM Defendants' demands for increased rebates in order to retain preferred formulary placement and block competitors. For example, in 2016, Sanofi and Novo Nordisk enhanced their rebate offers at the same time Eli Lilly introduced Basaglar, a follow-on biologic to Lantus. Basaglar is a long-acting insulin and is "[c]linically . . . very similar" to Sanofi's Lantus. Because of its near clinical equivalence, Basaglar posed a competitive threat in the long-acting insulin market. The PBMs threatened to switch to Basaglar because it was priced lower, and they expected Eli Lilly to offer larger discounts in response.

396. A 2016 Sanofi memo describes the market dynamic whereby a threatened new

---

[87] "*Pull through*" is an industry term that refers to an integrated process between PBMs and Manufacturers aimed at moving market share and increasing sales for a certain product following the PBM granting that product preferred placement on its formulary.

market entrant would lead not to lower prices, but to greater rebates:

**Figure 14: Sanofi memo on introduction of Basaglar**

> • Lilly is actively engaged with Anthem for 2017 Medicare and commercial business. Anthem believes they would not have significant challenges moving to Basaglar in 2017 if the WAC price and discounts are in line with what they are thinking (20% lower WAC and discounts >40% )

397.    In an attempt to avoid PBMs switching to Basaglar, Sanofi and Novo Nordisk increased their rebate bids to respond to Eli Lilly. For example, according to Sanofi internal memoranda, sometime around April 2016, Express Scripts requested bids for its 2017 national commercial formulary and indicated its desire to add only one insulin glargine product to its basal insulin category. Express Scripts communicated to Sanofi that "with the right competitive price, [it] would not have significant challenges moving [from Lantus and Toujeo] to Basaglar" and that Sanofi must enhance its current rebate rate of 42% to maintain access for their basal insulins.

398.    An internal Sanofi memo describes the dynamic where, at "the right competitive price," Express Scripts would not have a challenge moving Basaglar into a preferred position on its formulary:

**Figure 15: Sanofi memo on Basaglar pricing**

> **Likely Competitive Approach and Response:**
>
> • Lilly is actively engaged with ESI for 2017 commercial business. Pricing has not been confirmed however ESI has informed that the following assumptions pose a threat to Sanofi's glargine franchise:
>   - Discounts for Basaglar in the mid 60's have been communicated by ESI to Sanofi. This is likely a starter for ESI to consider excluding Lantus and Toujeo. Modeling assumed 70%.
>   - Basaglar WAC will be 15% to 25% less than the WAC price of Lantus. Sanofi modeling assumed 15%.
> • ESI has signaled, with the right competitive price, they would not have significant challenges moving to Basaglar in 2017 despite a follow-on biologic (Basaglar) approval.
> • In addition ESI has indicated that Novo must also enhance its current rate to maintain current access for their basal insulin(s). Novo is likely to enhance its current rebates given recent Tresiba addition to part D formulary.

399.    Rebate contracts confirm that Sanofi increased its offer up to almost 55% off its WAC of $248.51 for Lantus vials and $372.76 for Lantus pens.

400.    For the Manufacturers, the mere threat of exclusion has pressured them to offer substantially greater rebates to maintain formulary position. This is because formulary exclusions are likely to cause significant loss of a manufacturer's market share, leading to lower revenue. On the other hand, being the exclusive therapy on a formulary has the opposite effect, which incentivizes Manufacturers to offer large discounts to acquire or maintain such status. The use of formulary exclusions has thus led to a market dynamic in which Manufacturers offer ever-higher rebates to avoid exclusion, which has led to higher list prices.

401.    For example, before 2013, Sanofi offered an average rebate of 5% on Lantus. However, beginning in 2013, competitors sought to "[d]isplace Lantus in High Control Plans and Markets . . . through increased rebates" to capture market share. In response, Sanofi increased its rebate and discount offerings to remain on their formulary. A Sanofi memo further explains this dynamic:

**Figure 16: Sanofi memo on increased rebates for Lantus**



402.    While the PBM Defendants have touted that using formulary exclusions in the

insulin therapeutic class was a way to drive down costs for their clients, internal correspondence and memoranda show that increased use of formulary exclusions did exactly the opposite: WAC (list) prices have continued to increase, leading to higher costs for payors and higher prices for patients at the pharmacy counter.

403.    For example, in 2013, when Express Scripts threatened to move patients to other diabetes drugs in order to "break even on [the] rebate line" unless Sanofi increased its Medicare Part D rebate offer for Lantus, Sanofi considered increasing its rebate offer from 7.45% to 15% in order to prevent formulary exclusion. Sanofi also faced similar pressure to increase rebates for Express Scripts' commercial contracts. Internal Sanofi memoranda show that "Sanofi was notified by [Express Scripts] that Lantus was positioned to be removed from the formulary effective 2013. . . [and as a result] rebates were re-negotiated." An excerpt from this memo, discussing the threat to Lantus, illustrates that the threats used by Express Scripts to drive up rebates on Sanofi's flagship insulin product Lantus:

**Figure 17: Sanofi presentation on formulary threats to Lantus**



**Lantus Contracting History with ESI**
Account Management and Contracting have worked closely together to maintain a 5% rebate for Commercial contracts through 2012.  Sanofi was notified by ESI that Lantus was positioned to be removed from formulary effective 2013.  Rebates were re-negotiated resulting in a 6% Lantus Vial & 9% Lantus SoloStar rebate (no price protection).

**Lantus Overall Threat**
The Commercial business is at additional threat due to competitive rebate pressures and changing formulary design as well as Lantus pricing actions.
- ESI has shared that Novo has been extremely aggressive the last few months and this has triggered the need to revise our offer.
  - For 2014 ESI made Humalog exclusive in the RAI category, moving Novolog to Not Covered and made Byetta & Bydureon the only options in the GLP1 category, moving Victoza to Not Covered.
- Comments during discussion with ESI confirmed that modeling has occurred and that the current contracted offer will result in a Not Covered position for 2015.  This is based on competitive offers by Novo and client plans requesting exclusive offers for comparison.
- They have shared that the basal category is under consideration for exclusion list status for 2015.  This interest in an exclusive offer is consistent with recent actions they have taken to reduce the number of branded options available to patients.
- Lantus price increases over the past two years have positioned Sanofi as a cost driver that has triggered significant attention from ESI.

404.     According to internal memoranda, in 2014, Express Scripts and its affiliated businesses managed the prescription drug claims of over 4.6 million people, representing 15% of the total business in the Medicare Part D channel. Rebate agreements confirm Sanofi renegotiated rebates and entered into an agreement to provide up to 10.625% for Lantus, effective January 1, 2014. Rebates were renegotiated again that same year, and Sanofi increased its rebate offer up to 14.625%, effective October 1, 2014.

405.     CVS Caremark and OptumRx used similar formulary exclusion threats to drive up Lantus rebates. Around this same time, other PBMs learned that Sanofi had offered competitive rebates to Express Scripts which caused them to question their rebate status with Lantus. As a result, they too demanded higher rebates and threatened to exclude Lantus from their formulary to achieve this result.

406.     For example, in 2014, OptumRx threatened to remove Lantus from its commercial formulary. Sanofi offered an enhanced rebate for FY2015 in the 15% range, but OptumRx rejected Sanofi's offer and took steps to remove Lantus from its commercial formulary. Sanofi responded with a last-minute bid of a 45% rebate for Tier 2, which OptumRx countered with 45% for Tier 3. According to Sanofi, OptumRx's counteroffer was "ultimately accepted over access concerns to future products and the need to secure access to patient lives."

407.     Similarly, in 2016, Express Scripts threatened to remove Lantus and Toujeo from its Medicare Part D formulary and requested that Sanofi submit its "best and final offer" or else face formulary exclusion. According to internal memoranda, during negotiations, Express Scripts told Sanofi that it was justified in removing Lantus and Toujeo from its Medicare Part D formulary and requested that Sanofi submit its "best and final offer" or else face formulary exclusion. According to internal memoranda, during negotiations, Express Scripts told Sanofi that it was

justified in removing Lantus and Toujeo from its Medicare Part D formulary because it had allowed "quite a few years of price increases" and that Novo Nordisk's rebate offer was more competitive. In response to Express Scripts' threat, Sanofi discussed revising its rebate offer up to 40% with 4% price protection for Lantus and Toujeo.

408.    Although contracts with PBMs included larger and larger rebates, the Manufacturers still expected to remain profitable. For example, on July 28, 2017, one Sanofi official wrote to colleagues after considering their offer to CVS Caremark for placement on the Part D formulary: "After inclusion of additional fees, we are still profitable up to an 89% rebate." The official included an analysis that assumed "CVS would need to shift 68.9% of [its] glargine volume to Novo to break even (at an assumed 81% rebate offer)." In its analysis, Sanofi compared various negotiation scenarios including a "no contract" scenario, which it determined would be more profitable to the company even with the resulting reduction in sales volume and revenue. One of the deciding factors was optics. As one colleague put bluntly: "How would it look to be removed from the largest Medicare plan?"

409.    As the PBMs expanded the practice of using formulary exclusions to extract greater rebates, Sanofi's counterstrategy was to bundle unrelated products that had been excluded—Lantus and an epinephrine injection called Auvi-Q—to win formulary inclusion for both. (Bundling is a practice where manufacturers offer rebates and discounts for multiple products, but only if certain conditions are met.)

410.    Sanofi faced significant financial pressure across all accounts and sought to include bundling agreements in several of its contracts. While negotiating contracts for the 2015/16 plan year, Express Scripts advised Sanofi that it needed to be far more aggressive with rebate offers to gain access to the PBM's commercial book of business than in past years. Internally, Sanofi

officials warned in a memo that "Novo, specifically Levemir, has changed the game with regard to rebates," and that Sanofi would "need to rebate aggressively." A separate presentation describes "[c]ontracts that increase Lantus rebates if Auvi-Q is added to [the] formulary thus creating a bundled arrangement," and notes that the company had even considered a "triple product bundle" with Toujeo, despite concerns about the arrangements triggering Medicaid best price.

411.    This counterstrategy was not limited to Sanofi. An internal memo shows that Sanofi's competitors were using the same strategy: "Lantus is losing accounts and share within the institutional channel because of aggressive discounting and bundled contract offerings from Novo Nordisk and Lilly."

412.    For example, Novo Nordisk secured contract terms from CVS Caremark's Part D business in 2013 that tied its "exclusive" rebates for insulin to formulary access for its Type 2 diabetes drug Victoza. The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included two insulin products on their formulary. To qualify for the exclusive rebate, the plans would also need to list Victoza, a GLP-1 agonist, on their formulary, exclude all competing insulin products, and ensure "existing patients using a [c]ompeting [p]roduct may not be grandfathered."

### G. Defendants Play Down the Insulin Pricing Scheme and Its Harms

413.    On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on industry practices titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin." [88]

---

[88] *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin,* House Committee Hearing on House Energy and Commerce-Oversight and Investigations, 116th Cong. (2019), https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3 (last visited May 19, 2025) (hereinafter "Priced Out of a Lifesaving Drug").

414.    Representatives from all Defendants testified at the hearing, and each acknowledged before Congress that the price for insulin has increased exponentially in the past 15 years.

415.    Further, each Defendant conceded that the price that diabetics pay out-of-pocket for insulin is too high. For example:

- Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx since 2015, stated: "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

- Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified: "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, [list] prices for insulin have increased nearly 50 percent. And over the last ten years, [list] price of one product, Lantus, rose by 184 percent."

- Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated: "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

- Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified: "Patients are rightfully angry about rising out-of-pocket costs and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients. . ."

- Doug Langa, Executive Vice President of Novo Nordisk, stated: "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [list] prices of our medicines. We also know that [list] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

416.    None of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased production costs or improved clinical benefit.

417.    Instead, Novo Nordisk's President Doug Langa's written testimony for the April 2019 hearing recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC [list] price. That means a pharmaceutical company fighting to remain on formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase. This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others." Likewise, Mr. Langa's responses to questions for the record conceded that "[t]he disadvantage of a system in which administrative fees are paid as a percentage of the list price is that there is increased pressure to keep list prices high." The hearing transcript records Mr. Langa's further comments in this regard:

> So as you heard from Dr. Cefalu last week of the ADA [American Diabetes Association], there is this perverse incentive and misaligned incentives and this encouragement to keep list prices high. And we've been participating in that system because the higher the list price, the higher the rebate. There is a significant demand for rebates…. We're spending almost $18 billion a year in rebates, discount, and fees, and we have people with insurance with diabetes that don't get the benefit of that. (emphasis added)

418.    Eli Lilly admitted that it raises list prices as a quid pro quo for formulary positions.

At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly, testified:

> Seventy-five percent of our list price is paid for rebates and discounts—$210 of a vial of Humalog is paid for discounts and rebates. We have to provide rebates [to PBMs] in order to provide and compete for that [formulary position] so that people can use our insulin. In the very next question, Mr. Langa of Novo Nordisk was asked, "[H]ave you ever lowered a list price? His answer: "We have not."

419.    Sanofi's Executive Vice President for External Affairs, Kathleen Tregoning,

testified:

> The rebates is [sic] how the system has evolved. ............I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

420.    Her written response to questions for the record acknowledged that "it is clear that payments based on a percentage of list price result in a higher margin [for PBMs] for the higher list price product than for the lower list price product."

421.    The PBM Defendants also conceded at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by the Manufacturer Defendants.

422.    In her responses to questions for the record, Amy Bricker, former SVP of Express Scripts and PCMA board member, confirmed that "manufacturers lowering their list prices" would give patients "greater access to medications;" yet when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, answered, "Manufacturers do give higher discounts [i.e., payments] for exclusive [formulary] position" When asked why the PBM would not include both costly and lower-priced insulin medications on its formulary, Ms. Bricker stated plainly, "We'll receive less discount in the event we do that."[89]

423.    As Dr. Dutta, SVP of OptumRx, perversely reasoned, the cheaper list-priced alternative Admelog is not given preference on the formulary because "it would cost the payer

---

[89] *Id*. (citing Express Scripts, *Annual Report* (Form 10-K) (FYE Dec. 31, 2017) at 24) (Buried in Express Scripts' 2017 10-K is the following: "We maintain contractual relationships with numerous pharmaceutical manufacturers, which provide us with, among other things administrative fees for managing rebate programs, including the development and maintenance of formularies that include particular manufacturer's products . . . ." That is, the Manufacturers pay the PBMs to effectively participate in the creation of formularies that payors are required to adopt as a condition for obtaining PBM services. It also notes that its business would be "adversely affected" if it were to "lose [its] relationship with one or more key pharmaceutical manufacturers.").

more money to do that because the list price is not what the payer is paying. They are paying the net price."[90] In other words, under the pricing scheme, PBMs and manufacturers can make a drug with a lower list price effectively more expensive for payors and then ostensibly save payors from that artificially inflated price by giving preference to drugs that had higher list prices to begin with (yielding higher Manufacturer Payments to the PBMs).

424.    On May 10, 2023, the U.S Senate Committee on Health, Education, Labor, and Pensions held a hearing titled, "The Need to Make Insulin Affordable for All Americans." At this hearing, the CEOs and presidents of the Manufacturer and PBM Defendants doubled down on their testimony from 2019. David Ricks, for example, the Chair and CEO of Eli Lilly, testified that his company raised list prices and agreed to pay ever-increasing rebates to secure formulary placement:

> Getting on formulary is the best way to ensure most people can access our medicines affordably . . . But that requires manufacturers to pay ever-increasing rebates and fees, which can place upward pressure on medicines' list prices. . . Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees.

425.    Paul Hudson, the CEO of Sanofi, likewise indicated that PBMs prefer drugs with higher list prices and that the manufacturers have responded accordingly. In discussing a drug Sanofi introduced with a lower list price, Hudson explained: "It just didn't get listed in any way. If price is really the motivator, it would have been listed."

426.    While all Defendants acknowledged before Congress their participation in conduct integral to the Insulin Pricing Scheme, none revealed its inner workings or the connection between their coordination and the economic harm that payors, like Plaintiff, and Beneficiaries were unwittingly suffering. Instead, in an effort to obscure the true reason for precipitous price increases,

---

[90] *Id.* As noted in the hearing, even the "cheaper" alternative Admelog "costs over $200 a bottle."

each Defendant group pointed the finger at the other as the more responsible party.

427.    The PBM Defendants testified to Congress that the Manufacturer Defendants are solely responsible for their list price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

428.    This testimony is false. The amounts Manufacturers pay back to the PBMs is directly correlated to an increase in list prices. On average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in list price. Reducing or eliminating Manufacturer Payments would lower prices and reduce out-of-pocket expenditure.

429.    Further, in large part because of the increased list prices and related Manufacturer Payments, the PBMs' profit per prescription has grown substantially over the same time period that insulin prices have steadily increased. For example, since 2003, Defendant Express Scripts has seen its profit per prescription increase more than 500% per adjusted prescription.[91]

430.    Novo Nordisk's President, Doug Langa, submitted written testimony to Congress acknowledging "there is no doubt that the WAC [list price] is a significant component" of "what patients ultimately pay at the pharmacy counter." Yet, the Manufacturers urged upon Congress the fiction that the PBMs were solely to blame for insulin prices because of their demands for rebates in exchange for formulary placement. The Manufacturers claimed their hands were tied and sought to conceal their misconduct by suggesting that they have not profited from rising insulin prices.

431.    Given the Manufacturers' claims that rebates were the sole reason for rising prices, each was asked directly during the Congressional hearing to guarantee it would decrease list prices if rebates were restricted or eliminated. The spokespersons for Eli Lilly, Novo Nordisk and Sanofi

---

[91] David Balto, *How PBMs Make the Drug Price Problem Worse*, The Hill (Aug. 31, 2016) https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse/ (last visited May 19, 2025).

all said only that they would "consider it."

432.    In addition, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that during the time insulin price increases were at their steepest, distributions to the Manufacturers' shareholders in the form of cash dividends and share repurchases totaled $122 billion. In fact, during this period the Manufacturers spent a significantly lower proportion of profits on R&D compared to shareholder payouts. The paper also notes that "[t]he mean price paid by patients for insulin in the United States almost tripled between 2002 and 2013" and that "per-person spending on insulin by patients and insurance plans in the United States doubled between 2012 and 2016, despite only a marginal increase in insulin use."[92]

433.    The 2022 Community Oncology Alliance report found:[93]

There are several important ways that PBM rebates increase the costs of drugs for both plan sponsors and patients. . . . PBMs employ exceedingly vague and ambiguous contractual terms to recast monies received from manufacturers outside the traditional definition of rebates, which in most cases must be shared with plan sponsors. Rebate administration fees, bona fide service fees, and specialty pharmacy discounts/fees are all forms of money received by PBMs and rebate aggregators which may not be shared with (or even disclosed to) the plan sponsor. These charges serve to increase the overall costs of drugs, while providing no benefit whatsoever to plan sponsors. . . . The total drug spend of a plan sponsor, regardless of whether it is a federal or state governmental program or a self- funded employer, will inevitably increase because PBMs are incentivized to favor expensive drugs that yield high rebates. . .

434.    In January 2021, the Senate Finance Committee (Grassley-Wyden) issued a report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug,"[94] which

---

[92] Rosie Collington, *Profits, Innovation and Financialization in the Insulin Industry*, Inst. for New Econ. Thinking (Mar. 2020), https://www.ineteconomics.org/uploads/papers/WP_120-Collington-The-insulin-industry.pdf (last visited May 19, 2025).

[93] Community Oncology Alliance, *supra* note 82.

[94] Senate Insulin Report, *supra* note 5.

detailed Congress's findings after reviewing more than 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx, and Cigna. The report concluded, among other things:

- The Manufacturer Defendants retain more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;
- The Manufacturer Defendants have aggressively raised the list price of their Insulin products absent significant advances in the efficacy of the drugs; and
- The Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014-2018, during which time the company generated $22.4 billion in revenue on these drugs.

435.    The truth is that, despite their finger pointing in front of Congress, the Manufacturers and PBMs are both responsible for their concerted efforts in creating the Insulin Pricing Scheme.

**H. All Defendants Profit from the Insulin Pricing Scheme**

436.    The Insulin Pricing Scheme affords the Manufacturer Defendants the ability to pay the PBM Defendants secret but significant Manufacturer Payments in exchange for formulary placement, which garners the Manufacturer Defendants greater revenues from sales without decreasing their profit margins. During the relevant period, the PBM Defendants granted national formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

437.    The Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated list price.

438.    Because of the increased list prices and related Manufacturer Payments, the PBMs' profit per prescription has grown exponentially during the relevant period as well. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased more than 150% from 2014 to 2018. In fact, for transactions where the PBM Defendants control the PBM and the pharmacy (e.g., Caremark-CVS pharmacy) these Defendants were capturing an astonishing 40% of the money spent on each insulin prescription (up from only 25% just four years earlier), despite the fact that they do not contribute to the development, manufacture, innovation, or production of the product.[95]

439.    The PBM Defendants profit from the artificially inflated prices created by the Insulin Pricing Scheme in a number of ways, including by: (1) retaining a significant, yet undisclosed, percentage of the Manufacturers Payments, (2) using the inflated list price to generate profits from pharmacies, and (3) relying on the inflated list price to drive up the PBMs' margins through their own mail-order pharmacies.

*1.   The PBMs Pocket a Substantial Share of Manufacturer Payments*

440.    The first way in which the PBMs profit from the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

441.    The amount that the Manufacturers pay back to the PBMs has increased over time both in real dollars and as a proportion of the ever-increasing list prices.

442.    Historically, contracts between PBMs and payors allowed the PBMs to keep most,

---

[95] Karen Van Nuys, et al., *Estimation of the Share of Net Expenditures on Insulin Captured by U.S. Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies & Health Plans From 2014 to 2018*, JAMA Health Forum (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932 (last visited May 19, 2025).

or all, of the rebates they received, rather than forwarding them to the payor.

443.    Over time, payors secured contract provisions guaranteeing payment to them of all or some portion of the rebates paid by the Manufacturers to the PBMs. Critically, however, "rebates" are only one aspect of the total Manufacturer Payments, particularly as "rebates" are narrowly defined and qualified by vague exceptions in the PBM contracts with payors.

444.    Indeed, as described in the January 2021 Senate Insulin Report, the PBMs and Manufacturers coordinate to determine the contract options made available to payors: "Contracts between PBMs and manufacturers provide a menu of options from which their health plan clients can choose certain terms and conditions."[96]

445.    The contracts between the PBMs and Manufacturers also "stipulate terms the plans must follow regarding factors such as formulary placement and competition from other drugs in the therapeutic class."[97] Thus, the Manufacturers ultimately played a role in dictating the terms and conditions of the contracts that payors like Plaintiff entered with PBMs. Of course, the payors were not involved in the coordination or the negotiation of the contracts between the PBMs and Manufacturers, and the PBMs disclosed only the fact that such relationships may exist—the terms of the contracts, the consideration exchanged between the PBMs and Manufacturers, and the means of reaching these determinations all were and remain shrouded in secrecy.

446.    The PBM and Manufacturer Defendants thus created a "hide-the-ball" system where payors like Plaintiff are not privy to rebate negotiations or contracts between the Manufacturers and the PBMs. The consideration exchanged between them (and not shared with payors) is labeled and relabeled. As more payors moved to contracts that required PBMs to remit

---

[96] Senate Insulin Report, *supra* note 5, at 34.

[97] *Id.* at 38.

some or all of the manufacturer "rebates" through to the payor, the PBMs rechristened Manufacturer Payments to shield them from scrutiny and from their payment obligations. Payments once called "rebates" in contracts with payors like Plaintiff now include "administrative fees", "volume discounts", "service fees", "inflation fees", or other industry monikers designed to obfuscate the substantial sums being secretly exchanged between the PBMs and the Manufacturers.

447. The Senate Commerce, Science and Transportation Committee released testimony from David Balto—a former antitrust attorney with the DOJ and Policy Director for the FTC's Bureau of Competition—from a hearing on fairness and transparency in drug pricing:

> The PBM rebate system turns competition on its head with PBMs seeking higher, not lower prices to maximize rebates and profits. In the past decade, PBM profits have increased to $28 billion annually. PBMs establish tremendous roadblocks to prevent payors from knowing the amount of rebates they secure. Even sophisticated buyers are unable to secure specific drug by drug rebate information. PBMs prevent payors from being able to audit rebate information. As the Council of Economic Advisors observed, the PBM market lacks transparency as "[t]he size of manufacturer rebates and the percentage of the rebate passed on to health plans and patients are secret." Without adequate transparency, plan sponsors cannot determine if the PBMs are fully passing on any savings, or whether their formulary choices really benefit the plan and subscribers.

448. The renamed, undisclosed Manufacturer Payments are substantial. "Administrative fees" are one example. A heavily redacted complaint filed by Defendant Express Scripts in 2017 revealed that Express Scripts retains up to thirteen times more in "administrative fees" than it remits to payors in rebates.

449. In fact, administrative fees can dwarf rebates. In just one alleged invoice Express Scripts was seeking payment for in that lawsuit, "administrative fees" were more than three-and-

a-half times the amount billed for formulary rebates and price protection rebates combined.[98]

450.    Although the proportion of rebates retained by PBMs remains a secret, commentators have suggested that PBMs "designate as much as twenty-five or thirty percent of the negotiated rebates as fees to avoid sharing the rebates."[99]

451.    A review of Texas-mandated PBM disclosures also showed that PBMs retain a much greater percentage of manufacturer rebates than they lead on.[100] On information and belief, certain PBMs are required under applicable state law to report "aggregated rebates, fees, price protection payments, and any other payments collected from pharmaceutical drug manufacturers." Between 2016 and 2021, the PBMs reported that they retained between 9% and 21% of total manufacturer payments.[101]

452.    In an attempt to quantify the revenue PBMs receive from retained rebates, a 2023 report found that PBM compensation from rebates and other kickbacks doubled between 2018 and 2022, from $3.8 billion to $7.6 billion.[102] "This growth was fueled by increases in traditional administrative fees as well as the emerge of new data and PBM contracting entity fees."[103]

---

[98] *Express Scripts, Inc. v. Kaleo, Inc.*, No. 4:17-cv-01520-RLW (E.D. Mo. 2017); Balto, *supra* note 91.

[99] Joanna Shepherd, *Pharmacy Benefit Managers, Rebates, and Drug Prices: Conflicts of Interest in the Market for Prescription Drugs*, YALE L. POL'L REV., https://openyls.law.yale.edu/bitstream/handle/20.500.13051/17295/auto_convert.pdf?sequence=3& isAllowed=y, (last visited May 19, 2025).

[100] Adam Fein, *Texas Shows Us Where PBMs' Rebates Go*, Drug Channels (Aug. 9, 2022), https://www.drugchannels.net/2022/08/texas-shows-us-where-pbms-rebates-go.html (last visited May 19, 2025).

[101] *Id.*

[102] Eric Percher, *Trends in Profitability and Compensation of PBMs and PBM Contracting Entities*, Nephron Research (Sept. 18, 2023).

[103] *Id.*

Administrative fees, the report estimated, grew from $3.8 billion in 2018 to $5.8 billion in 2022.[104]

453.    These so-called administrative fees typically are based on a percentage of the drug price—as opposed to a flat fee—such that even if the actual "administrative" cost associated with processing two drugs is the same, the "administrative fee" would be correspondingly higher for the higher-priced drug, which creates (by design) a perverse incentive to give preference to more expensive drugs. Moreover, the PBM Defendants' contracts with payors, including those with Plaintiff, narrowly define "rebates" by tying them to patient drug utilization, so rebates for formulary placement – which are not tied to patient drug utilization – are characterized as "administrative fees" that are not remitted to payors and are beyond a payor's contractual audit right to verify the accuracy of "rebate" payments under the contracts.

454.    The opaque nature of these arrangements between the Manufacturers and PBM Defendants also makes it impossible for a given payor to discover, much less assess or confront, conflicts of interest that may affect it or its members. The January 2021 Senate Insulin Report observed with respect to these arrangements: "Relatively little is publicly known about these financial relationships and the impact they have on insulin costs borne by consumers."[105]

455.    Unsurprisingly, the PBMs have gone to great lengths to obscure these renamed Manufacturer Payments in order keep them for themselves and to avoid scrutiny from payors and others.

456.    For example, with regard to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay

---

[104] *Id.*

[105] Senate Insulin Report, *supra* note 5 at 1.

back to their client payors. These inflation fees enable PBM Defendants and Manufacturer Defendants to share and retain price increases imposed upon the payor.

457.    The PBMs also hide the renamed Manufacturer Payments using "rebate aggregators." Rebate aggregators, referred to as rebate GPOs, are entities that negotiate rebates and fees with, and collect payments from drug manufacturers, including the Manufacturer Defendants, on behalf of a large group of PBMs (including the PBM Defendants) and other entities that contract for pharmaceutical drugs.

458.    Each PBM Defendant owns or is closely affiliated with at least one rebate aggregator. As relevant here, Express Scripts established and controls Ascent; CVS Caremark established and controls Zinc; and OptumRx established and controls Emisar.

459.    The PBMs established these GPOs between 2018 and 2021, in response to mounting pressure from payors to pass through more rebates and other payments collected from the Manufacturers and anticipated Congressional action that would have required more transparency from the PBMs.

460.    As summarized by the recent Community Oncology Alliance report:

> PBMs have increasingly "delegated" the collection of manufacturer rebates to "rebate aggregators," which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors.    Even some of the major PBMs (i.e., the "Big Three" PBMs) sometimes find themselves contracting with other PBMs' rebate aggregators for the collection of manufacturer rebates.    In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (i.e., contracts between PBMs and rebate aggregators, as well as contracts between PBMs/rebate aggregators and pharmaceutical manufacturers) are not readily available to plan sponsors.[106]

461.    These rebate-aggregator GPOs perform the same commercial contracting function that the PBMs once handled themselves, including negotiating with and collecting rebates from

---

[106] Community Oncology Alliance, *supra* note 82.

the Manufacturers. They add no real value to the transactions they facilitate. These rebate aggregators, however, do retain a portion of the rebates they collect and impose additional fees on the Manufacturers, including new administrative and "data" fees, purportedly for their services.

462.    Payors cannot trace these additional amounts, as they are negotiated and collected by the PBMs' affiliate-GPOs and not the PBM-entities that contract with payors. These amounts are not subject to audit, nor do the PBMs disclose the various "fees" these GPOs collect and retain to the SEC or elsewhere.

463.    Additionally, further impeding adequate oversight, certain rebate aggregators are located offshore, including Defendant Ascent, in Switzerland, and Defendant Emisar, which has significant operations in Ireland.

464.    All told, the advent of rebate aggregators in the already complicated chain of financial transactions between drug manufacturers, PBMs, and payors creates an additional veil obfuscating the rebate payment trail and facilitates the PBMs' extraction of mislabeled rebates and additional fees from the Manufacturers without adding any value.

465.    And, as admitted by a former OptumRx executive who helped set up Emisar, OptumRx's rebate aggregator, "The intention of the GPO [rebate aggregator] is to create a fee structure that can be retained and not passed on to a client."[107]

466.    Before establishing Emisar, OptumRx worked with another rebate aggregator, the Coalition for Advanced Pharmacy Services, or "CAPS." CAPS is also a subsidiary of OptumRx, and ultimately of UnitedHealth Group.

467.    To avoid passing these rebates and other payments through to payors, the PBMs

---

[107] Rebecca Robbins & Reed Abelson, *The Opaque Industry Secretly Inflating Prices for Prescription Drugs*, NY TIMES (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html.

adjusted their business models by adding rebate aggregators to the pharmaceutical payment chain.

468.    The PBMs carefully guard the revenue streams from their rebate aggregator activities.

469.    Certain rebate-aggregator companies are located offshore, for example, in Switzerland (Express Scripts' Ascent Health) and Ireland (Emisar Pharma Services), making oversight even more difficult.

470.    A 2017 audit conducted by a local governmental entity on Defendant OptumRx, related to its PBM activities from 2013 to 2015, concluded that the auditor was unable to verify the percentage of rebates OptumRx remitted to its client payor because OptumRx did not grant the auditor full access to its rebate contracts. The audit report explained:

> Optum[Rx] has stated that it engaged the services of an aggregator to manage its rebate activity. Optum[Rx] shared that under this model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity, seeks rebates from the drug manufacturers, based upon the referred [Payor Client] prescription utilization, and retains any rebate amounts that may be received. Optum[Rx] states that they have paid [Payor Client] all amounts it has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum[Rx] has an affiliate relationship with its aggregator.[108]

471.    A footnote in the audit report clarifies that "Optum[Rx] contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc."[109]

472.    In other words, according to this report, OptumRx contracted with its own affiliate aggregator, Coalition for Advanced Pharmacy Services (CAPS), who then contracted with

---

[108] Robert Melton, Laura Rogers & Stacey Thomas, *Audit of Pharmacy Benefit Management Services Agreement*, Report No. 18-13, Broward County Florida, (Dec. 7, 2017).

[109] *Id.* n.3.

OptumRx's co-conspirator Express Scripts, who then contracted with the Manufacturers for rebates related to OptumRx's client's drug utilization. OptumRx then uses this complex relationship to obscure the amount of Manufacturer Payments that are being generated from its client's utilization.

473.    A subsequent audit by the same local entity—covering the period September 2017 to September 2018, concluded:[110]

> Several material weaknesses in Broward's agreement with Optum were identified, many of which are commonplace across pharmacy benefit manager agreements in general. Due to contract weaknesses, comparison of Broward's PBM agreement, including rebate amounts received, to the Consultant's marketplace data is not feasible. Broward could save an estimated $1,480,000 per year in net prescription drug benefit expenses (based upon minimum rebate guarantees) by switching from its current flawed agreement with Optum, to an agreement with its Coalition, which offers clearly defined terms, increased rebate guarantees and cost saving requirements.

474.    Among other "loopholes" discovered in the contract were a number of "flawed" (i.e., vague and manipulable) definitions—including the definition of Rebates, which "allows the exclusion of monies that should be included—and limitation with respect to "Pass Through Transparency Pricing."

475.    The January 2021 Grassley-Wyden Senate Report summarizing findings of their two-year probe into the Insulin Pricing Scheme contained the following observation on these rebate aggregators: [111]

> [T]he recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is

---

[110] Robert Melton & Laura Rogers, *Analysis of Broward County's Prescription Drug Coverage*, Broward County, Florida, Report No. 19-15, Broward County Fla. (July 31, 2019), https://www.broward.org/Auditor/Reports/Reports/082019_Exh1_BCRxDrug_19-15.pdf.

[111] Senate Insulin Report, *supra* note 5, at 119.

no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

476.    Federal regulations governing Medicare attempt to capture all possible forms of Direct or Indirect Remuneration (DIR) to PBMs (and plan sponsors), defining DIR as "any form of price concession" received by a plan sponsor or PBM "from any source," including "discounts, chargebacks, rebates, cash discounts, free goods contingent on a purchase agreement, up-front payments, coupons, goods in kind, free or reduced-price services, grants, legal judgment amounts, settlement amounts from lawsuits or other legal action, and other price concessions or similar benefits. DIR also includes price concessions from and additional contingent payments to network pharmacies that cannot reasonably be determined at the point of sale."[112]

477.    The Department of Health and Human Services, Centers for Medicare & Medicaid Services (CMS) considers all of the following as DIR: rebates, grants, reduced price administrative services, PBM-retained rebates, PBM rebate guarantee amounts, all post-point of sale payments by pharmacies that are not included in the negotiating price including dispensing incentive payments, prompt pay discounts, and payment adjustments. On the other hand, "bona fide service fees from pharmaceutical manufacturers" and "remuneration for administrative services with no impact on the sponsor's or PBM's drug cost (e.g., PBM incentive payments)" are not considered DIR, but only to the extent they reflect fair market value for services rendered.[113]

478.    Because the PBMs retain and conceal a majority of the secret Manufacturer Payments that they receive, they are able to reap significant profits on the Insulin Pricing Scheme.

---

[112] Jennifer R. Shapiro-CMS Director, *Final Medicare Part D DIR Reporting Guidance for 2021* at 7, CMS (March 30, 2022) Available at

https://www.cms.gov/files/document/final2021dirreportingreqsmemo508v3.pdf.

[113] *Id.* at 6–7.

479.    Even when payor clients receive a portion of the Manufacturer Payments from their PBM, those payors still are significantly overcharged as a direct result of the Insulin Pricing Scheme given the extent to which Defendants have deceptively and egregiously inflated the prices of the at-issue drugs.

480.    On September 20, 2024, the Federal Trade Commission brought suit against the PBM Defendants and their affiliated rebate aggregators for violations of Section 5 of the Federal Trade Commission Act "for engaging in anticompetitive and unfair rebating practices that have artificially inflated the list price of insulin drugs, impaired patients' access to lower list price products, and shifted the cost of high insulin list prices to vulnerable patients."[114]

481.    Specifically, the recent FTC Complaint revealed, among other things, (a) that the PBM Defendants' affiliated rebate aggregators "now perform the same commercial contracting function that the PBMs previously handled directly" and that the PBM Defendants "simply moved their commercial rebate contracting functions" to their affiliated rebate aggregators; (b) that the rebate aggregators solicit commercial bids from manufacturers using rebate grids "with different rebate rates for different levels of exclusivity: exclusive coverage (1 of 1 manufacturer), dual coverage with another manufacturer (1 of 2), and multiple manufacturers (1 of many)"; and (c) that the rebate aggregators extract WAC-based fees from drug manufacturers as part of commercial negotiations but "provide no additional services to justify the higher payout on higher list price drugs from the assortment of WAC-based fees" the rebate aggregators extract from the manufacturers.[115]

[114] *In the Matter of Caremark Rx, Zinc Health Services, LLC et al*., Complaint, FTC-221-0114, Docket No. 9437 (Sept. 20, 2024) https://www.ftc.gov/legal-library/browse/cases-proceedings/221-0114-caremark-rx-zinc-health-services-et-al-matter-insulin.

[115] *Id.*

### 2.  *The Insulin Pricing Scheme Allows the PBMs to Profit Off Pharmacies*

482.    A second way the PBM Defendants profit from the Insulin Pricing Scheme is by using the Manufacturers' inflated price to derive profit from the pharmacies with whom they contract nationwide.

483.    Each PBM Defendant decides which pharmacies are included in the PBM's network and how much it will reimburse these pharmacies for each drug dispensed.

484.    The PBMs pocket the spread between the amount that the PBMs are paid by their clients for the at-issue drugs (which are based on the prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which often is less).

485.    In other words, the PBMs charge a client, like Plaintiff, more for a drug than the PBM pays the pharmacy and pockets the difference.

486.    More specifically, the PBM Defendants negotiate with their client payors a reimbursement rate that the client pays the PBM for each prescription drug dispensed by a pharmacy. The PBM Defendants negotiate a separate rate that they pay to pharmacies for each drug dispensed.

487.    These rates are tied to AWP. For example, a PBM may purchase insulin from the pharmacy at a rate of AWP-15%, and the client may reimburse the PBM at a rate of AWP-13%. The PBM pockets the spread (2% of AWP in this example) between the rates.

488.    Because the PBM Defendants' revenue from the spread pricing is tied to AWP, the higher the AWP the greater the amount of money made by the PBMs. In the above example, if the AWP is $100 for a drug, the PBM would make $2 on the spread, but if the AWP is $1000 for the same drug, the PBM would make $20 on the spread from the same sale (AWP-15% = $850; AWP-13% = 870).

489.    When a PBM is affiliated with a retail pharmacy, the PBM earns the entire retail margin in addition to the pricing spread described above.

490.    The PBM Defendants, therefore, like the Manufacturers, directly benefit from inflated insulin prices.

491.    In addition, because the PBM Defendants' client payors pay for thousands of different prescription drugs, the client payors cannot practically keep track of the AWP for each prescription drug on a given formulary or how those prices change over time. The Payors, therefore, are unlikely to independently observe the AWP inflation resulting from the Insulin Pricing Scheme.

492.    The PBM Defendants have no incentive to alert their client payors to increasing AWPs since the PBM Defendants directly profit from those increases.

493.    In addressing this form of spread pricing, the National Association of Insurance Commissioners states: "Pharmacy pricing is complex, and the process is not transparent. Plan sponsors are often unaware of the difference between the amount they are billed and the pharmacy reimbursement."[116]

494.    A bipartisan bill introduced in the Senate in 2022 (the Pharmacy Benefit Manager Transparency Act—S. 4293)—would have criminalized spread pricing, which the bill defined as "[c]harg[ing] a health plan or payer a different amount for a prescription drug's ingredient cost or dispensing fee than the amount the PBM reimburses a pharmacy for the prescription drug's ingredient cost or dispensing fee where the PBM retains the amount of any such difference." The

---

[116] NAIC, *Guide to Understanding Pharmacy Benefit Manager and Associated Stakeholder Regulation—NAIC White Paper Draft* (as of Sept. 29, 2023) Available at: https://content.naic.org/sites/default/files/pmbwhitepap.pdf.

bill has not yet been enacted.[117]

495.    Not coincidentally, the PBMs' industry-funded trade association PCMA spent $7.8 million on federal lobbying in 2021, $8.66 million on lobbying in 2022, and $15.43 million on lobbying in 2023.[118]

496.    The PBMs often disclose the concept of spread pricing to payor but only in vague terms that require no accountability and are not subject to the payors' audit rights because the revenue is not defined as a "rebate" in the PBM contracts with payors.

497.    This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from the PBM Defendants to account for the cost effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

498.    The higher the Manufacturers' list prices, the more money the PBMs make off this spread. At the same time, a Beneficiary's out-of-pocket co-pay or deductible cost often is more than if the client had simply paid cash outside of his or her plan. On top of this, the PBM contracts generally allow no rebates to payors where the Beneficiary is responsible for 100% of the drug cost, e.g., under his or her deductible.

499.    The PBMs also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR (Direct or Indirect Remuneration) fees, based on the list prices—and again, the higher the list price for each diabetes

---

[117] Pharmacy Benefit Manager Transparency Act of 2022, S. 4293, 117th Congress (2022) https://www.govtrack.us/congress/bills/117/s4293 (last visited May 19, 2025).

[118] OpenSecrets, *Client Profile: Pharmaceutical Care Management Ass'n Annual Lobbying Totals*, https://www.opensecrets.org/orgs/pharmaceutical-care-management-assn/lobbying?id=D000028342 (last visited May 19, 2025).

medication sold, the more fees the PBMs generate—or by applying "retrospective" discounts. So, for example, a payor's (and member's co-pay or deductible) cost may be $100, but the price is discounted post-purchase (between the PBM and the (often self-owned) pharmacy) to $90 with the spread going to the PBM.

500.    CMS addressed these and similar DIR issues in a proposed rule in 2017. While noting the growth of "pharmacy price concessions" that "are negotiated between pharmacies and their sponsors or PBMs," CMS nevertheless concluded:[119]

> When manufacturer rebates and pharmacy price concessions are not reflected in the price of a drug at the point of sale, beneficiaries might see lower premiums, but they do not benefit through a reduction in the amount they must pay in cost-sharing, and thus, end up paying a larger share of the actual cost of a drug. Moreover, given the increase in manufacturer rebates and pharmacy price concessions in recent years, the point-of-sale price of a drug that a Part D sponsor reports on a PDE record as the negotiated price is rendered less transparent . . . .

> CMS expressed further concern that when rebates and other price concessions are not reflected in the negotiated point-of-sale drug price, it "can impede beneficiary access to necessary medications, which leads to poorer health outcomes and higher medical care costs for beneficiaries . . . ."

501.    PBMs thus make money coming and going. In a pre-PBM world, a competitively priced drug might have a (hypothetical) net cost to a health plan of $50 and that is what it paid. PBMs enter the picture and coordinate with Manufacturers to increase the list price to $150. The PBMs then "negotiate" the inflated price down to $100 and take a $50 rebate, some of which may be forwarded to the payor, whose net cost is less than the inflated list price, but whose real-world cost is considerably more than if the PBMs were not involved.

502.    At the same time, the PBM receives "administrative fees" for including certain

---

[119] Medicare Program; *Contract Year 2019 Policy and Technical Changes*, 82 Fed. Reg. 56336 (Nov. 29, 2017), available at https://www.govinfo.gov/content/pkg/FR-2017-11-28/pdf/2017-25068.pdf.

drugs on its formularies, which are not considered "rebates." The PBM also receives "service fees" or other payment for "administrative services" provided to the Manufacturers such as "formulary compliance initiatives," "education services," or "the sale of non-patient identifiable claim information." All these revenues are outside the definition of "rebates" found in contracts between the PBM Defendants and payors.

503.    The PBM then charges payors, like Plaintiff, for administrative fees for providing pharmacy benefit management services and charges for drug costs (i.e. ingredient costs) and per-prescription dispensing fees, as well as additional administrative fees for services not included in the PBM's general administrative obligations. The PBM also receives rebates and/or discounts (pre-purchase or post-purchase) from the pharmacies, which it often owns. These too are excluded from the definition of "rebates." These and other vaguely described revenue streams are sometimes disclosed but only in hazy, overly generalized terms. And they are beyond a payor's contractual rights to audit for "transparency" purposes because they are not defined "rebates."

504.    Additionally, the PBM may take months to pay rebates to payors and the PBM retains all interest on, and the time-value of, the rebates pending payment. This is one example of a PBM "disclosure" excerpted from a payor's PBM contract with Express Scripts:

> This disclosure provides an *overview* of the *principal* revenue sources of Express Scripts, Inc. and Medco Health Solutions, Inc. (individually and collectively referred to herein as "ESI"), as well as ESI's affiliates. In addition to administrative and dispensing fees paid to ESI by our clients for pharmaceutical benefit management ("PBM") services, ESI and its affiliates derive revenue from other sources, including arrangements with pharmaceutical manufacturers, wholesale distributors, and retail pharmacies. *Some* of this revenue relates to utilization of prescription drugs by members of the clients receiving PBM services. ESI *may* pass through certain manufacturer payments to its clients or *may* retain those payments for itself, depending on the contract terms between ESI and the client  Formulary rebate amounts vary based on the volume of utilization as well as formulary position applicable to the drug or supplies, and adherence to *various* formulary management controls, benefit design requirements, claims volume, and *other similar factors*, and *in certain instances* also *may* vary based on the product's market-share. ESI *often* pays an amount equal to all or a portion of the formulary rebates it receives to a client based on the client's PBM agreement terms. ESI retains the financial benefit of the use of any funds held until payment of formulary rebate amounts is made to the client. In addition, ESI provides administrative

services to formulary rebate contracted manufacturers, which include, *for example*, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data, as allowed by law, for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. (emphasis added)

505.    Payors have no access to, and no knowledge of, the intricacies of the dealings between the PBM Defendants and the Manufacturers that are shrouded by such vague "disclosures" (which vary in detail, but not in substance, in all three of the PBM Defendants' adhesive contracts).

### 3.    The Insulin Pricing Scheme Increases PBM Mail-Order Profit

506.    Another way PBMs profit from the Insulin Pricing Scheme is through the PBM Defendants' own mail-order pharmacies. The higher the price that PBM Defendants are able to get customers, such as Plaintiff, to pay for diabetes medications, the higher the profits PBM Defendants realize through their mail-order pharmacies.

507.    Because the PBMs base the price they charge for the at-issue diabetes medications on the Manufacturers' price, the more the Manufacturers inflate their prices, and the more money the PBMs make.

508.    When a PBM has its own mail-order pharmacy, its profits are even greater than when they are dispensed through its retail network pharmacies. When a PBM dispenses prescription drugs through its own mail-order pharmacy, it captures the entire retail margin as increased by the Insulin Pricing Scheme. For example, the PBMs have colluded with the Manufacturers so that the PBMs often know when the Manufacturers are going to raise their prices. The PBMs use this opportunity to purchase a significant amount of the at-issue drugs prior to the price increase, at the lower rate. Then, after the Manufacturers raise their price, the PBMs charge their mail-order customers based on the higher, increased prices and pocket the difference. The

PBMs make significant amounts of money through this arbitrage scheme.

509.    The PBMs also charge the Manufacturer Defendants fees related to their mail-order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the Manufacturers' price. Thus, once again, the higher the price, the more money the PBMs make on these fees.

510.    In sum, every way in which the PBMs make money on diabetes medications is tied directly to creating higher prices and inducing larger secret Manufacturer Payments. This involves coordination with the Manufacturers. The PBMs are not lowering the price of diabetes medications as they publicly represent; they are making billions of dollars by fueling these skyrocketing prices at the expense of payor clients and their beneficiaries.

## I.    Plaintiff Purchased the At-Issue Drugs Directly from Defendants

511.    As a large employer, Plaintiff serves its community by providing life-saving medical services and comprehensive treatments, among other vital roles. Plaintiff has a growing list of demands needed to provide its public services on a limited budget. Consequently, any significant increase in spending can have a severe detrimental effect on Plaintiff's overall budget and, in turn, negatively impact its ability to provide revolutionizing health and research services to the community.

512.    One benefit Plaintiff provides the Beneficiaries of its healthcare plan is payment for a large portion of their pharmaceutical purchases. In this role, Plaintiff spent significant amounts on the at-issue diabetes medications during the relevant period.

513.    Because Plaintiff maintains a self-funded plan, Plaintiff does not rely on a third-party insurer to pay for insured employees' medical care, pharmaceutical benefits, or prescription drugs. Rather, Plaintiff directly contracted with PBMs (and their affiliated pharmacies) for

pharmaceutical benefits and prescription drugs, including the at-issue medications.

514.    In the context of Plaintiff's purchases of the at-issue drugs, Plaintiff and its Beneficiaries are the victims of the Insulin Pricing Scheme. Plaintiff is the only named party that pays the full purchase price for the at-issue drugs, and the only named party that has not knowingly participated in the Insulin Pricing Scheme. Neither the PBM Defendants nor the Manufacturers Defendants suffer losses from the Insulin Pricing Scheme.

515.    As part of purchasing the at-issue drugs from the PBMs, Plaintiff directly contracted with the PBMs and consequently was forced to pay artificially inflated costs resulting from the Insulin Pricing Scheme, including "administrative fees," "inflation fees," "discount fees," and more—all of which are associated with Plaintiff's purchase of the at-issue drugs from the PBM Defendants. Because the at-issue medications are potentially life-saving drugs, and because the Manufacturers control the market for these drugs, Plaintiff has no choice but to pay these exorbitant, artificially inflated prices directly to PBM Defendants.

516.    Plaintiff also relies (and has relied) on the Defendants as administrative agents, for the alleged purposes of limiting its administrative burden and controlling pharmaceutical drugs costs during the relevant period. These PBM services included, but were not limited to, developing and offering formularies for Plaintiff's prescription plan, constructing and managing Plaintiff's pharmacy network (which included the PBMs' retail and mail-order pharmacies), processing pharmacy claims, and providing mail-order pharmacy services to Plaintiff.

517.    In providing PBM services to Plaintiff, the prices set by Defendants as part of the Insulin Pricing Scheme were artificially inflated, and Plaintiff paid Defendants directly for the at-issue drugs.

### J.  Defendants Deceived Plaintiff

518.    At no time has either Defendant group disclosed the Insulin Pricing Scheme or the reasons for the artificially inflated list prices produced by it.

### 1.   *The Manufacturer Defendants Deceived Plaintiff*

519.    At all times during the relevant period, the Manufacturer Defendants knew that the list prices, net prices, and payors' net costs (purchase prices) generated by the Insulin Pricing Scheme were artificially inflated, excessive, and untethered to any legal, competitive, or fair market price.

520.    The Manufacturer Defendants knew that these prices did not bear any rational relationship to the actual costs incurred or prices realized by Defendants, did not result from transparent or competitive market forces, and were artificially and arbitrarily inflated for the sole purpose of generating profits for Defendants.

521.    The insulin market, and Defendants' business arrangement relating thereto, exhibit the key features of oligopolies—concentration of numerous competitors into a small group of firms that dominates the market, high barriers to entry, ability to set and control prices, firm interdependence, and maximal revenues.

522.    The Manufacturer Defendants also knew that payors, including Plaintiff, relied on the artificially inflated list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs.

523.    The Manufacturer and PBM Defendants further knew that Plaintiff—like any reasonable consumer, and particularly one with fiduciary obligations to its Beneficiaries—wanted and expected to pay a price reflecting the lowest fair market value for the drugs (which was not necessarily the same as the lowest price in the market, given that all prices were inflated due to the Insulin Pricing Scheme).

524.    Despite this knowledge, the Manufacturer Defendants published the prices generated by the Insulin Pricing Scheme throughout the United States and Pennsylvania through publishing compendia, in various promotional and marketing materials distributed by entities downstream in the drug supply chain, and directly to pharmacies which then used these prices to set the amount that the pharmacies charged for the at-issue drugs

525.    The Manufacturer Defendants also publish these prices to the PBMs and pharmacies, which then use them to charge diabetics and payors like Plaintiff for the at-issue Drugs.

526.    By publishing their prices throughout Pennsylvania, the Manufacturer Defendants held these prices out as a reasonable price upon which to base the prices that payors actually pay for the at-issue drugs.

527.    These representations are false. The Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to their cost, their fair market value in a competitive market, or the net price received for the at-issue drugs.

528.    During the relevant period, the Manufacturer Defendants published prices in Pennsylvania at hundreds of dollars per dose for the same at-issue drugs that would have been profitable to Manufacturers at prices less than $10 per dose.

529.    The Manufacturer Defendants also have publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation. For example, briefing materials prepared for Dave Ricks, Eli Lilly's CEO, as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant research and development costs for insulin. During the relevant period, executives from Sanofi and Novo Nordisk also falsely represented that research and development

costs were key factors driving the at-issue price increases.[120]

530.    To the contrary, between 2005 and 2018, Eli Lilly spent hundreds of millions on R&D costs related to Humalog while earning billions in net sales during that same time period. In other words, Eli Lilly made multiples its reported R&D costs on Humalog during this portion of the relevant period, i.e., R&D costs amounted to about a fraction of net sales. Novo Nordisk has spent several times the amount it spends on R&D on stock buyouts and shareholder dividend payouts in recent years.[121]

531.    The January 2021 Senate Insulin Report found that the PBMs consider insulins to be "interchangeable" from "a clinical perspective" and that Manufacturers focus their R&D efforts on new insulin-related device, equipment, and other mechanical parts which are separate from insulin's formulation."[122]

532.    A House Oversight Committee staff report concluded that "drug companies' claims that reducing U.S. prescription drug prices will harm innovation is overblown" and that "[m]any drug companies spent a significant portion of their R&D budget on finding ways to suppress generic and biosimilar competition while continuing to raise prices, rather than on innovative research."[123]

533.    In sum, the Manufacturer Defendants affirmatively withheld the truth from Plaintiff and specifically made these misrepresentations in furtherance of the Insulin Pricing Scheme and to induce Plaintiff's reliance to purchase the at-issue drugs.

---

[120] Drug Pricing Investigation, *supra* note 47.

[121] *Id.*

[122] Senate Insulin Report, *supra* note 5 at 43.

[123] *Drug Pricing Investigation: Industry Spending on Buybacks, Dividends and Executive Compensation*, H.R. Comm. on Oversight and Reform,  117th Cong. (July 2021).

## 2. The PBM Defendants Deceived Plaintiff

534.    The PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by selecting the highest price at-issue drugs for preferred formulary placement and by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

535.    The PBM Defendants perpetuate the use of the artificially inflated insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme and to profit at the expense of Pennsylvania payors nationwide.

536.    At all times throughout the relevant period, the PBMs have purposefully, consistently, and routinely misrepresented that they negotiate with Manufacturer Defendants and construct formularies for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics. Representative examples include:[124]

- Defendant CVS Caremark has for the past decade consistently stated in its annual reports that its design and administration of formularies are aimed at reducing the costs and improving the safety, effectiveness, and convenience of prescription drugs. CVS Caremark has further stated that it maintains an independent panel of doctors, pharmacists, and other medical experts to review and approve the selection of drugs based on safety and efficacy for inclusion on one of Caremark's template formularies and that CVS Caremark's formularies lower the cost of drugs.

- Likewise, Defendant Express Scripts has consistently represented that it works with clients, manufacturers, pharmacists, and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain, and to improve members' health outcomes. Its annual reports consistently claim that in making formulary recommendations, Express Scripts' Pharmacy & Therapeutics Committee considers the drug's safety and

---

[124] CVS Health, *Annual Reports* (Form 10-K) (FY 2010-2019); OptumRx, *Annual Reports* (Form 10-K) (FY 2010- 2019); Express Scripts, *Annual Reports* (Form 10-K) (FY 2010-2019).

efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement that Express Scripts negotiates with the Manufacturer, and that Express Scripts fully complies with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy.

- Similarly, Defendant OptumRx has consistently stated in its annual reports over the past decade that OptumRx's rebate contracting and formulary management assist customers in achieving a low-cost, high-quality pharmacy benefit. It has consistently claimed that it promotes lower costs by using formulary programs to produce better unit costs, encouraging patients to use drugs that offer improved value and that OptumRx's formularies are selected for health plans based on their safety, cost and effectiveness.

537.    In addition to these general misrepresentations, the PBM Defendants have, during the relevant period, purposefully, consistently, and routinely made misrepresentations about the at-issue diabetes medications. Representative examples include:

- In a public statement issued in November 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."[125]

- In 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark, stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."[126]

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."[127]

---

[125] Chain Drug Review, *CVS Expands ExtraCare for Diabetes Products* (May 11, 2010), https:// www.chaindrugreview.com/cvs-expands-extracare-for-diabetes-products/ (last visited May 19, 2025).

[126] CBS News, *Diabetes Epidemic Growing* (June 22, 2010), https://www.cbsnews.com/news/diabetes-epidemic-growing/ (last visited May 19, 2025).

[127] Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year*, Wall St. J. (Nov. 8, 2012), https://www.wsj.com/articles/SB10001424127887324439804578107040729812454?msockid=3a a0dbfc5c03614f0947ce0d5d876029 (last visited May 19, 2025).

- In 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts, stated that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."[128] Mr. Stettin also claimed that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."[129]

- In 2017, Express Scripts CEO, discussing a program involving insulin, "disputed the idea that Express Scripts contributes to rising drug costs."[130]

- In a 2018 Healthline interview, Mark Merritt, longtime President of the PBM trade association PCMA, stated: "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."[131]

- CVS Caremark's Chief Policy and External Affairs Officer claimed in the April 2019 hearings that CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."[132]

- Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list

---

[128] Angela Mueller, *Express Scripts Launches Program to Control Diabetes Costs*, St. Louis Bus. J. (Aug. 31, 2016), https://drugstorenews.com/pharmacy/express-scriptsimplements-latest-diabetes-care-value-program.

[129] Express Scripts, *Express scripts Launches Diabetes Care Value ProgramSM, Guaranteeing More Affordable, High-Quality Diabetes Care,* (Aug. 23, 2016), https://www.prnewswire.com/news-releases/express-scripts-launches-diabetes-care-value-program-guaranteeing-more-affordable-higher-quality-diabetes-care-300320485.html#:~:text=The%20new%20program%20%E2%80%93%20part%20of,anticipated%20increase%20in%20diabetes%2Ddrug (last visited June 16, 2025).

[130] Katie Thomas, *Express Scripts to Offer Cheaper Drugs for Uninsured Customers*, N.Y. Times, (May 8, 2017), available at https://www.nytimes.com/2017/05/08/health/express-scripts-drug-prescriptions-prices.html.

[131] Dave Muoio, *Insulin Prices: Are PBMs and Insurers Doing Their Part?*, Population Health Learning Network (Dec. 2016), https://www.hmpgloballearningnetwork.com/site/frmc/article/insulin-prices-are-pbms-and-insurers-doing-their-part (last visited May 19, 2025).

[132] Priced Out of a Lifesaving Drug, *supra* note 88, also available at https://www.govinfo.gov/content/pkg/CHRG-116hhrg39747/html/CHRG-116hhrg39747.htm.

prices on behalf of our customers."[133]

- In May 2023, OptumRX's CEO, Heather Cianfrocco, told the U.S. Senate Committee on Health, Education, Labor, and Pensions that OptumRx "has been at the forefront of efforts to improve access to affordable insulin and provide comprehensive care to patients with diabetes."[134]

538.    The PBM Defendants not only falsely represent that they negotiate with the Manufacturer Defendants to lower the price of the at-issue diabetes medications for payors, but also for diabetic patients as well. Representative examples include:

- Express Scripts' code of conduct, effective beginning in 2015, states: "At Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable."[135] (emphasis added)

- Amy Bricker, former President of Express Scripts and PCMA board member, testified before Congress in April 2019: "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs."[136] (emphasis added)

- Ms. Bricker of Express Scripts also testified that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications."[137] (emphasis added)

- OptumRx CEO John Prince testified to the Senate: "We *reduce the costs of prescription drugs* [and] we are leading the way to ensure that *those discounts directly benefit consumers* . . . OptumRx's pharmacy care services

---

[133] *Id.*

[134] Heather Cianfrocco, *Written Testimony, The Need to Make Insulin Affordable for All Americans* (May 10, 2023), https://www.help.senate.gov/imo/media/doc/Cianfrocco%20Written%20Testimony%20HELP%20Committee%20_Final.pdf.

[135] Express Scripts, *Code of Conduct*, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited May 19, 2025).

[136] *Priced Out of a Lifesaving Drug*, *supra* note 88.

[137] *Id.*

business is *achieving better health outcomes for patients, lowering costs* for the system, and *improving the healthcare experience for consumers*. . . . OptumRx negotiates better prices with drug manufacturers *for our customers and for consumers*. [138] (emphasis added)

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . in 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative." (emphasis added)[139]

- The PCMA website touts PBMs as "the only entity in the prescription drug supply and payment chain dedicated to reducing drug costs" and (contradicting the PBM representatives' Congressional testimony), that "when new manufacturers enter the market at a lower list price, PBMs use the competition to drive costs down."[140]

539. Not only have PBM Defendants intentionally misrepresented that they use their market power to save payors money, but they have specifically and falsely disavowed that their conduct drives prices higher. Representative examples include:

- On an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated: "Drugmakers set prices, and we exist to bring those prices down."[141]

---

[138] Senate Insulin Report, *supra* note 5, Hearing Tr. at 171, https://www.finance.senate.gov/imo/media/doc/435631.pdf (last visited May 19, 2025).

[139] CVS Health, *2017 Drug Trend Report*, https://s2.q4cdn.com/447711729/files/doc_downloads/company_documents/2017-drug-trend-report.pdf (last visited May 28, 2025).

[140] PCMA, *PCMA Applauds Biden Administration Action to Stop Drug Manufacturer Patent Abuses, Lower Prescription Drug Costs* (Jul. 7, 2022), https://www.pcmanet.org/press-releases/pcma-applauds-biden-administration-action-to-stop-drug-manufacturer-patent-abuses-lower-prescription-drug-costs/07/07/2022/#:~:text=Pharmacy%20benefit%20managers%2C%20PBMs%2C%20are,patient%20access%2C%20and%20increasing%20affordability; PCMA, *PBMs Reduce Insulin Costs*

*PBMs are working to improve the lives of patients living with diabetes and their families*, available at https://www.pcmanet.org/pbms-reduce-insulin-costs/ (last visited May 28, 2025).

[141] Samantha Liss, *Express Scripts CEO Addresses Drug Pricing 'Misinformation', St. Louis Post-Dispatch* (Feb. 17, 2017), https://www.stltoday.com/business/local/expressscripts-ceo-addresses-drug-pricing-misinformation/article_8c65cf2a-96ef-5575-8b5c-95601ac51840.html (last visited May 19, 2025).

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017: "Any suggestion that PBMs are causing prices to rise is simply erroneous."[142]

- In 2017, Express Scripts' Wentworth went on CBS News to argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."[143]

- During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's Chief Medical Officer Sumit Dutta answered: "we can't see a correlation when rebates raise list prices."[144]

- In 2019, when testifying under oath before Congress on the rising price of insulins, Amy Bricker—former President of Express Scripts and PCMA board member— testified: "I have no idea why list prices [for insulin] are high and it's not a result of rebate."[145]

540.    All of Defendants' public statements regarding insulin pricing have been consistent with the misrepresentations above and those detailed below. None have contradicted those misrepresentations or revealed the Insulin Pricing Scheme.

541.    The PBM Defendants understand that payors like Plaintiff rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve access to medications. Plaintiff did so rely. Express Scripts' CEO told the U.S. Senate that PBMs "exist to help solve the challenge" of rising drug prices, including insulin, by "negotiating with

---

[142] Lynn R. Webster, *Who Is To Blame For Skyrocketing Drug Prices?*, The Hill (July 27, 2017, 11:40 AM), https://thehill.com/blogs/pundits-blog/healthcare/344115-who-is-to-blame-for-skyrocketing-drug-prices/#:~:text=The%20lawsuit%20blames%20Express%20Scripts%20for%20the%20high,the%20pharmacy%20benefit%20manager%20has%20negotiated%20with%20drugmakers.%E2%80%80%9D (last visited May 19, 2025).

[143] CBS News, *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices* (Feb. 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited May 19, 2025).

[144] *Priced Out of a Lifesaving Drug*, *supra* note 88.

[145] *Id.*

129

large pharmaceutical manufacturers to lower the cost of drugs for employers, health plans, federal and state governments, and most importantly, patients."[146]

542.    Throughout the relevant period, the PBM Defendants also falsely claimed they are transparent about the Manufacturer Payments and that the amounts they remit (or not) to payors. In fact, the PBM Defendants' disclosures of their ties to the Manufacturer Defendants were vague, equivocal, and misleading. Their manner of defining "rebates" in payor contracts was illusory and subject to indeterminate conditions and exceptions. The PBM Defendants thereby facilitated and obtained secret Manufacturer Payments far above and beyond the amount of "rebates" remitted to payors.

543.    The PBMs' internal processes and accounting were and are abstruse and opaque, allowing them to overtly mislead the public and payors like Plaintiff.

544.    In 2011, for example, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]very day we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."[147]

545.    In a 2017 CBS News interview, Express Scripts' CEO represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments they receive and that payors "know exactly how the dollars flow" with respect to these Manufacturer

---

[146] Adam Kautzner, *The Need to Make Insulin Affordable for All Americans: Testimony Before the U.S. S. Comm. on Health, Educ., Lab. & Pensions*, 118th Cong. (May 10, 2023).

[147] UnitedHealth Group, *Prescription Solutions by OptumRx Receives 4th Consecutive TIPPS Certification for Pharmacy Benefits Transparency Standards* (Sept. 13, 2011), https://web.archive.org/web/20210805182422/https://www.unitedhealthgroup.com/newsroom/2011/0913tipps.html  (last visited May 19, 2025). *See also, e.g.*, *Prescription Solutions by OptumRx Receives Transparency Award*, Fierce Pharma (Apr. 11, 2024), https://www.fiercepharma.com/pharma/prescription-solutions-optumrx-receives-transparency-award.

Payments.[148]

546.    When testifying before the Senate Finance Committee, CVS Executive Vice President Derica Rice stated: "[A]s it pertains to transparency overall, we at CVS Caremark are very supportive. We provide full visibility to our clients of all our contracts and the discounts that we negotiate on their behalf.  And transparency—today we report and fully disclose not only to our clients, but to CMS [Medicare]."[149]

547.    At the same hearing, Steve Miller of Cigna (Express Scripts) testified: "we are a really strong proponent for transparency for those who pay for health care. So, the patient should know exactly what they are going to pay. Our plan sponsors should know exactly what is in their contract."[150]

548.    John Prince of OptumRx chimed in: "Senator, if our discounts were publicly available, it would hurt our ability to negotiate effectively. Our discounts are transparent to our clients."[151]

549.    When testifying before Congress in April 2019, Amy Bricker, then a Senior Vice President of Defendant Express Scripts, claimed transparency with payors and echoed Mr. Prince's need for confidentiality around discounts:[152]

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. The reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].

---

[148] CBS News, *supra* note 143.

[149] Senate Insulin Report, *supra* note 5—*Hearing Transcript* at 28, 32, https://www.finance.senate.gov/imo/media/doc/435631.pdf (last visited May 19, 2025).

[150] *Id.* at 32.

[151] *Id.*

[152] *Priced Out of a Lifesaving Drug, supra* note 88.

\*\*\*

Mr. Sarbanes. Yeah, because it's a secret. What about if we made it completely transparent? Who would be for that?

\*\*\*

Ms. Bricker. Absolutely not . . . [i]t will hurt the consumer.  prices will be held high.

550.    Consistent with the PBM Defendants' intention in creating these rebate aggregators "to create a fee structure that can be retained and not passed on to a client,"[153] the PBMs also intentionally withhold information about their use of affiliated rebate aggregators (like Defendants Zinc, Ascent, and Emisar) to negotiate and collect rebates and additional fees from the Manufacturers. The PBMs use these GPOs to obfuscate the payment trail of rebates and these additional "fees," which are promised to payors under their sponsor agreements with the PBMs. The PBMs do not disclose the amounts collected by or details about the rebate aggregators in their SEC filings, nor do they disclose their existence or activity to payors publicly in sponsor agreements, RFP responses, or other communications. These amounts are also not subject to audit because they are not classified as rebates collected by the PBMs.

551.    As recently as May 2022, JC Scott—President of the PBM trade group PCMA—testified as follows before the Senate Commerce Committee:

> PBMs are proud of the work they do to reduce prescription drug costs, expand affordable access to medications, and improve patient outcomes. PBMs negotiate with drug companies to lower prescription drug costs PBMs advocate for patients in the fight to keep prescription drugs accessible and affordable.

552.    Mirroring the PCMA website, Mr. Scott also testified, "The PBM industry is the

---

[153] Robbins & Abelson, *supra* note 107.

only stakeholder in the chain dedicated to seeking lower costs."[154]

553.    During the relevant period, as seen above, PBM Defendants represented to Plaintiff that they constructed formularies and negotiated with the Manufacturer Defendants for the benefit of payors and patients to maximize drug cost savings while promoting the health of diabetics.

554.    Throughout the relevant period, the PBMs made the foregoing and similar misrepresentations consistently and directly to Pennsylvania payors, including the Plaintiff, through bid proposals, member communications, invoices, formulary change notifications, and extensive direct-to-consumer pull through efforts engaged in with the Manufacturers.

555.    All of these representations are false. The Manufacturer and PBM Defendants in fact coordinated to publish the artificially inflated prices and to construct the PBM formularies, causing the price of the at-issue drugs to skyrocket. For example:

- In 2018, the US spent $28 billion (USD) on insulin compared with $484 million in Canada. The average American insulin user spent $3,490 on insulin in 2018 compared with $725 among Canadians.[155]

- Diabetics who receive their medications from federal programs that do not utilize PBMs also pay significantly less. For example, in December 2020, the United States House of Representatives Committee on Oversight and Reform issued a Drug Pricing Investigation Report finding that federal health care programs that negotiate directly with the Manufacturers (such as the Department of Veterans Affairs), and are thus outside the PBM Defendants' scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program, which relies on the PBM Defendants to set their at-issue drug prices (and are thus victims of the PBMs' concerted efforts to drive up the list prices).

---

[154] Juan Carlos "JC" Scott, President & CEO, Pharm. Care Mgmt. Ass'n, Testimony Before the S. Subcomm. on Consumer Prot., Prod. Safety, & Data Sec. of the S. Comm. on Commerce, Sci., & Transp., 117th Cong. (May 5, 2022), https://www.commerce.senate.gov/services/files/61891DE9-AB7F-4325-97C3-531B4C0C8D7B.

[155] Trevor Schneider et al., Comparisons of Insulin Spending and Price Between Canada and the United States, 97 *Mayo Clinic Proc.* 573, 573–78 (2022).

556.    Defendants knew their representations were false when they made them and coordinated to affirmatively withhold the truth from payors, including Plaintiff.

557.    Defendants concealed the falsity of their representations by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other considerations between them.

558.    Defendants have never revealed the full amount of any drug-specific Manufacturer Payments exchanged between them.

559.    The PBM Defendants do not disclose the terms of their agreements with the Manufacturers or the Manufacturer Payments they receive. Nor do they disclose the details related to their agreements (formal or otherwise) with pharmacies. All these revenue streams are beyond the scope of the payors' contractual audit rights.

560.    Further, although PBMs negotiate drug-specific rebates with Manufacturers, [156] the PBM rebate payments to payor clients and summaries of such payments are in the aggregate, rather than on a drug-by-drug basis. It is impossible for payors like Plaintiff to tease out drug-specific rebates, much less the other undisclosed Manufacturer Payments. This allowed the PBM Defendants to hide the large Manufacturer Payments that they receive for the at-issue diabetes medications.

561.    The PBM Defendants have gone so far as to sue governmental entities to block the release of details on their pricing agreements with the Manufacturers and pharmacies.

562.    Even when audited by payors, the PBM Defendants routinely refuse to disclose their agreements with the Manufacturers and pharmacies, relying on overly broad confidential agreements, claims of trade secrets, and erecting other unnecessary roadblocks and restrictions.

---

[156] Senate Insulin Report, *supra* note 5, at 35.

563.    Beneficiaries of the Plaintiff's health plans have no choice but to pay prices flowing from Defendants' inflated list prices because Beneficiaries need these medications to survive, and the Manufacturer Defendants make virtually all diabetes medications available in the United States. The list prices generated by the Defendants' coordinated efforts directly impact out-of-pocket costs at the point of sale.

564.    In sum, the entire insulin pricing structure created by the Defendants—from the artificially inflated prices to the Manufacturers' misrepresentations related to the reason behind the price, to the inclusion of the artificially inflated prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is unconscionable, deceptive, and immensely lucrative.

565.    Plaintiff did not know, because the Defendants affirmatively concealed, that (1) the Manufacturers and PBMs coordinated to create the PBM formularies in exchange for money and other consideration; (2) the list prices were artificially inflated; (3) the list prices were manipulated to satisfy PBM profit demands; (4) the list prices and net costs (purchase prices) paid by Plaintiff bore no relationship to the fair market value of the drugs themselves or the services rendered by the PBMs in coordinating their pricing; or (5) the entire insulin pricing structure Defendants created was false.

### K. The Insulin Pricing Scheme Has Damaged Plaintiff

566.    Plaintiff provides health and pharmacy benefits to its Beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period.

567.    One benefit Plaintiff provides the Beneficiaries of its healthcare plan is paying for

their pharmaceutical needs.

568.    Plaintiff was unaware of the Insulin Pricing Scheme. Plaintiff relied on Defendants' public statements and material omissions.

569.    Plaintiff contracted with CVS Caremark for PBM services.

570.    Defendants' Insulin Pricing Scheme has cost Plaintiff millions of dollars in overcharges.

571.    Indeed, since 2011, Plaintiff has spent millions on the at-issue diabetes medications.

572.    Defendants failed to adhere to principles of good faith and fair dealing in carrying out their PBM contracts with Plaintiff. Defendants' respective relationships with Plaintiff were inherently unbalanced and their contracts adhesive. Defendants had superior bargaining power and superior knowledge of their relationships with the Manufacturer Defendants, including those that ultimately dictate the drug costs Plaintiff incurred. Although Defendants were supplying a vital service of a quasi-public nature, they both exploited their superior positions to mislead Plaintiff and thwart its expectations, all at great expense to the Plaintiff. The Defendants' misrepresentations, omissions, and misconduct—including and as manifested in the Insulin Pricing Scheme—directly and proximately caused economic damage to Plaintiff as a payor/purchaser of Defendants' at-issue diabetes medications.

573.    A substantial proportion of the money Plaintiff spent on diabetes medications is attributable to Defendants' inflated prices, which did not arise from competitive market forces but, instead, exist solely by virtue of the Insulin Pricing Scheme.

574.    Because of Defendants' success in concealing the Insulin Pricing Scheme through act and omission, no payor, including Plaintiff, knew (or should have known) during the relevant period that the prices for the at-issue diabetes medications were (and are) artificially inflated due

to the Insulin Pricing Scheme.

575.    As a result, Plaintiff has unknowingly overpaid for the Manufacturer Defendants' diabetes medications, which would have cost far less but for the Insulin Pricing Scheme.

576.    In addition, because of the inflated AWPs caused by the Insulin Pricing Scheme, Plaintiff's Beneficiaries may have had greater out-of-pocket expenses (because their co-pays are tied to AWP), which resulted in those Beneficiaries reaching their annual spending caps sooner and obligating Plaintiff to pay more for those Beneficiaries to cover the remainder of the plan year.

577.    In short, the Insulin Pricing Scheme has directly and proximately caused Plaintiff to substantially overpay for diabetes medications.

578.    Because Defendants continue to generate exorbitant, unfair, and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to Plaintiff is ongoing.

## L. Defendants' Recent Efforts in Response to Rising Insulin Prices

579.    In reaction to mounting political and public outcry, Defendants have taken action both on Capitol Hill and in the public relations space.

580.    First, in response to public criticism, Defendants have increased their spending to spread their influence in Washington, D.C.

581.    For example, in recent years Novo Nordisk's political action committee ("PAC") has doubled its spending on federal campaign donations and lobbying efforts. In 2017 alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, its biggest ever investment in directly influencing U.S. policymakers. Eli Lilly and Sanofi also have contributed millions of dollars through their PACs in recent years.

582.    In 2023, Eli Lilly spent over $8.4 million in lobbying and Sanofi spent over $5.4 million.

583.    Second, Defendants have recently begun publicizing programs ostensibly aimed at lowering the cost of insulins.

584.    These affordability measures fail to address the structural issues that caused the price hikes. Rather, these are public-relations measures that do not solve the problem.

585.    For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

586.    At that time, Eli Lilly told the Senate Finance Committee that "we can provide a lower-priced insulin more quickly without disrupting access to branded Humalog, on which thousands of insured patients depend, and which will remain available for people who want to continue accessing it through their current insurance plans."[157]

587.    When it launched Lispro, its press release said the drug was the "same molecule" as Humalog yet would be sold at half the price of Humalog. Eli Lilly expressly said it was to help make insulin medication "more affordable".[158]

588.    However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

589.    Following this the staff of the Offices of U.S. Senators Elizabeth Warren and Richard Blumenthal prepared a report examining the availability of this drug.

590.    The investigative report, Inaccessible Insulin: The Broken Promise of Eli Lilly's

---

[157] Joseph B. Kelly, Letter to S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf.

[158] Eli Lilly and Co., March 4, 2019, Press Release, *Lilly to Introduce Lower-Priced Insulin*, available at https://investor.lilly.com/node/40881/pdf (last visited May 19, 2025).

Authorized Generic, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability. [159]

591.    In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous. In any event, ReliOn is not included in any of the PBM Defendants' formularies as of January 2023.

592.    Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem, and the PBMs continue to exclude drugs with lower list prices despite their assurances of cost-savings for payors and Beneficiaries.

593.    Plaintiff continues to suffer harm caused by the Insulin Pricing Scheme.

## TOLLING OF STATUTES OF LIMITATIONS

594.    Plaintiff has diligently pursued and investigated the claims asserted in this Complaint. Through no fault of its own, Plaintiff did not learn, and could not have learned, of the factual bases for its claims or the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

### A.    Discovery Rule Tolling

595.    Plaintiff did not know about the Insulin Pricing Scheme until shortly before filing

---

[159] Sen. Elizabeth Warren & Sen. Richard Blumenthal, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, (Dec. 2019), https://www.warren.senate.gov/imo/media/doc/Inaccessible%20Insulin%20report.pdf (last visited May 19, 2025).

this Complaint. Plaintiff was unaware that it was economically injured and unaware that any economic injury was wrongfully caused. Nor did Plaintiff possess sufficient information concerning the injury complained of here, or its cause, to put Plaintiff or any reasonable person on inquiry notice to determine whether actionable conduct was involved.

596. The PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants or the details of Defendants' negotiations and payments between each other or their pricing structures and agreements—Defendants labeled these trade secrets, shrouded them in confidentiality agreements, and circumscribed payor audit rights to protect them.

597. Each Defendant group also affirmatively blamed the other for the price increases described herein, both during their Congressional testimonies and through the media. All disavowed wrongdoing and falsely claimed that their dealings with payors like Plaintiff were honest and transparent.

598. Plaintiff did not discover until recently facts sufficient to cause a reasonable person to suspect that Defendants were engaged in the Insulin Pricing Scheme or that Plaintiff had suffered economic injury as a result of any or all Defendants' wrongdoing. Nor would diligent inquiry have disclosed the true facts had Plaintiff been aware of any cause to undertake such an inquiry.

599. Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships, and agreements between and among the Manufacturer Defendants and the PBM Defendants, i.e., the Insulin Pricing Scheme, continue to obscure Defendants' unlawful conduct from Plaintiff and the general public.

**B.    Fraudulent Concealment**

600. Through the acts, omissions, and misrepresentations alleged throughout this

Complaint, Defendants fraudulently concealed the fact of Plaintiff's economic injury and its cause.

601.    Defendants cannot rely upon any statute-of-limitations defense because they purposefully concealed the Insulin Pricing Scheme, their generation of artificially inflated list prices, and the fact that the prices for the at-issue diabetes medications were artificially inflated. The Defendants deliberately concealed their behavior and active role in the Insulin Pricing Scheme and other unlawful conduct.

602.    Defendants' acts, omissions, and misrepresentations were calculated to—and did—lull and induce payors, including Plaintiff, into forgoing legal action or any inquiry that might lead to legal action. Defendants' acts, omissions, and representations were intended to and, in fact, did prevent Plaintiff from discovering its claims.

603.    Defendants knowingly and fraudulently concealed the facts alleged herein. Defendants knew of the wrongful acts set forth above, had information pertinent to their discovery, and concealed them from the public. As a result of Defendants' conduct, Plaintiff did not know, and could not have known through the exercise of reasonable diligence, of the existence or scope of the Insulin Pricing Scheme or Plaintiff's cause of action.

604.    Defendants continually and secretly engaged in the Insulin Pricing Scheme. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

605.    As alleged herein, and among other things, Defendants affirmatively concealed:

(a) that the Manufacturers and PBMs coordinated to create the PBM formularies in exchange for money and other consideration;

(b) that the list prices were artificially inflated and manipulated;

(c) that the list prices and net costs (purchase prices) paid by payors and patients bore no relationship to the fair market value of the drugs themselves or the services rendered by the PBMs in coordinating their pricing;

(d) that the at-issue insulin drugs were selected for inclusion or preferred status on the formularies based on higher prices (and greater potential revenues for Defendants) rather than because of cost-effectiveness or because they were beneficial to payors' Beneficiaries;

(e) the exchange of various payments and pricing agreements between the Manufacturers and PBMs; or

(f) that the entire insulin pricing structure Defendants created was artificially inflated.

606.    As alleged more fully herein, the PBM Defendants have blocked drug pricing transparency efforts.

607.    As alleged more fully herein, the Manufacturer Defendants have testified to Congress that they were not responsible for skyrocketing insulin prices, claiming that they had no control over the pricing, blaming the PBM Defendants for the high prices, and suggesting that they have not profited from astronomical insulin prices.

608.    Meanwhile, the PBM Defendants testified to Congress that the Manufacturer Defendants were solely responsible for the list price increases and that the payments that the PBMs receive from the Manufacturer Defendants are unrelated to rising insulin prices.

609.    As alleged herein, the PBM Defendants concealed the Insulin Pricing Scheme through vague and manipulable definitions of terms in their contracts, including by hiding the fees that the Manufacturer Defendants paid to the PBM Defendants and which the PBM Defendants retained and did not pass along to payors as Rebates.

610.    The PBM Defendants also concealed payments they received from the Manufacturer Defendants through their affiliated rebate aggregators, hiding them in complex contractual relationships—often with other Defendants—and not reporting them on their quarterly SEC filings.

611.    Defendants coordinated to affirmatively withhold the truth about the Insulin Pricing Scheme from payors, including Plaintiff, patients, and the public and concealed the falsity of representations made to payors, including Plaintiff, by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration between them.

612.    Plaintiff did not know, and could not reasonably have discovered, the full extent of agreements between the PBM Defendants and the Manufacturer Defendants or payments the Manufacturer Defendants made to the PBMs because Defendants actively concealed these agreements and payments.

613.    Despite the claims of transparency made to payors, including Plaintiff, and to the public, Defendants have never revealed the full amount of drug-specific payments they have exchanged or received. Payors, including Plaintiff, and patients reasonably relied on Defendants' claims of transparency.

614.    Defendants intended that their actions and omissions would be relied upon by the public, to include payors and patients. Plaintiff did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

615.    Payors, including Plaintiff, and individuals with diabetes who need insulin, reasonably relied on Defendants' affirmative statements to Congress, the public, and in contracts between PBMs and their clients, that Defendants were working to lower insulin prices and provide payors with cost savings.

616.     The purposes of the statute of limitations are satisfied because Defendants cannot claim any prejudice due to an alleged late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

617.     In light of the information set forth above, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

618.     Any applicable statutes of limitation therefore have been tolled.

**C.      Equitable Estoppel**

619.     Defendants were under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided—all of which would be and are now material to Plaintiff.

620.     Instead of disclosing these facts, Defendants knowingly misrepresented and concealed them with a reasonable expectation that Plaintiff would act upon the misrepresentations and omissions.

621.     Being unaware of the true facts and the economic harm it was suffering, and having no cause to inquire further, Plaintiff did indeed rely in good faith to its detriment on Defendants' misrepresentations and omissions.

622.     In short, through Defendants' acts, omissions, and misrepresentations as alleged throughout this Complaint, Defendants knowingly misrepresented and concealed material facts with the expectation that Plaintiff would act upon them, which Plaintiff did in good faith and to its detriment.

623.    Accordingly, Defendants are equitably estopped from relying on any statutes of limitations in defense of this action.

**D.    Continuing Violations**

624.    The acts, omissions, and misrepresentations alleged throughout this Complaint have continued to the present day. Defendants' systematic misconduct constitutes a continuous, unbroken violation of the law that has caused, and continues to cause, continuous economic harm to Plaintiff.

625.    Accordingly, all applicable statutes of limitations are tolled.

**CLAIMS FOR RELIEF**
**First Cause of Action (Count I)**
*Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO")*
*18 U.S.C. § 1962(c)*
(against all Defendants)

626.    Plaintiff, Trustees of the University of Pennsylvania, which include the University of Pennsylvania Hospital System and the University of Pennsylvania, re-alleges and incorporates herein by reference each of the allegations contained in paragraphs 1–625.

627.    Plaintiff brings this count against PBM Defendants, and the Manufacturer Defendants for violations of 18 U.S.C. § 1962(c).

628.    Defendants are (1) culpable "persons" who (2) willfully and knowingly (3) committed and conspired to commit two or more acts of mail and wire fraud (4) through a "pattern" of racketeering activity that (5) involves an "association in fact" enterprise, (6) the results of which had an effect on interstate commerce.

**A.    Defendants Are Culpable "Persons" Under RICO**

629.    Defendants are "persons" as that term is defined in 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property.

630.    Each one of Defendants are separate entities and "persons" that are distinct from the RICO enterprises alleged below.

**B.    The Manufacturer-PBM RICO Enterprise**

631.    For the purposes of this claim, the RICO enterprises are nine separate associations-in-fact consisting of one of each of the PBM Defendants and one of each of the Manufacturer Defendants, including those entities' directors, employees, and agents. They are the Eli Lilly-CVS Caremark Enterprise; the Eli Lilly-Express Scripts Enterprise; the Eli Lilly-OptumRx Enterprise; the Novo Nordisk-CVS Caremark Enterprise; the Novo Nordisk-Express Scripts Enterprise; the Novo Nordisk-OptumRx Enterprise; the Sanofi-CVS Caremark Enterprise; the Sanofi-Express Scripts Enterprise; and the Sanofi-OptumRx Enterprise. These association-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Enterprises."

632.    Each Manufacturer-PBM Enterprise is a separate, ongoing, and continuing business organization consisting of corporations and individuals associated for the common purpose of manufacturing, selling, and facilitating the purchase of the Manufacturer Defendants' products, including the at-issue drugs. For example:

    a.    Each of the three Eli Lilly enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Eli Lilly medications including Prozac, Cymbalta, and Zyprexa, as well as the at-issue Eli Lilly insulin and insulin-analog medications (Trulicity, Humulin N, Humulin R, Humalog, and Basaglar), which are Eli Lilly's primary source of revenue.

    b.    Each of the three Novo Nordisk Enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Novo Nordisk medications for the treatment of obesity, hemophilia, and hormone imbalance, as well as the at-issue Novo Nordisk insulin and insulin-analog medications (Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic), which account for more than three-quarters of Novo Nordisk's revenue.

    c.    Each of the three Sanofi Enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Sanofi

146

medications including Ambien, Plavix, and Dupixent, as well as the at-issue Sanofi insulin and insulin-analog medications (Lantus, Toujeo, Apidra, and Soliqua).Each Manufacturer-PBM Enterprise engaged in the shared purpose of exchanging false list prices and secret Manufacturer Payments for preferred formulary positions for the at-issue drugs in order to control the market for diabetes medications and profit off diabetics and payors, including the Plaintiff.

633.    Each Manufacturer-PBM Enterprise engaged in the shared purpose of exchanging false list prices and secret Manufacturer Payments for preferred formulary positions for the at-issue drugs in order to control the market for diabetes medications and profit off diabetics and payors, including the Plaintiff.

634.    The members of each enterprise are bound by contractual relationships, financial ties, and the ongoing coordination of activities.

635.    There is also a common communication network by which Defendants share information and meet on a regular basis. These communications include, but are not limited to, communications relating to the use of false list prices for the at-issue diabetes medications and the regular flow of Manufacturer Payments from each Manufacturer Defendant to PBM Defendants in exchange for formulary placement.

636.    Each Manufacturer-PBM Enterprise functions as a continuing but separate unit separate and apart from the pattern of racketeering activity in which it engages. Each Manufacturer-PBM Enterprise, for example, engages in the manufacture, distribution and sale of medications and other products other than the at-issue insulin and insulin- analog medications. Additionally, each Manufacturer engages in conduct other than mail and wire fraud in furtherance of the Insulin Pricing Scheme.

637.    At all relevant times, each of the Manufacturer-PBM Enterprises was operated and conducted for unlawful purposes by each Manufacturer Defendant and PBM Defendants, namely, carrying out the Insulin Pricing Scheme.

638.    Each Manufacturer-PBM Enterprise derived secret profits from these activities that were greater than those any one of the Manufacturer Defendants or either PBM Defendants could obtain absent their misrepresentations regarding their non-transparent pricing schemes.

639.    To accomplish this common purpose, each Manufacturer Defendant periodically and systematically inflated the prices of the at-issue drugs and then secretly paid a significant, yet undisclosed, portion of this inflated price back to PBM Defendants in the form of Manufacturer Payments.

640.    Each Manufacturer-PBM Enterprise did so willfully and with knowledge that Plaintiff paid for the at-issue drugs at prices directly based on the artificially inflated list prices.

641.    Each Manufacturer-PBM Enterprise's inflation of the list prices and secret Manufacturer Payments was a quid pro quo exchange for preferred formulary placement.

642.    Each Manufacturer-PBM Enterprise concealed from Plaintiff that these artificially inflated prices and secret Manufacturer Payments resulted in each Manufacturer gaining formulary access without requiring significant price reductions and resulted in higher profits for Defendants, whose earnings increase the more inflated the price is and the more payment it receives from each Manufacturer Defendant.

643.    Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating the use of the artificially inflated list prices for the at-issue drugs as the basis for the price that payors, including the Plaintiff, and diabetics pay for diabetes medications.

644.    The Manufacturer Defendants would not be able to offer large pricing spreads to PBM Defendants in exchange for favorable formulary positions without the use of the artificially inflated list prices as the basis for the price paid by diabetics and payors, including the Plaintiff, for the at-issue drugs.

645.    PBM Defendants share this common purpose because nearly all profit and revenue generated from the at-issue drugs is tied to the artificially inflated prices generated by the Insulin Pricing Scheme. Without diabetics and payors, including the Plaintiff, paying for diabetes medications based on the inflated list prices, their profits from the Insulin Pricing Scheme would decrease.

646.    As a result, PBM Defendants have, with the knowing and willful participation and assistance of each Manufacturer Defendant, engaged in hidden profit-making schemes falling into four general categories: (1) garnering undisclosed Manufacturer Payments from each Manufacturer Defendant PBM Defendants retains to a large extent; (2) generating substantial profits from pharmacies because of the falsely inflated prices; (3) generating profits on the diabetes medications sold through PBM Defendants' own mail-order and retail pharmacies; and (4) keeping secret discounts each Manufacturer Defendant provides in association with PBM Defendants' mail-order and retail operations.

647.    At all relevant times, PBM Defendants and each Manufacturer Defendant have been aware of their respective Manufacturer-PBM Enterprise's conduct, have been knowing and willing participants in and coordinator of that conduct, and have reaped profits from that conduct.

648.    Neither PBM Defendants, nor any of the Manufacturer Defendants alone could have accomplished the purposes of the Manufacturer-PBM Enterprises without the other entities.

## C. The Enterprises Misrepresent and Fail to Disclose Material Facts in Furtherance of the Insulin Pricing Scheme.

649.    Each Manufacturer-PBM Enterprise knowingly made material misrepresentations to the public and the Plaintiff in furtherance of the Insulin Pricing Scheme, including publishing artificially inflated prices for insulin on published indices and representing that:

    a.  the artificially inflated list prices for the at-issue diabetes

medications were reasonably related to the actual prices realized by Defendants and were a reasonable and fair basis on which to base the price Plaintiff paid for these drugs;

b. each Manufacturer priced its at-issue drugs according to each drug's value to the healthcare system and the need to fund innovation;

c. the Manufacturer Payments paid back to PBM Defendants for each at-issue drug were for Plaintiff's benefit;

d. all "rebates" and discounts negotiated by PBM Defendants with the Manufacturer Defendants were passed through to the Plaintiff;

e. the "rebates" negotiated by the members of each enterprise saved Plaintiff money;

f. each Manufacturer Defendant and PBM Defendants were transparent with Plaintiff regarding the Manufacturer Payments and the PBMs did not retain any funds associated with prescription drug rebates or any the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies; and

g. PBM Defendants constructed formularies in a manner that lowered the price of the at-issue drugs and promoted the health and safety of diabetics.

650. Each artificially inflated list price published by the Manufacturer Defendants constituted a material misrepresentation to Plaintiff and the public, in that each purported to be a fair market price for the medication at issue, and each omitted to disclose the fraudulent spread between the list price and the net price of the medication or the basis therefor. Examples of other specific affirmative representations by each RICO Defendant in furtherance of each enterprise's Insulin Pricing Scheme are set forth in this Complaint.

651. At all times relevant to this Complaint, each Manufacturer-PBM Enterprise knew the above-described representations to be false.

652. At all times relevant to this Complaint, each Manufacturer-PBM Enterprise intentionally made these representations for the purpose of inducing Plaintiff into paying

artificially inflated prices for diabetes medications.

653.    Plaintiff relied on the material misrepresentations and omissions made by each Manufacturer-PBM Enterprise in paying prices for the at-issue diabetes medications based upon the artificially inflated prices generated by Insulin Pricing Scheme.

654.    Additionally, each PBM-Manufacturer Enterprise relied on the list prices negotiated and published by the other PBM-Manufacturer enterprises in setting their own list prices and determining the value of the kickbacks paid to the PBMs. Plaintiff was injured by the inflated prices that arose as a result.

655.    PBM Defendants convinced Plaintiff to pay prices for the at-issue drugs based upon the false list prices by utilizing the misrepresentations listed above to convince Plaintiff that they had secured lower prices when, in fact, they did the opposite, all while concealing the Insulin Pricing Scheme.

656.    Without these misrepresentations and each RICO Defendant's failure to disclose the Insulin Pricing Scheme, each Manufacturer-PBM Enterprise could not have achieved its common purpose, as Plaintiff would not have been willing to pay these artificially inflated list prices.

### D.  Defendants' Use of the U.S. Mails and Interstate Wire Facilities

657.    Each of the Manufacturer-PBM Enterprises engaged in and affected interstate commerce because each engaged in the following activities across state boundaries: the sale, purchase and/or administration of diabetes medications; the setting and publishing of the prices of these drugs; and/or the transmission of pricing information of diabetes medications; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission of diabetes medications through mail order and retail pharmacies; and/or the transmission and/or receipt of

invoices, statements, and payments related to the use or administration of diabetes medications; and/or the negotiations and transmissions of contracts related to the pricing of and payment for diabetes medications.

658.    Each Manufacturer-PBM Enterprise participated in the administration of diabetes medications to millions of individuals located throughout the United States, including in Pennsylvania.

659.    Each Manufacturer Defendant's and PBM Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

660.    The nature and pervasiveness of the Insulin Pricing Scheme, which included each Manufacturer Defendants' and PBM Defendants' corporate headquarters operations, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with each other and with pharmacies, physicians, payors, and diabetics throughout Pennsylvania.

661.    Each Manufacturer-PBM Enterprise's use of the U.S. mails and interstate wire facilities to perpetrate the Insulin Pricing Scheme involved thousands of communications including:

    a.   Marketing materials about the published prices for diabetes medications, which each Manufacturer Defendant sent to PBM Defendants located across the country, including throughout Pennsylvania;

    b.   Written and oral representations of the artificially inflated list prices of diabetes medications that each Manufacturer Defendant and PBM Defendants made at least annually and, in many cases, several times during a single year to the public;

    c.   Thousands of written and oral communications discussing, negotiating, and confirming the placement of each Manufacturer

Defendants' diabetes medications on PBM Defendants' formularies;

d. Written and oral representations made by each Manufacturer Defendant regarding information or incentives paid back to each PBM Defendant for each diabetes medications sold and/or to conceal these Incentives or the Insulin Pricing Scheme;

e. Written communications made by each Manufacturer Defendant, including checks, relating to Manufacturer Payments paid to PBM Defendants to persuade them to advocate the at-issue diabetes medications;

f. Written and oral communications with U.S. government agencies that misrepresented what the published prices were or that were intended to deter investigations into the true nature of the published prices or to forestall changes to reimbursement based on something other than published prices;

g. Written and oral communications with payors, including the Plaintiff, regarding the price of diabetes medications;

h. Written and oral communications to the Plaintiff, including marketing and solicitation material sent by PBM Defendants regarding the existence, amount, or purpose of payments made by each Manufacturer Defendant to PBM Defendants for the diabetes medications described herein and the purpose of PBM Defendants' formularies;

i. Transmission of published prices to third parties and payors, including the Plaintiff; and

j. Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the Insulin Pricing Scheme.

662. Although Plaintiff pleads the dates of certain communications in allegations incorporated into this Count, it cannot allege the precise dates of others without access to books and records within each RICO Defendant's exclusive custody and control. Indeed, an essential part of the successful operation of the Insulin Pricing Scheme depended upon secrecy, and each Manufacturer Defendant and PBM Defendants took deliberate steps to conceal its wrongdoing.

### E. Conduct of the Manufacturer-PBM Enterprises' Affairs

663.    Each Manufacturer Defendant and PBM Defendant participates in the operation

and management of Manufacturer-PBM Enterprises with which it is associated and, in violation

of Section 1962(c) of RICO, and conducts or participates in the conduct of the affairs of those

association-in-fact RICO enterprises, directly or indirectly. Such participation is carried out in the

following ways:

a.    Each Manufactures Defendant directly controls the secret Manufacture Payments it provides to PBM Defendants for its diabetes medications.

b.    PBM Defendants directly manage and control their respective drug formularies and the placement of the at-issue diabetes medications on those formularies.

c.    PBM Defendants intentionally select higher-priced diabetes medications for formulary placement and exclude lower priced ones in order to generate larger profits and coordinate with the Manufacturer Defendants to increase the availability and use of higher-priced medications because they are more profitable for both groups of Defendants.

d.    Each Manufacturer Defendant directly controls the publication of the artificially inflated list prices generated by the Insulin Pricing Scheme.

e.    Each Manufacturer Defendant directly controls the creation and distribution of marketing, sales and other materials used to inform PBM Defendants of the profit potential from its diabetes medications.

f.    PBM Defendants directly control the creation and distribution of marketing, sales, and other materials used to inform payors and the public of the benefits and cost-saving potential of PBM Defendants' formularies and negotiations with the Manufacturers.

g.    PBM Defendants direct and control each enterprise's direct relationships with payors such as the Plaintiff by negotiating the terms of and executing the contracts that govern those relationships.

h.    PBM Defendants direct and control each enterprise's Insulin Pricing Scheme by hiding, obfuscating, and laundering Manufacturer Payments through their affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

i.    PBM Defendants distribute through the U.S. mail and interstate wire facilities

154

promotional and other materials which claim that the Manufacturer Payments paid from each Manufacturer Defendant to PBM Defendants save Plaintiff and other payors money on the at-issue drugs.

j.    Each Manufacturer Defendant represented to the Plaintiff—by publishing and promoting artificially inflated list prices without stating that these published prices differed substantially from the prices realized by each Manufacturer Defendant and PBM Defendants—that the published prices of diabetes medications reflected or approximated the actual price realized by Defendants and resulted from transparent and competitive fair market forces.

### F. Defendants' Pattern of Racketeering Activity

664.    Each Manufacturer Defendant and PBM Defendants have conducted and participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are unlawful under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

665.    Each Manufacturer Defendant's and PBM Defendant's pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Insulin Pricing Scheme. Each of these mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which each Manufacturer Defendant and PBM Defendant intended to defraud Plaintiff.

666.    By intentionally and artificially inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments (made from each Manufacturer Defendant to PBM Defendants) and PBM Defendants' formulary construction, and by subsequently failing to disclose such practices to Plaintiff, each Manufacturer Defendant and PBM Defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

667.    Each Manufacturer Defendant's and PBM Defendant's racketeering activities

amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiff.

668.    Each separate use of the U.S. mails and/or interstate wire facilities employed by each Manufacturer Defendant and PBM Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff.

669.    Each Manufacturer Defendant and PBM Defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Enterprises with which each of them is and was associated in fact.

## G.  The RICO Defendants' Motive

670.    Each Manufacturer Defendant's and PBM Defendant's motives in creating and operating the Insulin Pricing Scheme and conducting the affairs of the Manufacturer-PBM Enterprises described herein was to control the market for diabetes medications and falsely obtain sales of, and profits from, diabetes medications.

671.    The Insulin Pricing Scheme was designed to, and did, encourage others, including payors like Plaintiff, to advocate for the use of each Manufacturer Defendant's respective products and to pay for those diabetes medications based on artificially inflated prices. Each Manufacturer Defendant used the Insulin Pricing Scheme to obtain formulary placement to sell more of its drugs without having to cut into its profits. PBM Defendants used the Insulin Pricing Scheme to artificially inflate the price payors such as the Plaintiff paid for diabetes medications in order to profit off the Insulin Pricing Scheme, as discussed above.

## H.  The Manufacturer-PBM Enterprises' Insulin Pricing Scheme Injured Plaintiff.

672.    Each Manufacturer-PBM Enterprise's violations of federal law and pattern of racketeering activity have directly and proximately caused the Plaintiff to be injured in its business

or property.

673.    The prices the Plaintiff pays for the at-issue drugs are directly tied to the artificially inflated list prices generated by the Insulin Pricing Scheme.

674.    No other intermediary in the supply chain has control over or is responsible for the list prices on which nearly all Plaintiff's payments are based other than the Manufacturer-PBM Defendant Enterprises.

675.    Defendants collectively set the prices that the Plaintiff paid for the at-issue diabetes medications.

676.    During the relevant period, certain Defendants provided PBM services to the Plaintiff and benefit therefrom.

677.    During the relevant period, the Plaintiff paid Defendants for the at-issue drugs.

678.    Each Manufacturer-PBM Enterprise controlled and participated in the Insulin Pricing Scheme that was directly responsible for the artificially inflated list prices upon which the price Plaintiff paid was based.

679.    Thus, Plaintiff was damaged by reason of the Insulin Pricing Scheme. But for the misrepresentations and artificially inflated prices created by the Insulin Pricing Scheme that each Manufacturer- PBM Enterprise employed, Plaintiff would have paid less for diabetes Medications.

680.    As a direct result of the Insulin Pricing Scheme the Plaintiff was further damaged by incurring increased healthcare costs and by losing tax revenue due to decreased workforce productivity.

681.    Because the Insulin Pricing Scheme resulted in payors and consumers paying supracompetitive prices for the at-issue medications, the scheme could not have continued without each Manufacturer-PBM Enterprise's participation. In other words, if one of the Manufacturer-

PBM Enterprises had opted not to participate in the scheme—and not inflated its list prices—the other enterprises could not have continued to overcharge their own clients. Each enterprise's participation in the scheme—and execution of its own pattern of racketeering activity—was essential to the overall scheme's survival and a direct cause of Plaintiff's injuries.

682.    The Plaintiff's damages are separate and distinct from any other victim that was harmed by the Manufacturer-PBM Defendant Enterprises' Insulin Pricing Scheme.

683.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable to the Plaintiff for three times the damages that were sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

684.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(a) of RICO, the Plaintiff seeks injunctive relief against each Manufacturer and PBM for their fraudulent reporting of their prices and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their artificially inflated prices for diabetes medications, plus the costs of bringing this suit, including reasonable attorneys' fees.

685.    Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff continues to purchase the at-issue diabetes medications. Plaintiff will continue to pay based on the Defendants' artificially inflated list prices. This continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiff seeks injunctive relief, including an injunction against each Manufacturer and PBM Defendants, to prevent them from affirmatively misrepresenting and/or concealing and suppressing material facts concerning their conduct in furtherance of the Insulin Pricing Scheme.

**Second Cause of Action (Count II)**
*Violations of RICO, 18 U.S.C. § 1962(d)*

*By Conspiring to Violate 18 U.S.C. § 1962(c)*
(against all Defendants)

686.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1–685.

687.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

688.    Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C.§ 1962(c). The object of this conspiracy has been and is to conduct or participate in the Insulin Pricing Scheme.

689.    As set forth in detail above, Defendants each knowingly agreed to facilitate the Insulin Pricing Scheme and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants agreed to and did inflate the prices of the at-issue drugs in lockstep to achieve an unlawful purpose; Defendants agreed to and did make false or misleading statements or material omissions regarding the reasons for these price increases, the purpose of the Manufacturer Payments exchanged between Defendants and the PBMs' formulary construction; and PBMs agreed to and did, in concert, request and receive larger Manufacturer Payments and higher prices in exchange for formulary placement.

690.    The nature of the above-described Defendant co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

691.    Defendants have engaged and continue to engage in the commission of overt acts,

including the following unlawful racketeering predicate acts:

    a.   Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

    b.   Multiple instances of wire fraud in violations of 18 U.S.C. § 1343; and

    c.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

692.    Defendants' conspiracy to violate the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff has been injured in its property by reason of these violations: Plaintiff has paid more for the at-issue drugs than it would have but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c).

693.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff for three times the damages this District has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### Third Cause of Action (Count III)
*Violation of The Pennsylvania Unfair Trade Practices and Consumer Protection Law,*
*73 Pa. Cons. Stat. ¶¶ 201-1 et. Seq.*
(against Eli Lilly, Sanofi, Novo Nordisk, and CVS Caremark)

694.    Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraphs 1–693.

695.    Plaintiff is a "person" pursuant to section 201-2(2), Pennsylvania Statutes.

696.    Defendants' business practices described herein constitute "trade or commerce" pursuant to section 201-2(3), Pennsylvania Statutes.

697.    Defendants' misconduct as described throughout this Complaint, collectively and as individuals, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by section 201-2(4), Pennsylvania Statutes.

698.    Defendants are independently liable for their own misconduct in violation of

UTPCPL and are liable for their collective efforts in furtherance of the Insulin Pricing Scheme. Using a complex structure of interdependent entities, Defendants confuse and mislead consumers about each Defendant's respective role in an attempt to evade liability for the unfair and deceptive scheme as a whole, and for the acts and omissions of the enterprise's interdependent participants.

699.    Defendants' misconduct in violation of UTPCPL included, inter alia, the following:

a.    The Manufacturer Defendants published prices for the at-issue drugs and, in doing so, held these prices out as the actual prices for these drugs despite knowing these prices were artificially inflated and untethered from the cost of the drugs or the price the Manufacturers were paid for them—all with the PBM Defendants' knowledge, consent, and cooperation.

b.    The Manufacturer Defendants misrepresented and actively concealed the true reasons why they set and raised list prices—the truth being that it was to increase revenues and profits and to offer higher prices and larger Manufacturer Payments to the PBMs—all with the PBM Defendant's knowledge, consent, and cooperation.

c.    CVS Caremark furthered the scheme by using the artificially inflated list prices to determine the inflated prices paid by payors, including Plaintiff and Plaintiff's Beneficiaries—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

d.    CVS Caremark represented to payors and to the public that they worked to generate savings with respect to the at-issue drugs and to promote the health of diabetics. Instead, directly counter to their representations, the PBMs drove up the prices of the at-issue drugs and damaged payors, including Plaintiff, by demanding ever-increasing Manufacturer Payments that, in turn, increased what otherwise would

have been the retail prices for the at-issue drugs— all with the Manufacturer Defendants' knowledge, consent, and cooperation.

e.  CVS Caremark has hidden, obfuscated, and laundered these Manufacturer Payments through their affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

f.  CVS Caremark intentionally selected higher-priced diabetes medications for formulary placement and excluded lower priced ones in order to generate larger profits and coordinated with the Manufacturer Defendants to increase the availability and use of higher priced medications because they are more profitable for both groups of Defendants.

g.  CVS Caremark misled their payors, including Plaintiff, as to the true nature or value of the services they provided and reaped illicit profits exponentially greater than the fair market value of the services they purported to provide—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

h.  CVS Caremark owed a duty to represent the true facts to their payor clients, including Plaintiff, but intentionally chose instead to conceal them, both to further the Insulin Pricing Scheme and to conceal it from payors, including Plaintiff—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

700.  Defendants' conduct also constitutes unfair acts and practices prohibited by UTPCPL, because it caused substantial injury, cannot be reasonably avoided, and there are no countervailing benefits to consumers that result from Defendants egregiously driving up the price of the at-issue drugs. In addition to the above:

a. The price increases for the at-issue drugs bear no reasonable relationship to manufacturing or production cost increases or changes in supply and demand conditions.

b. As a direct, proximate, and intended result of the Insulin Pricing Scheme, the list and net prices for the at-issue drugs are without exception higher than the but-for prices that would have existed absent the Insulin Pricing Scheme.

c. The Insulin Pricing Scheme confers no benefits upon payors, including Plaintiff, or upon their Beneficiaries or diabetics throughout the Commonwealth of Pennsylvania and any ostensible benefit would be far outweighed by the harms brought about by the scheme.

701. Defendants' misconduct is also unfair because it violates Pennsylvania public policy.

702. Defendants' deceptive acts and practices were intended to and did cause confusion and misunderstanding among payors, including Plaintiff.

703. The Manufacturer Defendants and CVS Caremark made these misrepresentations for the sole purpose of inducing reliance by payors, including Plaintiff, into purchasing diabetes medications through PBM Defendants.

704. Defendants knew that the representations described above were false when they made the representations—the rebates and formulary positions agreed upon between Defendants did not lower the price Plaintiff paid for insulin, but rather were primary factors driving the exponential increase in the amount that Plaintiff paid for insulins during the relevant timeframe.

705. Defendants made these false representations directly to Plaintiff through, among other things, oral and written communications, the inclusion of the reported price in their contracts

163

with payors as a determinant of the price for diabetes medications, marketing materials, presentations, publications of the artificially inflated reported price, and in public statements.

706.    Defendants' false representations and omissions were material to Plaintiff had no way of discerning that Defendants were, in fact, deceiving it because Defendants possessed exclusive knowledge regarding the nature of the pricing of diabetes medications; intentionally concealed the foregoing from Plaintiff; and made false, fraudulent, incomplete, or negligent representations about the pricing of the diabetes medications and the Defendants' role in that pricing, while purposefully withholding material facts from Plaintiff that contradicted those representations.

707.    Defendants' actions, representations, and misrepresentations demonstrate callous disregard for not only the rule of law but also public health, safety, and well-being.

708.    As a direct and proximate result of Defendants' fraudulent role in the Insulin Pricing Scheme, Plaintiff sustained damages, including but not limited to paying excessive and inflated prices for diabetes medications described herein.

709.    Defendants are liable to Plaintiff for damages in an amount to be proven at trial.

710.    The acts and practices alleged herein are ongoing, repeated, and affect the public interest.

711.    Accordingly, Plaintiff seeks actual economic damages, punitive damages, injunctive relief, attorneys' fees, costs of this action, all appropriate penalties and fees, and any other relief to which Plaintiff may be entitled.

### Fourth Cause of Action (Count IV)
*Common Law Fraud*
(against Eli Lilly, Sanofi, Novo Nordisk, and CVS Caremark)

712.    Plaintiff re-alleges and incorporates herein by reference each of the allegations from

paragraphs 1–711.

713.    Defendants affirmatively misrepresented, omitted, or concealed and suppressed material facts concerning, among other things:

    a.  the true cost and price of the at-issue drugs;

    b.  the inflated and fraudulent nature of the list prices set and charged by Defendants for the at-issue drugs;

    c.  the existence, amount, flow, and purposes of discounts and rebates offered or negotiated by Defendants for the at-issue medications; and

    d.  the role that Defendants played in the price paid for the at-issue, including marketing materials and other public statements stating that Defendants decrease the price of prescription drugs for consumers.

714.    Defendants' false representations and omissions were material to Plaintiff.

715.    Defendants knew that their representations and omissions were false and misleading. They knew, for example, that the list prices for the at-issue drugs were excessive, inflated, and untethered to any competitive market price. They knew that these list prices were artificially inflated to fund kickbacks for the PBMs in exchange for preferred formulary placement.

716.    These Defendants intended that Plaintiff would rely on their misrepresentations and omissions. Through their scheme, the PBM Defendants leveraged formulary control for ever-increasing Manufacturer Payments while the Manufacturer Defendants maintained or increased their profit margins or sales volume as preferred formulary members. Defendants intended to profit at the expense of payors like Plaintiff.

717.    Plaintiff reasonably relied on these Defendants' deception, and these Defendants intended that they would so rely. Plaintiff had no way of discerning that these Defendants were, in

fact, deceiving it because they possessed exclusive knowledge regarding the nature of diabetes drug pricing; intentionally concealed the foregoing from Plaintiff and the public; and made incomplete or false representations about the pricing of the at-issue drugs and their role in that pricing, while purposefully withholding material facts from Plaintiff that contradicted these representations.

718.    Plaintiff relied on these Defendants' artificially inflated list prices. Because of the Insulin Pricing Scheme, list prices have skyrocketed and the spread between list price and net price has ballooned in turn. Plaintiff is injured by this list and net price divergence. Through the scheme, these Defendants have forced payors, including Plaintiff, to pay not just for the drugs, but also for undisclosed kickbacks that are paid to PBMs.

719.    These Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to Plaintiff.

720.    These Defendants owed Plaintiff a duty to disclose, truthfully, all facts concerning the true cost of the at-issue medications and the inflated and fraudulent nature of their pricing; the existence, amount, flow, and purpose of rebates and discounts negotiated for those products; and the role that Defendants played in increasing the price of the at-issue drugs.

721.    These Defendants possessed superior knowledge of essential facts about the at-issue drugs and their prices. That information was peculiarly and exclusively in their control and not available to payors, including Plaintiff. In light of their misleading or incomplete representations, these Defendants also had an obligation to disclose facts related to the Insulin Pricing Scheme.

722.    These Defendants hatched their deceptive schemes and knew that Plaintiff did not know (and could not reasonably discover) that they sought to artificially inflate the price of the

insulin medications. These Defendants not only concealed all the facts concerning the true cost of the at-issue medications but went further to make affirmative misrepresentations in marketing materials and other communications that these Defendants worked to lower the ultimate cost of prescription medications. These Defendants engaged in this fraudulent concealment at the expense of Plaintiff.

723.    Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and it would not have acted as it did, had it known the truth.

724.    As a direct and proximate result of these Defendants' fraudulent scheme, Plaintiff sustained damages, including but not limited to paying excessive and inflated prices for the at-issue medications.

725.    These Defendants valued their profits over the trust, health, and safety of Plaintiff and diabetics across the country. These Defendants repeatedly misrepresented the price of the at-issue drugs.

726.    These Defendants' actions, misrepresentations, and omissions demonstrate callous disregard for not only the rule of law but also public health. Indeed, as a direct result of these Defendants' actions, access to live-saving diabetes medications has been limited, denied, or forgone.

727.    Defendants are liable to Plaintiff for damages in an amount to be proven at trial. Moreover, because these Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiff and for the purpose of enriching themselves to the public's detriment, Defendants' conduct warrants punitive damages in an amount to be determined at trial.

728.    For purposes of the transactions that are the subject of this Complaint, both Plaintiff

and its insulin-using Beneficiaries were the "consumer" because both were damaged by the unlawful pricing behavior and paid excessive amounts for the competitively priced insulin products.

729.    As a result of the foregoing, Plaintiff has suffered an actual loss equal to the difference between the amount it paid for the Manufacturer Defendants' products and what it would have paid had the products been sold at legitimate prices without the Insulin Pricing Scheme.

**Fifth Cause of Action (Count V)**
*Unjust Enrichment*
(against Eli Lilly, Sanofi, Novo Nordisk, and CVS Caremark)

730.    Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraphs 1–729.

731.    This cause of action is alleged in the alternative to any claim Plaintiff may have for legal relief.

732.    Plaintiff conferred a benefit upon Defendants.

733.    Plaintiff conferred a benefit on Defendants by purchasing the at-issue insulins at artificially and illegally inflated prices as established by the Insulin Pricing Scheme.

734.    Plaintiff conferred this benefit upon Defendants to Plaintiff's financial detriment.

735.    Defendants deceived Plaintiff and have received a financial windfall from the Insulin Pricing Scheme at Plaintiff's expense.

736.    Defendants wrongfully secured and retained a benefit in the form of amounts paid for diabetes medications, unearned fees, and other payments collected based on the market forces and prices generated by the Insulin Pricing Scheme, and revenues that would not have been realized but for the Insulin Pricing Scheme.

737.    Defendants wrongfully secured and retained a benefit in the form of revenues and

profits to which they were not entitled, which did not represent the fair market value of the goods or services they offered, and which were obtained at Plaintiff's expense.

738. Defendants wrongfully secured and retained a benefit in the form of monies paid at artificially inflated prices for the at-issue medications that would not have existed but for the Defendants' misconduct.

739. Defendants were aware of the benefit, voluntarily accepted it, and retained and appreciated the benefit, to which they were not entitled, all at Plaintiff's expense.

740. Any Defendant's retention of any portion of any benefit obtained by way of the Insulin Pricing Scheme is unjust and inequitable regardless of the Insulin Pricing Scheme's legality.

741. Each Defendant's retention of any portion of the benefit violates the fundamental principles of justice, equity, and good conscience. Even absent Plaintiff's ability to prove the elements of any other claim, it would be unfair, unjust, and inequitable for any Defendant to retain any portion of the benefit.

742. Even absent legal wrongdoing by any or all Defendants, Plaintiff has a better claim to the benefit than any Defendant.

743. The benefit retained is in an amount not less than the difference between the reasonable or fair market value of the drugs for which Plaintiff paid and the actual value of the drugs Defendants delivered and the reasonable or fair market value of the services for which Plaintiff paid and the actual value of services rendered with respect to the at-issue drugs.

744. Defendants should not be permitted to retain the benefit conferred upon them by Plaintiff and restitution is appropriate to prevent the unjust enrichment.

745. Accordingly, Plaintiff seeks disgorgement of the benefit and seeks restitution,

rescission, or such other relief as will restore to Plaintiff that to which it is entitled.

**Sixth Cause of Action (Count VI)**
*Civil Conspiracy*
(against all Defendants)

746. Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1–745.

747. Plaintiff re-alleges and incorporates the allegations contained herein.

748. Defendants' conduct described herein constitutes an agreement between two or more parties to commit an unlawful act or a lawful act by unlawful means and Defendants' overt acts in furtherance of this conspiracy caused Plaintiff's damages.

749. Defendants aided and abetted one another to violate federal laws and commit common law fraud.

750. Each Defendant agreed to and carried out acts in furtherance of the Insulin Pricing Scheme that artificially and egregiously inflated the price of diabetes medications.

751. Each PBM Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

752. The Manufacturer Defendants agreed with each other and the PBM Defendants to intentionally raise their diabetes medication prices and then pay back a significant portion of those prices to the PBMs.

753. In exchange for the Manufacturer Defendants inflating their prices and making large secret payments, the PBM Defendants agreed to and did grant preferred formulary status to the Manufacturer Defendants' diabetes medications.

754. Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme and neither the PBM Defendants nor the Manufacturer Defendants alone could have

accomplished the Insulin Pricing Scheme without their co-conspirators.

755.    The PBM Defendants need the Manufacturer Defendants to inflate the reported price of their diabetes medications and to make secret payments back to the PBM Defendants in order for the PBM Defendants to profit off the Insulin Pricing Scheme.

756.    The Manufacturer Defendants need the PBM Defendants to grant their diabetes medications preferred formulary placement in order to maintain access to a majority of payors and diabetics.

757.    As discussed throughout this Complaint, the Insulin Pricing Scheme resulted from explicit agreements, direct coordination, constant communication, and exchange of information between the PBMs and the Manufacturers.

758.    In addition to the preceding direct evidence of an agreement, Defendants' conspiracy is also demonstrated by the following indirect evidence that infers Defendants conspired to engage in fraudulent conduct:

- Defendants refuse to disclose the details of their pricing structures, agreements and sales figures in order maintain the secrecy of the Insulin Pricing Scheme;

- Numerous ongoing government investigations, hearings and inquiries have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer and PBM Defendants, including:

  - Civil investigation demands from multiple states related to the pricing of their insulin products and their relationships with PBMs;

- Letters from numerous senators and representatives in recent years to the Justice Department and the Federal Trade Commission asking them to investigate potential collusion among Defendants;

- A House Oversight committee investigation into the corporate strategies of drug companies, including Manufacturer Defendants, seeking information on the increasing price of drugs and manufacturers efforts to preserve market share and pricing power;

- A Senate report titled "Insulin: A Lifesaving Drug Too Often Out of Reach" aimed addressing the dramatic increase in the price of insulin; and

- Several hearings before both the Senate Financing Committee and the House Oversight and Reform Committees on the Insulin Pricing Scheme and the collusion between the PBMs and the Manufacturers; and

- Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturers and the PBMs.

- The astronomical rise in the price of the at-issue drugs coincides with PBM Defendants' rise to power within the pharmaceutical pricing system starting in 2003.

759.    Plaintiff was, and continues to be, damaged by the conspiracy when it overpaid for

the diabetes medications as a result of Defendants' unlawful actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment against the Defendants for all the relief requested herein and to which the Plaintiff may otherwise be entitled, including: that the Court determine that Defendants have violated the Pennsylvania UTPCPL, have violated RICO, engaged in civil conspiracy, have breached their contract with Defendants, committed fraud, and have been unjustly enriched;

A. That the Court determine that Defendants have violated RICO as set forth in Counts I and II, have violated the Pennsylvania UTPCPL as set forth in Count III, have engaged in Fraud as set forth in Count IV, have been unjustly enriched as set forth in Count V, and engaged in a civil conspiracy as alleged in Count VI.

B. Judgment in favor of Plaintiff and against the Defendants for damages in excess of the minimum jurisdictional requirements of this Court, in a specific amount to be proven at trial;

C. That Plaintiff be granted the following specific relief:

1. In accordance with Pennsylvania law, that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein in violation of RICO and/or the UTPCPL, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from

adopting or following any practice, plan, program or device having a similar purpose or effect;

2. That Defendants be ordered to disgorge all profits and provide equitable restitution to Plaintiff for its payments for the at-issue drugs;

3. That Plaintiff:

    i. be awarded treble damages pursuant to 18 U.S.C. § 1964(c);

    ii. be awarded restitution, damages, disgorgement, penalties, treble damages, and/or all other legal and equitable monetary remedies available under the federal and state laws set forth in this Complaint, and the general equitable powers of this Court in an amount according to proof;

    iii. be awarded punitive damages because Defendants knowingly, willfully, wantonly and intentionally harmed the health, wellbeing, and financial interests of Plaintiff and its Beneficiaries;

    iv. be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

    v. recover its costs of suit, including its reasonable attorney's fees, as provided by law and pursuant to 18 U.S.C. § 1964(c), and

    vi. be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff The Trustees of the University of Pennsylvania demands trial by jury on all issues so triable.

Dated: July 11, 2025

*/s/ Katie R. Beran*
Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
(215) 985-3270
kberan@hausfeld.com

*/s/ Kyle G. Bates*
Kyle G. Bates
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
(646) 357-1100
kbates@hausfeld.com

*/s/ Farhad Mirzadeh*
Farhad Mirzadeh
**HAUSFELD LLP**
1200 17th Street, N.W.
Washington, DC 20036
(202) 540-7200
fmirzadeh@hausfeld.com

*/s/ Joshua H. Grabar*
Joshua H. Grabar
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085
jgrabar@grabarlaw.com